**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| JOSE GARCIA, MARK WILBURN, JOSE LUIS VAZQUEZ, JOSE CABALLERO, AMERICO FUENTES, FRANCISCO MARTINEZ-VILLARREAL, JOSE MEJIA, KENNETH POWELL, ROSA RAMIREZ, ALEX SANTOS, DULCE SANTOS, JAMES STEPHENS, AARON DUNNING, ALBERT FOKS, GABRIEL STRASSER, LARRY BURT, JEFFREY CASADY, ALBERT DENNIS, WLODZIMIERZ DEBSKI, IVAN DIAZ, RAMON DIAZ, MELISSA EARLEY, RANDAL MORTON HOOPER, GENERAL LEE MCKINNEY, MICHAEL KEE, ED KRAPF, JORDAN O'DONNELL, MARSELO RODRIGUEZ, CHET PAINTER, WILLIAM SHELTON, and MICHAEL WILLIN on behalf of themselves and all other persons similarly situated,<br>　　　*Plaintiffs*,<br><br>v.<br><br>VASILIA A/K/A "VAUNA" PETERSON; ROBERT PETERSON; ORMANDO GOMEZ; ALL MY SONS OF DENTON COUNTY, INC.; GRAEBEL VAN LINES HOLDINGS, LLC d/b/a GRAEBEL MOVING SERVICES; GRAEBEL VAN LINES, LLC; GRAEBEL/ HOUSTON MOVERS, LLC; GRAEBEL/ILLINOIS MOVERS, LCC, GRAEBEL/LOS ANGELES MOVERS, LLC, GRAEBEL MOVING AND WAREHOUSE CORP., GRAEBEL MOVING AND WAREHOUSE, LLC ; GRAEBEL/NORTH CAROLINA MOVERS, LLC; GRAEBEL/ST. LOUIS MOVERS, LLC; MIDCAP FINANCIAL TRUST F/K/A MIDCAP FINANCIAL, LLC; MIDCAP FUNDING X TRUST, and JOHN DOES 1-10,<br>　　　*Defendants*. | § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 4:17-cv-1601<br><br>JURY TRIAL DEMANDED |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Plaintiffs Jose Garcia, Mark Wilburn, Jose Luis Vazquez, Jose Caballero, Americo Fuentes, Francisco Martinez-Villarreal, Jose Mejia, Kenneth Powell, Rosa Ramirez, Alex Santos, Dulce Santos, James Stephens, Aaron Dunning, Albert Foks, Gabriel Strasser, Larry Burt, Jeff Casady, Wlodzimierz Debski, Albert Dennis, Ivan Diaz, Ramon Diaz, Randal Morton Hooper, General Lee McKinney, Michael Kee, Ed Krapf, Jordan O'Donnell, Marselo Rodriguez, Chet Painter, William Shelton, and Michael Willin ("Plaintiffs") file this lawsuit against Vasilia a/k/a "Vauna" Peterson, Robert Peterson, Ormando Gomez, All My Sons Moving of Denton County, Inc., Graebel Van Lines Holdings, LLC d/b/a Graebel Moving Services, Graebel/Houston Movers, LLC, Graebel Moving and Warehouse Corp., Graebel Moving and Warehouse, LLC, Graebel/Illinois Movers, LLC, Graebel/Los Angeles Movers, LLC, Graebel/North Carolina Movers, LLC, Graebel/St. Louis Movers, LLC, MidCap Funding MidCap Financial Trust f/k/a MidCap Financial, LLC, Midcap Funding X Trust, and John Does 1-10 (collectively "Defendants") and allege as follows:

## I.
## INTRODUCTION AND FACTUAL BACKGROUND

1.      Graebel Companies, Inc., a non-party to this action, is the former parent company of Graebel Van Lines, Inc., and was the largest independently owned and operated moving company in North America. Graebel was in the business of providing local, intrastate, and interstate moving, storage, and relocation services for professionals.

2.      The business operated out of 33 local terminal offices across the United States, and was headquartered in Wausau, Wisconsin and later in Aurora, Colorado. Administrative staff, terminal managers, and moving crews all worked for Graebel as employees, but the heart of the business and its primary revenue generators—the moving truck drivers—Graebel misclassified as independent contractors.

3.      In late 2014, Graebel Van Lines, Inc. underwent a change in ownership that would set off the chain of events leading to its dissolution in March of 2017. Publicly available accounts of the transaction differ, but some combination of All My Sons, Robert Peterson, and Vasilia "Vauna" Peterson acquired Graebel Van Lines and reorganized it into Graebel Van Lines, LLC, effective on or about January 1, 2015. All My Sons and its owners, Robert and Vasilia Peterson, were interested in acquiring Graebel Van Lines to expand their business capabilities from a local and short haul mover to a long haul moving company with moving and storage capabilities.

4.      MidCap Financial, LLC financed the purchase of the business and provided working capital for Graebel Van Lines, LLC moving forward with a $60,000,000.00 revolving credit facility. MidCap Funding Trust X, as successor in interest to MidCap Financial Trust f/k/a MidCap Financial, LLC, along with MidCap Financial, LLC (collectively "MidCap") has a security interest in all or virtually all of Graebel Van Lines, LLC and its subsidiaries' assets.

5.      Prior to loan closure, MidCap participated in dozens of calls with the people who would become senior management of what would become the new Graebel

business, most of whom were located in Dallas, Texas. Following loan execution, calls ranging from a few times per month to near daily occurred between MidCap and Graebel management in Dallas.

6.      Under the new organizational regime, Graebel Van Lines, LLC acted as parent, with each of the 33 local branch terminal locations operating as subsidiaries. The "Graebel Entities" in this Complaint, refers to both Graebel Van Lines, LLC and the local terminal entities.

7.      Prior to the Graebel Entities' eventual default of the the Credit and Security Agreement, Midcap was obligated to provide funding within the borrowing base availability or the revolving loan commitment to finance the Graebel business. The Graebel Entities required funding for everything, because when their receivables came in, they were deposited into a Lockbox account controlled by MidCap. All money paid to Graebel would go to that Lockbox. Once that money went into the Lockbox account, by agreement, it was MidCap's decision how much, if any, to allocate to Graebel so Graebel could pay its expenses. In fact, as soon as the money went in, MidCap swept it back out into its own accounts, on a daily basis.

8.      MidCap provided the Graebel Entities' cash flow needs on a day to day basis, following the issuance of a borrowing certificate which had the total amounts of finances for the day requested. MidCap provided the daily funding for *all of the expenses* that the Graebel Entities paid. If at any point that funding were to disappear, the Graebel Entities would quickly fold.

9.      On the business administration side, he new Graebel Van Lines ownership, which includes Ormando Gomez in addition to All My Sons and the Petersons, quickly changed implementation and enforcement of policies governing drivers. These changes resulted in Graebel asserting more direct control over its drivers in its 33 branch locations, as more fully discussed below. The new Graebel Van Lines ownership brought in Michael Humm, who became Graebel's Vice President of Safety and Compliance. He was responsible for, among other things, ensuring that Graebel Drivers complied with "company production standards, policies, and procedures."

10.      The new management brought other new changes. Prior to transfer of ownership, Graebel enjoyed the best safety rating in the business and a reputation as one of the best, if not the best, relocation service company in the United States. This quickly changed as the new management had experience with shipping and local moves but no experience in running a company designed to provide the full range of services provided by the Graebel business, which includes cross country moves, storage services, and a higher level of customer care. All My Sons vehicles began appearing in Graebel warehouses. Service began to lag, and internal logistical problems began to arise.

11.      Those problems became worse, and beginning on June 30, 2016, and through and until execution of the January 2017 amendment to the Credit and Security Agreement, the Graebel Entities were and remained in default with MidCap for failing to meet required financial metrics. Once the Graebel Entities defaulted on the Credit and Security Agreement, and save for a brief period in January 2017 when the Graebel

Entities 'cured' default by executing an Amendment to the Credit and Security Agreement, the Graebel Entities were in constant default and every decision to extend the Graebel Entities' financing was entirely at MidCap's discretion.

12.     Graebel Drivers started missing pay in early October of 2016, receiving only a portion of their pay calculated according to a formula determined by Brian Etchison at the direction of MidCap. Brian Etchison, the National Director of Recruiting and Retention at Graebel Van Lines, worked closely with MidCap as they seized control of the Graebel Entities in the fall of 2016. He was the Graebel agent most directly responsible for paying the Graebel Drivers less than they were owed in the fall of 2016. The formula calculated the "advance" Graebel Drivers would receive for their jobs, and was based upon the gross weight the drivers transported. All funding provided by MidCap to the Graebel Entities during the fall of 2016, when the Graebel Drivers stopped being paid in full and started to receive these advances, was therefore at the entire and unfettered discretion of MidCap.

13.     In November 2016, Graebel had a payroll crisis; under the borrowing certificate, there were no available funds to make payroll for the classified employees. When Ormando Gomez at Graebel approached William Gould at MidCap about the payroll shortfall, Mr. Gould indicated that he would need Robert Peterson to put up some money before he would provide additional financing. Mr. Peterson complied, and put up a guaranty contemporaneous with an amendment to the Credit and Security Agreement. Disaster averted; MidCap recognized and fulfilled its obligation as discretionary financier

to pay the employees if it was going to keep the Graebel Entities in business.

14.     In mid-December of 2016, Kevin Sullivan of MidCap met with Mr. Gomez, Chris Preston, Greg Cutlip Sr. and other members of Graebel management in Dallas, Texas to discuss the viability of the Graebel Entities' business.

15.     Despite that in-person meeting, the week before Christmas of 2016, Graebel once again fell short on its operating capital, and had to beg MidCap for extra funding outside the borrowing base to finance payroll for the workers it classified as employees. MidCap did so, lending money outside the borrowing base at its discretion and this time without requiring the Graebel Entities to enter into another amendment to the Credit and Security Agreement.

16.     Two days later, the Graebel Entities begged for money to pay the drivers, but Mr. Gould at MidCap stated "I can't let you borrow this." Bob Idzi, the interim Chief Financial Officer sent an email on December 23, 2017 begging for the money to pay the "Independent Contractors"—or rather, the drivers and workers Graebel Entities improperly classified as independent contractors. The money never came.

17.     After MidCap decided to stiff the Graebel Drivers, the laborers who generate the lion's share of the Graebel Entities' revenue, confidence in the business was destroyed. But MidCap, as discretionary financier, would then decide to inject new life into the business without paying the Graebel Drivers, despite that those drivers continued to generate the companies' revenue.

18.     In January of 2017, MidCap sent a team of Mr. Gould and two or three

other gentlemen employed by MidCap to Dallas. Mr. Gould left, but the MidCap team he brought with him stayed until Graebel Van Lines, LLC closed its doors in or around April of 2017. Mr. Sullivan with MidCap confirms their presence in Texas. "Due Diligence Services" from MidCap were in Dallas every week of 2017 that the Graebel Entities were in business. When the team showed up, they requested a "particular office, a big one," confirmed that they would have "privacy," and spent most of their time in their new office in Dallas. They officed at 12790 Merit Drive, Suite 400, Dallas, Texas 75251 from the beginning of 2017 until Graebel Van Lines closed its doors.

19.     Through the use of that Texas MidCap team and others, MidCap made numerous financial decisions to keep the company afloat, instead of foreclosing on its collateral. Disregarding the catastrophic reputational damage to the Graebel Entities' perceived ability to pay bills from vendors and independent contractors, MidCap came down to Dallas to revive the business in early 2017. MidCap and the Graebel Entities entered a new amendment to the Credit and Security Agreement and declared that Graebel was no longer in default. Mr. Gould got on the phone with vendors and told them that the Graebel Entities were out of default, that the issues the Graebel entities had were billing issues, and reaffirming that the Graebel Entities would come out of their difficulties financially sound.

20.     MidCap admits that the Graebel Entities needed outside financing to continue operating as a going concern. MidCap admits that their funding was necessary for the Graebel Entities to meet its daily capital requirements and to continue operating as

a business. MidCap undertook to perform these obligations by bringing the Graebel Entities out of default and providing them additional financing, but it did not fulfill its obligation to pay the drivers.

21.     Meanwhile, out in the field, local terminal managers represented to Graebel Drivers that they should keep performing moving services for customers at Graebel's instruction and supervision, and that the Graebel Entities would eventually pay them the entire amount they were owed, and not just advances. In an October conference call with all of the Graebel Drivers, Robert Peterson, Ormando Gomez, Greg Cutlip Sr. (a high-ranking Graebel representative), and Brian Etchison personally made this representation to all of theGraebel Drivers on a nationwide call, and did so to keep them driving for Graebel and generating revenue to be gathered and controlled by MidCap, the Graebel Entities' credit sleeve. The Graebel Drivers never received the balance owed to them out of the work for which they received advances, and worse, got paid nothing for much of the work they performed.

22.     Graebel Drivers learned that they would probably never be paid for their back wages in mid-March of 2017, when Graebel Van Lines, LLC announced its liquidation. In the time between October and mid-March, MidCap chose to direct the fruits of Graebel Drivers' labor to itself, rather than paying them their wages. Around the same time, in 2017, Midcap directed the Graebel Entities to liquidate, with the assistance of Mackinac Partners, LLC, a turnaround company. This plan of liquidation was designed to leave Graebel Drivers across the nation without their wages for the final months of

their employment with Graebel. It was executed by MidCap through the Graebel Entities and accomplished by MidCap leveraging its control over the Graebel Entities pursuant to the Credit and Security Agreement, a $60,000,000.00 revolving line of credit MidCap provided to the Petersons to purchase the Graebel Entities and to provide operating capital for the Graebel Entities as an ongoing business.

23.     That plan reached the next level when, on April 26, 2017, MidCap filed its Original Verified Petition and Application for Appointment of Receiver in Cause No. DC-17-04976, in the 160th District Court of Dallas County, Texas (the "Dallas Receivership"). MidCap filed this Receivership to liquidate the assets of the Graebel Entities for the benefit of MidCap and MidCap only. Once MidCap decided to put the Graebel Entities into Receivership, MCA officially began to work for the Receiver, but with MidCap as the only beneficiary of the Graebel Entities' estate. In its first Interim Report, the Receiver openly stated that all of the Graebel Entities' assets would be applied to benefit MidCap, to the exclusion of all other creditors.

24.     After the magistrate entered the "Agreed Receivership Order," the Graebel Drivers intervened, claiming a right to a constructive trust over the Graebel Entities' assets that are traceable to the revenue they generated. MidCap moved to strike the intervention, claiming that the Graebel Entities had not yet established their right to a constructive trust in that action. The Court denied MidCap's motion to strike, but allowed MidCap to continue daily Lockbox sweeps of the Graebel Entities' assets, a practice that continues today.

## II.
## NATURE OF ACTION

26.     This is an action arising under the Fair Labor Standards Act ("FLSA"), as well as breach of contract, quantum meruit, and common law fraud. It is brought to recover unpaid wages and compensation for work performed, liquidated damages, and attorneys' fees & expenses owed to Plaintiffs and all other persons similarly situated, who acted as Graebel Drivers during the previous three years.

27.     This case implicates Vasilia a/k/a "Vauna" Peterson, Robert Peterson, Ormando Gomez, All My Sons Moving of Denton County, Inc., Graebel Van Lines Holdings, LLC d/b/a Graebel Moving Services, Graebel/Houston Movers, LLC, Graebel Moving and Warehouse Corp., Graebel Moving and Warehouse, LLC, Graebel/Illinois Movers, LLC, Graebel/Los Angeles Movers, LLC, Graebel/North Carolina Movers, LLC, Graebel/St. Louis Movers, LLC, MidCap Funding MidCap Financial Trust f/k/a MidCap Financial, LLC, Midcap Funding X Trust, and John Does 1-10 longstanding policy of misclassifying Graebel Drivers as independent contractors, as well as their failure to compensate those employees as required by the terms of their contractual arrangements and the law.

28.     Defendants' conduct violates the FLSA, which requires all employees, such as Plaintiffs, to be compensated a wage for work performed. Defendants' failure to compensate their drivers pursuant to the terms of the parties' agreement violates Plaintiffs' statutory wage rights and their contractual rights. Furthermore, the Graebel

Defendants committed fraud by inducing the Plaintiffs and others similarly situated to continue work by making a promise to pay that Defendants never intended to fulfill.

29.     Defendants required or permitted Plaintiffs to work as drivers for their companies in excess of forty (40) hours per week, but refused to compensate them at the applicable overtime rate of pay for the hours they worked. Defendants' conduct violates the Fair Labor Standards Act, which requires non-exempt employees, such as Plaintiffs, to be compensated for their overtime work at a rate of one and one-half times their regular rate of pay.  *See* 29 U.S.C. § 207(a). Plaintiffs were not "exempt" employees for purposes of calculating overtime. 29 U.S.C. § 213. Plaintiffs were not governed by the maximum hour requirements of 49 U.S.C. § 31502.

30.     Plaintiffs bring a collective action to recover unpaid wages owed to them and all other similarly situated employees, current and former, of Defendants, who worked as Graebel Drivers at any time during the three year period before this Complaint was filed up to the present. These class members should be informed of the pendency of this action and apprised of their rights to join in the manner envisioned by *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989) and its progeny.

### III.
### PARTIES

31.     Plaintiff Jose Garcia is an individual residing in Harris County, Texas.

32.     Plaintiff Mark Wilburn is an individual residing in Mecklenburg County, North Carolina.

33.     Plaintiff Jose Luis Vazquez is an individual residing in Milwaukee County, Wisconsin.

34.     Plaintiff Jose Caballero is an individual residing in Fort Bend County, Texas.

35.     Plaintiff Americo Fuentes is an individual residing in Fort Bend County, Texas.

36.     Plaintiff Francisco Martinez-Villarreal is an individual residing in Harris County, Texas.

37.     Plaintiff Jose Mejia is an individual residing in Harris County, Texas.

38.     Plaintiff Kenneth Powell is an individual residing in New Haven County, Connecticut.

39.     Plaintiff Rosa Ramirez is an individual residing in Harris County, Texas.

40.     Plaintiff Alex Santos is an individual residing in Harris County, Texas.

41.     Plaintiff Dulce Santos is an individual residing in Harris County, Texas.

42.     Plaintiff James Stephens is an individual residing in Mecklenburg County, North Carolina.

43.     Plaintiff Aaron Dunning is an individual residing in Brazoria County, Texas.

44.     Plaintiff Albert Foks is an individual residing in Arapahoe County, Colorado.

45.     Plaintiff Gabriel Strasser is an individual residing in Seminole County,

Florida.

46.     Plaintiff Larry Burt is an individual residing in St. Louis County, Missouri.

47.     Plaintiff Jeffrey Casady is an individual residing in Douglas County, Nebraska.

48.     Plaintiff Wlodzimierz Debski is an individual residing in Pasco County, Florida.

49.     Plaintiff Albert Dennis is an individual residing in East Baton Rouge Parish, Louisiana.

50.     Plaintiff Ivan Diaz is an individual residing in Fort Bend County, Texas.

51.     Plaintiff Ramon Diaz is an individual residing in Harris County, Texas.

52.     Plaintiff Randal Morton Hooper is an individual residing in Lake County, Illinois.

53.     Plaintiff General Lee McKinney is an individual residing in Union County, North Carolina.

54.     Plaintiff Michael Christopher Kee is an individual residing in Mecklenberg County, North Carolina.

55.     Plaintiff Ed Krapf is an individual residing in McHenry County, Illinois.

56.     Plaintiff Jordan O'Donnell is an individual residing in DuPage County, Illinois.

57.     Plaintiff Marselo Rodriguez is an individual residing in Dallas County, Texas.

58.    Plaintiff Chet Painter is an individual residing in Lake County, Illinois.

59.    [Deleted].

60.    Plaintiff Michael Willin is an individual residing in Lake County, Illinois.

61.    Defendant Vasilia a/ka "Vauna"Peterson in an individual residing in Dallas County, Texas.

62.    Defendant Robert Peterson in an individual residing in Dallas County, Texas.

63.    Defendant Ormando Gomez is an individual residing in Dallas County, Texas.

64.    Defendant All My Sons of Denton County, Inc. is a foreign corporation doing business in Texas and has appeared in this lawsuit.

65.    Defendant Graebel Van Lines Holdings, LLC d/b/a Graebel Moving Services is a Texas limited liability company has appeared in this lawsuit.

66.    Defendant Graebel Van Lines, LLC is a Texas limited liability company and has appeared in this lawsuit.

67.    Defendant Graebel/Illinois Movers, LLC is an Illinois limited liability company doing business in Texas, and it may be served through the Secretary of State at its primary place of business, 1701 Airport Road, Waukesha, Wisconsin 53188. Graebel/Illinois Movers, LLC does not have a designated agent for service of process, and the lawsuit arises from its significant contacts in and with the State of Texas.

68.    Defendant Graebel/Los Angeles Movers, LLC is a California limited

-15-

liability company doing business in Texas, and it may be served through the Secretary of State at its primary place of business, 912 E Arlee Place, Anaheim, California 92805. Graebel/Los Angeles Movers, LLC does not have a designated agent for service of process, and the lawsuit arises from its significant contacts in and with the State of Texas.

69.     Defendant Graebel/Houston Movers, LLC is a Texas limited liability company and has appeared in this lawsuit.

70.     Defendant Graebel Moving and Warehouse Corp. is a Wisconsin Corporation doing business in Texas, and has appeared in this lawsuit.

71.     Defendant Graebel Moving and Warehouse, LLC is a Wisconsin Limited Liability Company and is the successor-in-interest to Graebel Moving and Warehouse Corp. It does business in Texas, and it may be served through the Secretary of State at its primary place of business, 1701 Airport Road, Waukesha, Wisconsin 53188. Graebel Moving and Warehouse, LLC does not have a designated agent for service of process, and the lawsuit arises from its significant contacts in and with the State of Texas.

72.     Defendant Graebel/North Carolina Movers, LLC is a North Carolina limited liability company doing business in Texas and has appeared in this lawsuit.

73.     Defendant Graebel/Illinois Movers, LCC is an Illinois Limited Liability Company doing business in Texas, and it may be served through the Secretary of State at its primary place of business, 1011 Arbury Dr., Buffalo Grove, Illinois 60089. Graebel/Illinois Movers, LCC does not have a designated agent for service of process, and the lawsuit arises from its significant contacts in and with the State of Texas.

74. Defendants identified in Paragraphs 51-59 are collectively referred to in this Complaint as the "Graebel Entities."

75. Defendant MidCap Financial Trust, f/k/a/ MidCap Financial Services, LLC is a Maryland Trust and former Maryland Limited Liability Company doing business in Texas and has appeared in this lawsuit.

76. Defendant MidCap Funding X Trust is a Delaware statutory trust doing business in Texas and has appeared in this lawsuit.

77. This Court has jurisdiction over MidCap Financial Trust f/k/a MidCap Financial Services, LLC and MidCap Funding X Trust (collectively "MidCap") in this case on the following bases more fully set forth in Plaintiffs' Response in Opposition to MidCap's Rule 12(B)(2),(3), and (6) Motions to Dismiss Plaintiffs' First Amended Complaint (ECF No. 47) and Plaintiffs' Supplemental Response to Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 92):

    a. MidCap consented to jurisdiction in Texas due to its prosecution of a Receivership in Dallas County District Court;

    b. MidCap is subject to the jurisdiction of this Court as joint employers of Plaintiffs pursuant to the FLSA;

    c. MidCap is subject to the jurisdiction of this Court under agency principles in relation to the Graebel Entities;

    d. MidCap is the Graebel Entities alter ego for jurisdictional purposes; and

    e. MidCap aided and abetted the Graebel Entities' fraud in Texas.

78.     Defendants John Doe 1-10 are unnamed individuals and entities who, through the course of discovery, may be revealed to be employers of Plaintiffs pursuant to the Fair Labor Standards Act or may be revealed to be alter egos of certain Graebel entities.

## IV.
## JURISDICTION AND VENUE

79.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1367 and 29 U.S.C. § 216(b).

80.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because Defendants and Plaintiffs transacted business within this judicial district and the events underlying this complaint occurred within this judicial district.

81.     Alternatively, if venue is improper pursuant to 28 U.S.C. § 1391(b)(2), then venue is proper pursuant to 28 U.S.C. § 1391(b)(3), because there is no other judicial district in which this suit may be brought, and this is a judicial district where a defendant is subject to this Court's personal jurisdiction with respect to this action.

## V.
## FLSA COVERAGE

82.     At all material times, Defendants Vasilia a/k/a "Vauna" Peterson, Robert Peterson, Ormando Gomez, All My Sons Moving of Denton County, Inc., Graebel Van Lines Holdings, LLC d/b/a Graebel Moving Services, Graebel/Houston Movers, LLC, Graebel Moving and Warehouse Corp., Graebel Moving and Warehouse, LLC, Graebel/Illinois Movers, LLC, Graebel/Los Angeles Movers, LLC, Graebel/North

-18-

Carolina Movers, LLC, Graebel/St. Louis Movers, LLC, MidCap Funding MidCap Financial Trust f/k/a MidCap Financial, LLC, Midcap Funding X Trust, and John Does 1-10 have been enterprises within the meaning of 3(r) and 3(s) of the FLSA and Defendants have had a gross annual business volume in excess of $500,000.00. 29 U.S.C. §§ 203(r), 203(s).

83.    At all material times, Plaintiffs were individual employees who engaged in commerce or in the production of goods for commerce as required by 29 U.S.C. §§ 206 and 207.

84.    Upon information and belief, Defendants Vasilia a/k/a "Vauna" Peterson, Robert Peterson, Ormando Gomez, All My Sons Moving of Denton County, Inc., Graebel Van Lines Holdings, LLC d/b/a Graebel Moving Services, Graebel/Houston Movers, LLC, Graebel Moving and Warehouse Corp., Graebel Moving and Warehouse, LLC, Graebel/Illinois Movers, LLC, Graebel/Los Angeles Movers, LLC, Graebel/North Carolina Movers, LLC, Graebel/St. Louis Movers, LLC, MidCap Funding MidCap Financial Trust f/k/a MidCap Financial, LLC, Midcap Funding X Trust, and John Does 1-10 had the authority to hire and fire employees, make decisions regarding Graebel's policies and procedures, make decisions regarding employee compensation and capital expenditures, and ultimately, make the decision not to pay drivers pending the liquidation of Graebel Van Lines, LLC and the other Graebel Entities.

85.    Pursuant to 29 U.S.C. § 203(d), Defendants Vasilia a/k/a "Vauna" Peterson, Robert Peterson, Ormando Gomez, All My Sons Moving of Denton County, Inc.,

-19-

Graebel Van Lines Holdings, LLC d/b/a Graebel Moving Services, Graebel/Houston Movers, LLC, Graebel Moving and Warehouse Corp., Graebel Moving and Warehouse, LLC, Graebel/Illinois Movers, LLC, Graebel/Los Angeles Movers, LLC, Graebel/North Carolina Movers, LLC, Graebel/St. Louis Movers, LLC, MidCap Funding MidCap Financial Trust f/k/a MidCap Financial, LLC, Midcap Funding X Trust, and John Does 1-10 (collectively "Defendants")acted directly or indirectly in the interest of Plaintiffs and other Graebel Drivers' employment as their employer, which makes them jointly liable as employers under the FLSA.

## VI.

## STATEMENT OF FACTS

86.    Plaintiffs were employed during the last three years as Graebel Drivers. During the course of their employment, when a work assignment became available, a Graebel Entity would contact a Graebel Driver, such as Plaintiffs, and if the driver accepted the assignment, he or she was  responsible for the following, at the direction of Defendants:

> loading and unloading, packing and unpacking, crating and uncrating, pad-wrapping, decking, strapping, securing, unwrapping, debris removal, and other services that Company [Graebel/Houston Movers, LLC], or Carrier [Graebel Van Lines, LLC], has agreed to provide for its customer. The transportation and related services will be as indicated in the orders for service, other informational documents, applicable tariffs, contracts, government tenders, bid documents, and Graebel's Policies and Procedures.

(*See* <u>Exhibit 2</u>, p. 3, Graebel Independent Contractor Agreement for Transportation Services).[1] Furthermore, "[d]uring the time the Vehicle is operated by the Company [Graebel/Houston Movers, LLC] and/or Carrier [Graebel Van Lines, LLC], Company and/or Carrier shall have the exclusive possession, control, and use of the Vehicle and shall assume complete responsibility for the operation of the Vehicle." (*Id.*).

87.     In addition to requirements set forth in the agreement itself, Graebel's Policies and Procedures in turn incorporate sixteen independent documents setting forth additional requirements which govern the terms of employment between drivers and Graebel, and which are made available to drivers "on request" and "during normal business hours." (<u>Exhibit 1-K</u>, Graebel's Policies and Procedures).

88.     Graebel, through their Vice President of Safety and Compliance, Michael Humm, and at each terminal through their local terminal managers, heavily regulated the Graebel Drivers to make sure they complied with Graebel's Policies and Procedures. At the nationwide level, Mr. Humm regulated the Graebel Drivers in the following manner:

- He sent out a written memorandum requiring every Graebel Driver to purchase and keep electronic devices for keeping track of driver logs for the benefit of Graebel.

- He required the Graebel Drivers to have unnecessary repair and maintenance work done on the Graebel Drivers' tractors and trailers.

---

[1]     <u>Exhibit 1</u> is Jose Garcia's contract. Other drivers may have signed different forms of contracts, but based upon interviews with named plaintiffs, the above is a factually accurate description of the reality of their employment relationship.

- He suspended Graebel Drivers from working when they did not comply with Graebel policy. For example, he suspended Jesus Esquivel for receiving a commercial traffic ticket in Wyoming, and suspended Jose Caballeros for having a taillight out on his trailer.

89.    As a matter of economic reality, Graebel Drivers are economically dependent upon Graebel. Graebel controls the method and manner in which the drivers perform their duties, have a substantial financial investment in the Graebel Drivers' expenses, and control the opportunity for profit and loss by acting as gatekeeper for getting work assignments. The Graebel Drivers' duties involve largely unskilled labor, and the driver's relationship with Graebel is intended to be permanent. As a factual matter, the vast majority of Graebel Drivers drive for Graebel full time and do not drive for other carriers.

90.    Graebel Drivers, like Plaintiffs, are not paid a wage as required by the FLSA. Nor are they paid overtime, even though during the time the Plaintiffs worked for the Defendants, they regularly worked in excess of 40 hours in a workweek. Instead, Graebel Drivers are compensated pursuant to a complex Contractor's Rate Schedule.

91.    Following completion of a work assignment, Graebel Drivers are required to submit a form for payment calculated pursuant to the the Contractor's Rate Schedule, which is then purportedly credited into the driver's Settlement Account, which is controlled by the Graebel Entities. According to the parties' agreement, the Graebel Drivers can have the balance in the Settlement Account directly deposited into a bank account of their choosing bi-monthly or they can leave it in the Settlement Account

where it purportedly earns interest and can be collected at the driver's convenience, similar to a checking account at a financial institution.

92. Beginning in the fall of 2016, Graebel stopped paying Plaintiffs the full amount of wages owed, and began to pay a partial 'advance.' Upon information and belief, the decision not to pay the Graebel Drivers the full amount they were owed came from MidCap.

93. The Credit and Security Agreement between MidCap and the Graebel Entities granted MidCap (defined as "Agent" and as "Lender") virtual control over all of the Graebel Entities (defined as "Borrowers" and as "Credit Parties"). (§ 1.1). MidCap controlled the Graebel Entities through use of the contract terms, including but not limited to the following:

    a.    Principal Amounts owed by the Graebel Entities are due and payable immediately to MidCap upon receipt payment on accounts receivable. (§§ 1.1, 2.1).

    b.    The loan required the Graebel Entities to maintain a "Lockbox" account opened at the direction and under the control of MidCap. The Graebel Entities are required to deposit all accounts receivable revenue (unless the revenue comes from the government or from natural persons writing checks) directly into the Lockbox account. That revenue is then transferred by MidCap or the Lockbox Bank to a Payment Account controlled and owned by MidCap, at the end of each day. (§§ 1.1, 2.11).

    c.    MidCap "without notice or demand" can "take and hold any Collateral for the payment of the Obligations" relating to the loan. (§ 2.10). Collateral includes:

            all goods, Accounts [including accounts receivable], Equipment, Inventory, contract rights or rights to payment of

money, leases, license agreements, franchise agreements, General Intangibles, commercial tort claims, documents, instruments (including any promissory notes), chattel paper (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether tangible or electronic), cash, deposit accounts, securities accounts, fixtures, letter of credit rights (whether or not the letter of credit is evidenced by a writing), securities, and all other investment property, supporting obligations, and financial assets, whether now owned or hereafter acquired, wherever located; [] all of [the Graebel Entities] books and records relating to any of the foregoing; and [] any and all claims, rights, and interests in any of the above and all substitutions for, additions, attachments, accessories, accessions and improvements to and replacements, products, proceeds and insurance proceeds of any or all of the foregoing.

(Schedule 9.1).

d.    The Graebel Entities must provide MidCap with a monthly "consolidated balance sheet, cash flow and income statement" including "evidence of payment and satisfaction of all payroll [] together with a an unqualified opinion on the financial statements from an independent certified public accounting firm acceptable to [MidCap] in its reasonable discretion." (§ 4.1).

e.    The Graebel Entities may only use the loan proceeds to finance the Petersons and All My Sons' acquisition of the Graebel Entities and for general working capital of the Graebel Entities. (§ 4.7).

f.    The Graebel Entities must notify MidCap in writing if Robert Peterson is not Chairman of the Board or of any change in the Graebel Entities' board of directors or executive officers. (§ 4.15).

g.    The Graebel Entities (all LLC's) may not make membership distributions except as expressly provided by the Credit and Security Agreement. (§ 4.15).

h.    The Graebel Entities cannot modify Material Contracts without MidCap's review and permission. (§ 5.10). Material Contracts include 61 enumerated

-24-

written and oral contracts covering lease and employment matters, and includes leases for each of the Graebel Terminals, as well as All My Sons Moving and Storage of Denver, Inc. (Schedule 3.17).

i. The Graebel Entities may not engage in any "line of business other than those engaged in on the Closing Date" for the loan. The Graebel Entities may not change their "normal billing payment and reimbursement policies and procedures with respect to its Accounts (including, without limitation, the amount and timing of finance charges, fees and write-offs)." (§ 5.11).

j. The Graebel Entities may not sell and lease back any asset. (§ 5.13).

k. The Graebel Entities may make no sale based on credit that is not within the ordinary course of business unless they receive advance consent from MidCap. (§ 5.16).

l. MidCap is entitled to act as agent for the Graebel Entities in assigning rights of payment relating to the loan. (§ 11.17(a)(iii)).

m. Following an event of default, MidCap may direct and apply all proceeds it receives on behalf of the Graebel Entities, and "shall have the exclusive right to apply and to reapply any and all payments received against the Obligations in such manner as [MidCap] may deem advisable in its good faith." (§ 10.07(a)).

94. In the early fall of 2016. It was around that time that Graebel Van Lines began conducting layoffs at its former headquarters of Wausau, Wisconsin. (http://wsau.com/news/articles/2016/sep/15/graebel-announces-wausau-layoffs/).

95. Upon information and belief, at or around this time, MidCap leveraged the threat of exercising its default remedies (which would give MidCap complete control) to exert substantial leverage on the Graebel Entities and gain management control over them.

96. Beginning in October and November 2016, and a result of MidCap exerting

this leverage, the Graebel Entities paid the Graebel Drivers based upon a formula created by Brian Etchison and calculated by weight of cargo moved. Pursuant to the terms of the Credit and Security Agreement, the Graebel Entities were required to disclose the full amount paid to Graebel Drivers in their monthly reports to MidCap. (Credit and Security Agreement, § 4.1). Upon information and belief, MidCap, either on its own or through it agent, Mackinac Partners, directed the Graebel Entities to cut costs, and that included cutting the Graebel Drivers' pay. Eventually, at MidCap's direction, the Graebel Entities stopped paying its drivers at all.

97.    After Graebel Van Lines and the local terminal entities quit paying the Graebel Drivers, they continued to encourage drivers to take work assignments and invoice them based on the promise that they would eventually be paid.

98.     Promises became excuses, and eventually, in March of 2017, Graebel publicly announced its intent to liquidate. Adding insult to injury, rather than paying the Graebel Drivers, it directed them (and all of its other creditors) to make a claim by email and be paid if "excess funds are available" following satisfying its secured creditor (MidCap) in liquidation. (*See* https://www.graebelmoving.com/customer-and-creditor-notice/).

99.    All of the Defendants knew of, approved of, and benefited from Plaintiffs' regular and overtime work, even after the Graebel Entities stopped paying drivers. Defendants, via the Graebel Entities, induced Plaintiffs to keep taking work assignments based on the promise of payment for work performed.

100.    Defendants did not make a good faith effort to comply with the minimum wage or overtime provisions contained within the FLSA. Defendants' actions were willful and in blatant disregard for Plaintiffs' federally protected rights.

101.    As non-exempt employees, Plaintiffs are entitled to be paid their regular wages and to be paid an overtime premium for all work performed during the hours worked over forty (40) in each workweek. Defendants regularly and consistently failed to pay Plaintiffs the required overtime premium while they were employed by Defendants, and Plaintiffs worked in excess of forty (40) hours in many of the weeks they worked for the Defendants.

**VI.**
**CAUSES OF ACTION**

**COUNT ONE**
**VIOLATION OF THE FLSA—FAILURE TO PAY WAGES**
(all named Defendants)

102.    Based on the foregoing, Defendants violated the FLSA by failing to properly compensate Plaintiffs for work performed in the employ of the Defendants. 29 U.S.C. § 206.

103.    Defendants Vasilia a/k/a "Vauna" Peterson, Robert Peterson and Ormando Gomez, and All My Sons of Denton County, Inc. are "Employers" within the meaning of the FLSA because they possessed the power to hire and fire Graebel Drivers, supervised and controlled the method and manner of how the Graebel Drivers worked by implementing new policies governing Graebel Drivers beginning at the end of 2014, determined how much the Graebel Drivers would be paid, and maintained records relating to the Graebel Drivers' employment.

104.    Graebel Van Lines, LLC and the local terminal entities, including Graebel Van Lines Holdings, LLC d/b/a Graebel Moving Services, Graebel/Houston Movers, LLC, Graebel Moving and Warehouse Corp., Graebel Moving and Warehouse, LLC, Graebel/Illinois Movers, LLC, Graebel/Los Angeles Movers, LLC, Graebel/North Carolina Movers, LLC, and Graebel/St. Louis Movers, LLC, are "Employers" within the meaning of the FLSA. They each directly controlled the Graebel Drivers on a daily basis, through policies implemented by Michael Humm, other nationwide policy makers, and

through the local terminal managers. They suspended and terminated Graebel Drivers, maintained records, including payment information, and driver logs, and contracts setting forth the terms of the Graebel Drivers' employment.

105.    MidCap Financial Trust f/k/a MidCap Financial, LLC and MidCap Funding X Trust are "Employers" within the meaning of the FLSA. Upon information and belief, beginning around the fall of 2016, MidCap exerted its financial leverage and security interest in the Graebel Entities' assets to seize control of the Graebel Companies. MidCap, directly or through its agent, Mackinac Partners, began to control the Greabel Entities' employment decisions with respect to the Graebel Drivers using the power of the purse. Most crucially, once MidCap seized control of the Graebel Drivers' assets, it made the decision when and how to pay the Graebel Drivers, and ultimately, not to pay them at all.

106.    Plaintiffs have suffered damages as a direct result of Defendants' unlawful actions.

107.    Defendants are liable to Plaintiffs for wages, unpaid overtime compensation, liquidated damages, attorneys' fees & expenses under the FLSA, for the three-year period preceding the filing of this lawsuit. 29 U.S.C. § 216.

## COUNT TWO
## VIOLATION OF THE FLSA—FAILURE TO KEEP RECORDS
### (all named Defendants)

108.   Defendants failed to keep adequate records of Plaintiffs' and Class Members work hours and pay in violation of 29 U.S.C. § 211(c).

109.   Federal law mandates that an employer is required to keep for three years all payroll records and other records containing, among other things, the following information:

   a.   The time of day and day of week on which the employees' work week begins;

   b.   The regular hourly rate of pay for any workweek in which overtime compensation is due under the FLSA;

   c.   An explanation of the basis of pay by indicating the monetary amount paid on a per hour, per day, per week, or other basis;

   d.   The amount and nature of each payment which is excluded from the "regular rate";

   e.   The hours worked each workday and total hours worked each workweek;

   f.   The total daily or weekly straight time earnings or wages due for hours worked during the workday or workweek, exclusive of premium overtime compensation;

   g.   The total premium for overtime hours. This amount excludes the

straight-time earnings for overtime hours recorded under this section;

h.  The total additions to or deductions from wages paid each pay period including employee purchase orders or wage assignments;

i.  The dates, amounts, and nature of the items which make up the total additions and deductions;

j.  The total wages paid each pay period; and

k.  The date of payment and the pay period covered by payment.

29 C.F.R. § 516.2, 516.5.

110.   Defendants have not complied with federal law and have failed to maintain such records with respect to Plaintiff and Class Members. Because Defendants' records are inaccurate or inadequate, Plaintiff and Class Members can meet their burden under the FLSA by proving that they, in fact, performed work for which they were not compensated, and produce sufficient evidence to show the amount and extent of the work as a matter of just and reasonable inference.

## **COUNT THREE**
## **BREACH OF CONTRACT**
### (all named Defendants)

111.   The Graebel Entities materially breached their agreements with the Graebel Drivers by failing to pay Plaintiffs the amount due and owing under the agreement for compensable work performed for the Graebel Entities. The Graebel Entities further breached their agreements with the Graebel Drivers by failing to return 'escrow' or 'reserve' deposits paid to Defendants at the commencement of the Graebel Drivers' employment, by wrongfully charging for license plate renewal for a full year one month before Graebel's liquidation, and by removing the mechanism to appeal or challenge claims made by customers against Graebel Drivers. Many of these claims were improper and were simply deducted from Graebel Drivers' pay. The named Plaintiffs alone have incurred damages over $500,000.00.

112.   The remaining Defendants are liable for breach of contract under veil-piercing and alter ego theories, discussed below.

## **COUNT FOUR**
## **QUANTUM MERUIT**
### (all named Defendants)

113.    In the alternative to Plaintiffs' breach of contract claims, Plaintiffs provided

compensable and valuable moving services for the benefit of Ormando Gomez, Robert

and Vasilia a/ka/ "Vauna" Peterson, All My Sons, and the Graebel Entities, and Mid Cap,

who accepted those services knowing that Plaintiffs expected compensation for them.

## COUNT FIVE
### FRAUD
(all named Defendants)

114.     After the Graebel Entities quit paying Graebel Drivers, it induced them to continue taking work assignments on promises that payment would be forthcoming. These representations were directed from Graebel Van Lines, LLC's management and communicated to the individual drivers through Graebel's local driver liaisons, usually the terminal's general managers.

115.     These representations were made consistently to the Graebel Drivers right up until the Graebel Entities announced their intention to liquidate in March of 2017. They were made when the Graebel Entities had no intention of paying the drivers and they were made with the specific intent to induce the drivers to keep generating revenue for the Graebel Entities. No agent for the Graebel Entities disclosed to the Graebel Drivers that they would in all likelihood never be paid for the work they performed. Graebel employees represented to the Graebel Drivers that they would be paid and encouraged them to continue driving even though they had stopped being paid in full and were only given partial 'advances.' For example:

- In Houston, Dan Tanner and Done Rupe made these representations to Jose Garcia, Jose Caballero, Americo Fuentes, Franciso Martinez-Villareal, Jose Mejia, Rosa Ramirez, Alex Santos, Dulce Santos, and Aaron Dunning.

- In St. Louis, Wesley (Randy) Roger made these representations to Larry Burt.

- In New Jersey, Michael DiMarzo made these representations to Kevin Cooks and

-34-

Rufus Sorrells.

- In Wassau, Wisconsin, Craig and Mark Reineking made these representations to Albert Dennis.


- In Roscoe Illinois and in Wisconsin, Cory Gilles made these representations to Robert Catterson.

- In Buffalo Grove, Illinois, David Marsden made these representations to Jordan O'Donnell and Chet Painter. Mr. Marsden specifically represented to Jordan O'Donnell in February of 2017 that the priority determination of which Graebel Drivers would be paid first would be based on whether they kept driving after they stopped being paid.

- In Charlotte, North Carolina, Jason Studer and Brian Ash made these representations to Melissa Earley.

116.   Upon information and belief, the Graebel representatives making these representations were following the direction of upper management. Operations managers and terminal managers had weekly conference calls with Terry Bruso, Graebel Van Lines Director of Quality Assurance. Brian Etchison was usually on these calls as well. The company line disseminated to the local terminal and operations managers was this — IRS Form 1099s ("1099s") for the Graebel Drivers for calendar year 2016 would be reconciled in early 2017. In other words, Graebel Drivers would receive 1099s in 2017 that accurately reflected the amount of money they should have earned--and the Graebel Drivers would be paid in full.

117.   Additionally, on several occasions the Graebel Entities' upper management directly represented to the Graebel Drivers that they would be paid, and made these representations to induce them to keep driving for Graebel and generate revenue:

- In October 2016, when Graebel Drivers first stopped being paid, Robert Peterson, Ormando Gomez, Greg Cutlip Sr., and Brian Etchison conducted a conference call with all of the Graebel Drivers available. The Graebel Representatives assured the Graebel Drivers that they would all be paid and did so to induce the Graebel Drivers to continue to work while only receiving 'advances.'

- In a December 8, 2016 email, Brian Etchison emailed the Graebel Drivers and represented that "while we have some challenges in the short term, we are committed to paying you funds for work performed..." (Exhibit 3).

- On February 3, 2017, Dan Dailey sent an email summarizing an "All Driver Call" reiterating that the Graebel Van Lines were committed to "bringing us back to the glory days of Graebel," and stating that "[t]o accomplish this, we need you...our best movers!" Speaking to the "difficult times" the Graebel Drivers were facing, he stated "[t]he new leadership owns it and is committed to make good on it." (Exhibit 4).

118.   These misrepresentations were false, material, made knowingly or recklessly, and the representations were made with the intent to induce Graebel Drivers, like Plaintiffs, to continue to take work assignments and perform moving services without getting paid. At the time the Graebel Entities made these representations, they had no intent of paying the Graebel Drivers. Graebel Drivers, like Plaintiffs, relied on these representations to their detriment and suffered damages as a result.

119.   Internal Graebel Employees agree. In a March 30, 2017 email from Kenny Sommers, Regional Operations Manager for Region 5 to a Graebel Driver, he stated--

It has come to my attention that you too were affected by what appears to be a vast amount deception by our Contractor Care Group within the final months of operations here at Graebel Moving. Although it is no longer my role within the company, I have still involved myself in the procedures implemented by that team in an effort to understand how much fraud was and still is taking place.

I have discovered that it was the specific intent of both person in charge of

that group (Brian Etchison and Connie Fox) to mislead you and other contractors regarding the true balance of your accounts by telling you that your debts were being paid. This was done to minimize any debts owed *to* you by the company or otherwise make it appear as if that was the case. This form of rampant dishonesty still persists today since operations have ceased and the banks have taken over. Bear in mind all of this was done while violating your contract and refusing to provide any of our contractors with detailed statements or back up.

….

There should be nothing but shame for the hierarch within this company, sadly in the end they will blame you and me for their failures.

(Exhibit 5). The above communications shows that Graebel Van Lines and those who exercised control over them deliberately planned a wrap up strategy designed to leave the Graebel Drivers high and dry.

120.   Robert Peterson and Ormando Gomez are personally liable for their own fraudulent misrepresentations including but not limited to those made in the October conference call.

121.   Robert Peterson, Vasilia a/k/a "Vauna" Peterson, Ormando Gomez and MidCap are liable for fraud via conspiracy and aiding and abetting liability.

122.   MidCap is liable for Graebel agents' representations. The Graebel Entities acted as agents for MidCap when instructing Graebel employees to keep Graebel Drivers driving without pay.

123.   MidCap and All My Sons are liable under alter-ego and veil-piercing theories.

## COUNT SIX
## CONSPIRACY AND AIDER AND ABETTOR LIABILITY FOR FRAUD
(against Robert Peterson, Vasilia a/k/a "Vauna" Peterson, Ormando Gomez, and
MidCap)

124.   In addition to the direct misrepresentations, Robert Peterson, Vasilia a/k/a "Vauna" Peterson, Ormando Gomez, and MidCap are liable to the Graebel Drivers for acting in concert with the Gaebel Entities to defraud the Graebel Drivers.

125.   Robert Peterson and Ormando Gomez engaged in tortious acts in concert with the Graebel Entities and pursuant to a common design with the Graebel Entities to cause Graebel Drivers to work and generate revenue for the benefit of the Graebel Entities and ultimately MidCap.

126.   Upon information and belief, Robert Peterson, Vasilia a/ka "Vauna" Peterson, Ormando Gomez, and MidCap knew that the Graebel Entities' conduct, as detailed under Count Four, constituted a breach of duty to the Graebel Drivers and gave substantial assistance or encouragement to the Graebel Entities by:

a.     Failing to inform the Graebel Drivers that they would not be paid for the work they performed;

b.     Controlling and administering the finances of the Graebel Entities in such a manner that would cause the Graebel Drivers not be paid for work they performed; and

c.     Directing terminal managers, regional managers, and other agents of Graebel to represent to Graebel Drivers that they should keep driving

despite not having been paid for work that was performed and based upon the representation that Graebel Drivers would be paid.

127.   Upon information and belief, Robert Peterson, Vasilia a/ka "Vauna" Peterson, Ormando Gomez, and MidCap had a meeting of the minds to defraud Graebel Drivers by representing or causing representations to be made to the Graebel Drivers that they would be paid for work they performed.

128.   The following overt acts occurred in furtherance of this agreement:

a.   The misrepresentations described in Count Four by Robert Peterson and Ormando Gomez;

b.   MidCap's failure to allocate or make capital available to pay the Graebel Drivers, even while knowing that the Graebel Drivers were not being paid for their work and had been told to keep working on the promise of future pay;

c.   Robert Peterson, Vasilia a/k/a "Vauna" Peterson and Ormando Gomez' administration and control of the Graebel Entities in such a way as to prevent the Graebel Drivers from being paid for their work.

129.   Robert Peterson, Vasilia a/ka "Vauna" Peterson, Ormando Gomez, and MidCap's actions caused the Graebel Drivers not to be paid for their work, and for Graebel Drivers to continue to be told that they would be paid for their work.

## SUCCESSOR LIABILITY OF ASSET PURCHASERS
### (John Does 1-10)

130.    Upon information and belief, many of the terminals sold or are selling all or substantially all of their assets as a going concern. In acquiring these assets, the companies that acquired them acquired the Graebel Entities' FLSA liabilities.

131.    Those companies are unknown to the Graebel Drivers at this time and are indentified in this pleading as John Does 1-10.

132.    When liability is based on a violation of a federal statute relating to labor relations or employment, a federal common law standard of successor liability applies that is more favorable to Plaintiffs.

133.    Federal common law presumes successor liability absent the showing of sufficient good reasons to the contrary.

134.    There is a substantial continuity of business operations from the Graebel Entities to those companies that purchased the assets of Graebel Entities operating out of specific terminals. Those companies were on notice of the Graebel Drivers' claims, and are able to provide relief to the Graebel Drivers.

## VEIL PIERCING AND ALTER EGO

(against MidCap, Ormando Gomez, Robert and Vasilia a/ka/ "Vauna"
Peterson, All My Sons, and Graebel Van Lines, LLC)

135.   The Graebel Drivers hereby expressly allege that Defendants MidCap,

Ormando Gomez, Robert Petersion, Vasilia a/k/a "Vauna" Peterson, All My Sons,

Graebel Van Lines, LLC, and John Does 1-10 are each liable under veil-piercing and/or

alter-ego theories of vicarious liability.

136.   Specifically, the corporate forms of the Graebel Entities ought to be

disregarded because, *inter alia*:

> a.  their forms were used as a sham to perpetrate a fraud insofar as one
>     or more of the defendants (MidCap, Ormando Gomez, Robert
>     Peterson, Vasilia "Vauna" Peterson, All My Sons, and Graebel Van
>     Lines)  used the Graebel Entities to dupe the Graebel Drivers into
>     continuing to drive for Graebel.  The Defendants did so by directing
>     Graebel employees to make false promises of payment even though
>     the Defendants knew at that time that they had no intention of
>     providing Graebel with sufficient funds to pay the Graebel Drivers
>     for their work;
>
> b.  their forms were organized and operated as a mere tool or business
>     conduit ("alter ego") of the Defendants (MidCap, Ormando Gomez,
>     Robert Peterson, Vasilia Peterson, All My Sons, and Graebel Van
>     Lines);
>
> c.  their forms were used to evade an existing legal obligation insofar as
>     one or more of the Defendants (MidCap, Ormando Gomez, Robert
>     Peterson, Vasilia a/k/a "Vauna" Peterson, All My Sons, and Graebel
>     Van Lines)  used the Graebel Entities as a means to shield
>     themselves (the Defendants) from liability for claims by unpaid

-41-

Graebel Drivers, who interfaced with the Graebel Entities and operated out of their respective local terminals;

d.  their forms were used to circumvent a statute insofar as one or more of the Defendants (MidCap, Ormando Gomez, Robert Peterson, Vasilia a/k/a "Vauna" Peterson, All My Sons, and Graebel Van Lines) attempted to insulate themselves from liability by utilizing the Graebel Entities as shield-like intermediaries between the Graebel Drivers and the Defendants;

e.  the Graebel Entities were inadequately capitalized with the effect of creating an injustice insofar as, at least as early as October 2016, one or more of the Defendants (MidCap, Ormando Gomez, Robert Peterson, Vasilia a/k/a "Vauna" Peterson, All My Sons, and Graebel Van Lines) failed to provide the Graebel Entities with sufficient capital for the Graebel Entities to continue paying their drivers despite assuring the Graebel Drivers that payment was forthcoming; and

f.  one or more of the defendants (MidCap, Ormando Gomez, Robert Peterson, Vasilia a/k/a "Vauna" Peterson, All My Sons, and Graebel Van Lines) caused the Graebel Entities to be used for the purpose of perpetrating an actual fraud, i.e., duping the Graebel Drivers into continuing to drive without pay based on the false promise of payment, and perpetrated an actual fraud on the Graebel Drivers primarily for the Defendants' direct personal benefit.

137.   As of February of 2017, when MidCap 'called' the note on its revolving line of credit, MidCap gained complete control and ownership of the Graebel Entities for all practical purposes and from that time on, at the very least acted as the alter ego of the Graebel Entities.

## AGENCY LIABILITY
(against MidCap)

138.   MidCap is liable for the Graebel Entities' fraudulent representations because the Greabel Entities made those misrepresentations at the direction of and as

MidCap's agent. MidCap had the right to control the Graebel Entities with respect to how it allocated capital, and how it maximized revenue for the benefit of the Graebel Entities. MidCap had the right to control the means and details of the processes that the Graebel Entities used to accomplish that task. MidCap is also liable for any and all actions undertaken by Mackinac Partners, because it controlled the method and manner of Mackinac Partners administration of the Graebel Entities' liquidation.

## LIQUIDATED DAMAGES

139.   Plaintiffs are entitled to recovery of liquidated damages pursuant to 29 U.S.C. §§ 216, 260.

## ATTORNEYS' FEES

140.   Plaintiffs are entitled to recovery of their attorneys' fees and expenses pursuant to 29 U.S.C. § 216 (b)  and Texas Civil Practice and Remedies Code §§ 38.001 (1), (2) and (8).

141.   Plaintiffs hereby ask the Court to impose a constructive trust on all property and proceeds that can be directly traced to the fraud perpetrated by Defendants.

## CONDITIONS PRECEDENT

142.   All conditions precedent have been performed by Plaintiffs or waived by Defendants.

## IMPOSITION OF A CONSTRUCTIVE TRUST

143.   Plaintiffs hereby ask the Court to impose a constructive trust on all property

and proceeds that can be directly traced to the fraud perpetrated by Defendants.

## DEMAND FOR JURY

144.   Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand:

1.   Judgment against Defendants for an amount equal to Plaintiffs' unpaid wages at the applicable rate and at time and a half for overtime work;

2.   Judgment against Defendants equal to the amounts due and owing pursuant to the terms of the parties' contractual arrangement;

3.   The fair market value of the work performed by Plaintiffs for the benefit of Defendants;

4.   An equal amount to Plaintiffs' wage damages as liquidated damages;

5.   Judgment against Defendants that their violations of the FLSA was willful;

6.   An award of prejudgment interest;

7.   Punitive and exemplary damages for Plaintiffs' Fraud claims;

8.   All costs and attorneys' fees & expenses incurred prosecuting these claims;

9.   Leave to amend to add claims under applicable federal and state laws; and

10.   For such further relief as the Court deems just and equitable.

Respectfully submitted,

*/s/ Benjamin W. Allen*
Benjamin W. Allen
State Bar No. 24069288
Federal I.D. No. 1058996
FELDMAN & FELDMAN, P.C.
3355 West Alabama, Suite 1220
Houston, Texas 77098
Telephone: (713) 986-9471
Facsimile:  (713) 986-9472
ben.allen@feldman.law

**ATTORNEY OF RECORD AND CO-LEAD
COUNSEL FOR PLAINTIFFS**


Robert H. Ford
State Bar No. 24074219
Federal I.D. No. 1392569
FOGLER, BRAR, FORD, O'NEIL & GRAY LLP
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 325-8241
Facsimile: (713) 574-3224
rford@fbfog.com

**CO-LEAD COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I certify that I served the above instrument in accordance with the Federal Rules of Civil Procedure on April 27, 2018.

Jamil N. Alibhai
Email: jalibhai@munkwilson.com
Munck Wilson Mandala LLP
12770 Coit Rd, Dallas, Texas 75251
Telephone: (972) 628-3600

*Counsel for MidCap Financial Trust f/k/a*
*MidCap Financial, LLC and for MidCap Funding X Trust*

William Scott Helfand
Email: bill.helfand@lewisbrisbois.com
Katherine C. Den Bleyker
Email: katherine.denbleyker@lewisbrisbois.com
Jeffrey Ranen
Email: jeffrey.ranen@lewisbrisbois.com
Alice Kwak
Email: alice.kwak@lewisbrisbois.com
Lewis Brisbois Bisgaard & Smith LLP
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: (213) 250-1800

*Counsel for Robert Peterson, Vasilia Petterson, Ormando Gomez,*
*All My Sons of Denton County, Inc, Graebel Van Lines Holdings, LLC*
*d/b/a Graebel Moving Services, Graebel Van Lines, LLC, Graebel/Houston*
*Movers, LLC, Graebel Moving and Warehouse Corp., and Graebel/North*
*Carolina Movers, LLC*

*Benjamin W. Allen*
Benjamin W. Allen

-46-