# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, et al., | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-1601 |
| | § | |
| VASILIA a/k/a "VAUNA" PETERSON, et al., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion to dismiss for improper venue, lack of personal jurisdiction, and failure to state a claim filed by defendants MidCap Financial Trust, f/k/a MidCap Financial, LLC ("MidCap Trust"), and MidCap Funding X Trust ("MidCap Funding") (collectively, "MidCap"). Dkt. 41, 42. This motion was originally filed on September 29, 2017. Dkt. 41, 42. The plaintiffs, who are a group of moving truck drivers, filed a motion for leave to conduct jurisdictional discovery, which the court granted on November 8, 2017. Dkts. 49, 59. The court originally required that the discovery be completed by January 5, 2018, and that the plaintiffs file a supplemental response to MidCap's pending motion for jurisdictional discovery by January 19, 2018. Dkt. 59. The Magistrate Judge extended the deadline for jurisdictional discovery until March 23, 2018, and required the plaintiffs to file a response by April 6, 2018, and MidCap to file a reply by April 13, 2018. Dkt. 85. The plaintiffs filed their supplemental response on April 6 (Dkt. 92), and MidCap filed a reply on April 13 (Dkt. 98).

In the interim, the plaintiffs sought leave to amend their complaint, the court granted leave, and the plaintiffs filed a second amended complaint. Dkts. 94, 103, 104. On April 30, 2018, MidCap filed a notice requesting that the court apply their pending motion to dismiss, which was

originally filed in response to the first amended complaint, to the second amended complaint, which the court may do under the Federal Rules of Civil Procedure. Dkt. 105. The original motion to dismiss is now fully briefed and ready for disposition. The court has reviewed all of the relevant documents in the record and the applicable law and is of the opinion that the motion to dismiss for improper venue should be DENIED, the motion to dismiss for lack of personal jurisdiction should be GRANTED IN PART AND DENIED IN PART, and the motion to dismiss for failure to state a claim should be DENIED.

## I. BACKGROUND

This is a Fair Labor Standards Act ("FLSA") case filed by twenty-eight plaintiffs on behalf of themselves and those similarly situated. Dkt. 104. Eleven of the named plaintiffs reside in Texas, and seventeen of the named plaintiffs live outside of Texas. *Id.* The plaintiffs were drivers for Graebel Companies, Inc., and they were classified as independent contractors. *Id.* The plaintiffs contend that Graebel Companies, Inc., underwent a change in ownership in 2014, became Graebel Van Lines, LLC in 2015, and was eventually dissolved in March 2017.[1] *Id.* They assert that the MidCap financed the purchase of Graebel Companies, Inc., and provided working capital. *Id.* MidCap thus had a security interest in Graebel's and its subsidiaries' assets. *Id.* The plaintiffs allege that when the reorganization occurred, the new owners asserted more direct control over the drivers and implemented changes that were detrimental to the company. *Id.*

The plaintiffs contend that by 2016, Graebel decided to start liquidating at the direction and control of MidCap and a turnaround company, and the liquidation plan was designed to leave the plaintiffs without wages for months. *Id.* They allege that they started receiving only a portion of

---

[1] The court will refer to Graebel Companies, Inc. and Graebel Van Lines, LLC collectively as "Graebel."

their pay in October 2016 and that the amount they received was determined via a formula and at the direction of MidCap. *Id.* This formula allegedly calculated an "advance" that the drivers would receive based on the gross weight they transported. *Id.* Graebel's local terminal managers assured the drivers that they would receive their entire pay, not just the advances, and that they should continue to perform moving services at Graebel's instruction and supervision. *Id.* The drivers contend, however, that they never received the balance and were paid nothing for much of the work they performed. *Id.* They allege that they learned they would probably never be paid when Graebel announced its liquidation in mid-March 2017. *Id.*

The plaintiffs claim that MidCap and the other defendants are liable for the actions of Graebel under agency, veil-piercing, or alter-ego theories of vicarious liability and that the corporate forms of the Graebel entities ought to be disregarded. *Id.* They contend that the defendants "used the Graebel Entities to dupe the [plaintiffs] into continuing to drive for Graebel." *Id.* They allege that the corporate forms of the Graebel entities were organized and operated as a mere tool or business conduit of the defendants and that MidCap and the other defendants used the Graebel entities as a means to shield themselves from liability for claims by unpaid drivers. *Id.* They assert that the Graebel entities were inadequately capitalized and that by the time MidCap "'called' the note on its revolving line of credit [in February 2017], MidCap had gained complete control and ownership of the Graebel Entities for all practical purposes and from that time on, at the very least acted as the alter ego of the Graebel Entities." *Id.* The plaintiffs additionally allege that MidCap is liable for Graebel's fraudulent representations because Graebel made those representations at the direction of MidCap's agent, who had the right to control how Graebel allocated its capital. *Id.* The causes of action the plaintiffs assert against MidCap are (1) violation of the FLSA for failure to pay wages because MidCap was an "employer" under the FLSA; (2) violation of the FLSA for failure

to keep records; (3) breach of contract; (4) quantum meruit; (5) fraud; (6) conspiracy and aider and abettor liability for fraud; and (7) veil piercing, alter ego, and agency liability. *Id.*

MidCap moves for the court to dismiss the claims asserted against it because (1) the court lacks personal jurisdiction over MidCap; (2) the plaintiffs have not shown venue is proper in Texas; and (3) the plaintiffs fail to state a claim for which relief can be granted under Rules 8(a) and 9(b). Dkt. 41, 42. With regard to personal jurisdiction, MidCap points out that each plaintiff must establish separately that his or her claims arise out of or relate to MidCap's activities in Texas. *Id.* (citing *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773 (2017)). It asserts that despite being allowed to conduct discovery on their alter ego allegations, the plaintiffs have no evidence to support their jurisdictional theories. Dkt. 98.

With regard to venue, MidCap contends that the plaintiffs have not shown that a substantial part of each plaintiff's claim against MidCap arose in the Southern District of Texas. Dkt. 41, 42. Additionally, MidCap asserts that the "employment agreements for the non-Texas Plaintiffs have mandatory venue clauses that require those Plaintiffs to pursue litigation arising from their employment in other states." *Id.*

Finally, with regard to their assertion that the plaintiffs fail to state a claim for which relief can be granted, MidCap contends that (1) the plaintiffs' Fair Labor Standards Act ("FLSA") claims fail because they are not parties covered by the FLSA; (2) the plaintiffs do not provide any factual support for their FLSA claim; (3) the plaintiffs fail to describe the putative class for the proposed FLSA collective action; (4) the plaintiffs cannot maintain both a conspiracy claim and claims of imputed liability because if there is an agency relationship, there can be no conspiracy; (5) the plaintiffs fail to state a claim for conspiracy because they do not plead it with particularity; (6) the plaintiffs cannot assert a claim for "aider and abettor liability" because no such claim exists

independent of a conspiracy claim in Texas; (7) the plaintiffs do not meet Rule 9(b)'s standard with regard to the corporate veil and alter ego theories for imputing the fraud claims to MidCap; (8) the plaintiffs fail to state a claim for breach of contract with regard to the corporate veil and alter ego theories for imputing the claims to MidCap; and (9) the plaintiffs fail to state a claim to impute liability under an agency theory. *Id.*

The court will first review the legal standards for motions to dismiss for improper venue, lack of personal jurisdiction, and failure to state a claim. It will then substantively address venue, personal jurisdiction, and the adequacy of the pleading *in seriatim*.

## II. LEGAL STANDARDS

### A. Venue

Under 28 U.S.C. § 1391,

> A civil action may be brought in . . .(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). "On a Rule 12(b)(3) motion to dismiss for improper venue, the court must accept as true all allegations in the complaint and resolve all conflicts in favor of the plaintiff." *Braspetro Oil Servs. Co. v. Modec (USA), Inc.*, 240 F. App'x 612, 615 (5th Cir. 2007) (unpublished) (citing *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004)). The plaintiffs have the burden of demonstrating that venue is proper. *Am Gen. Life Ins. Co. v. Rasche*, 273 F.R.D. 391, 396 (S.D. Tex. 2011).

### B. Personal Jurisdiction

Federal courts are courts of limited jurisdiction. *Ins. Corp. of Ir., Ltd. v. Compagnie des*

*Bauxites de Guinee*, 456 U.S. 694, 710, 102 S. Ct. 2099 (1982). Federal courts sitting in diversity may exercise personal jurisdiction to the extent permitted by the laws of the state in which the court sits. *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424 (5th Cir. 2005) (citing *Allred v. Moore & Peterson*, 117 F.3d 278, 281 (5th Cir. 1997)). The Texas long-arm statute allows jurisdiction to be exercised to the extent allowable under the Due Process clause of the Fourteenth Amendment. *Id.* at 424–25 (citing *Helicopteros Nacionales de Colom., S.A. v. Hall*, 466 U.S. 408, 413-14 (1984)).

When the court rules on personal jurisdiction without an evidentiary hearing, the plaintiff must make a prima facie showing of jurisdiction. The burden then shifts to the defendant to demonstrate that the assertion of jurisdiction would be unfair; however, such demonstrations are rare. *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999). In deciding whether to exercise personal jurisdiction, the court can consider the entire contents of the record, including affidavits. *Paz v. Bush Engineered Metals, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006).

The Due Process analysis entails a two-part inquiry. *Asarco, Inc. v. Glenara, Ltd.*, 912 F.2d 784, 786 (5th Cir. 1990). First, "the nonresident defendant purposefully must have established 'minimum contacts' with the forum state such that he invoked the benefits and protections of the forum's laws and thus reasonably could anticipate being haled into court there." *Id.* Second, "circumstances must be such that the exercise of personal jurisdiction does not offend 'traditional notions of fair play and substantial justice.'" *Id.* (citing *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 107 S. Ct. 1026 (1987); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76, 105 S. Ct. 2174 (1985); and *Gulf Consol. Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071 (5th Cir. 1990)).

Minimum contacts are established through the assertion of either general or specific jurisdiction. *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 865 (5th Cir.

2001).  If the court has general jurisdiction, it "may hear *any* claim against the defendant, even if all the incidents underlying the claim occurred in a different State." *Bristol-Myers Squibb*, 137 S. Ct. at 1780.  "[O]nly a limited set of affiliations will render a defendant amenable to all-purpose [or general] jurisdiction there." *Daimler AG v. Bauman*, 571 U.S. 117, 137, 134 S. Ct. 746 (2014).  "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Id.*  For a corporation, "'the paradigm forum for the exercise of general jurisdiction is . . . one in which the corporation is fairly regarded as at home.'" *Bristol-Myers*, 137 S. Ct. at 1780 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 924, 131 S. Ct. 2846 (2011)).  The relevant inquiry is whether the corporation's "affiliations with the State are so 'continuous and systematic' as to render them essentially at home in the forum state." *Goodyear*, 564 U.S. at 919 (quoting *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 317, 66 S. Ct. 154 (1945)).

A court may exercise specific jurisdiction if "the cause of action arises out of a defendant's purposeful contacts with the forum." *Dalton v. R&W Marine, Inc.*, 897 F.2d 1359, 1361 (5th Cir. 1990) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S. Ct. 559 (1980)); *see Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000) (quoting *Burger King Corp.*, 471 U.S. at 472).  "Even a single, substantial act directed toward the forum can support specific jurisdiction." *Dalton*, 897 F.2d at 1361 (citing *Burger King Corp.*, 471 U.S. 462).  The defendant's contacts with the forum must be more than "random, fortuitous, or attenuated," but even "isolated or sporadic contacts" can support specific jurisdiction "so long as the plaintiff's claim relates to or arises out of those contacts." *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498–99 (5th Cir. 2012) (internal quotation marks omitted).

## C.    Failure to State a Claim

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the

claim showing that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65 (2007). In considering a Rule 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The supporting facts must be plausible—enough to raise a reasonable expectation that discovery will reveal further supporting evidence. *Id.* at 556.

In addition to meeting the plausibility standard, under Federal Rule of Civil Procedure 9(b), if a party is alleging fraud or mistake, the pleading must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (noting that Rule 9(b) does not "supplant" Rule 8(a)). However, this particularity requirement "does not 'reflect a subscription to fact pleading.'" *Id.* (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). Instead, pleadings alleging fraud must contain "simple, concise, and direct allegations of the circumstances constituting the fraud, which . . . must make relief plausible, not merely conceivable, when taken as true." *Id.* (internal quotations omitted) (referring to the standard enunciated in *Twombly*).

The Fifth Circuit interprets Rule 9(b) strictly, "requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id.* (quoting *Herrmann Holdings Ltd.*

*v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002)). Thus, Rule 9(b) generally requires the complaint to "set forth 'the who, what, when, where, and how' of the events at issue." *Id.* (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)). However, "Rule 9(b)'s ultimate meaning is context-specific." *Grubbs*, 565 F.3d at 185. Thus, "[d]epending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand." *Id.*

## III. ANALYSIS

### A. Venue

MidCap contends that the Southern District of Texas is not the proper venue because all of the defendants do not live in Texas and the plaintiffs cannot show that a substantial part of each of their claims against MidCap arose in the Southern District of Texas. Dkt. 42 at 12. MidCap asserts that many of the events and representations allegedly occurred outside of Texas, and that the employment agreements for the non-Texas plaintiffs have mandatory venue clauses that require those plaintiffs to pursue litigation arising from their employment in other states.[2] *Id.* at 12–13 (citing Dkt. 29-2 ¶ 28).

The plaintiffs argue that the Southern District of Texas is a proper venue because several of the predicate misrepresentations were made in Texas. Dkt. 47 at 7. They additionally contend that MidCap fails to address why venue is not appropriate under the federal venue statute's fallback provision, 28 U.S.C. § 1391(b)(3). *Id.* Citing *McCaskey v. Continental Airlines, Inc.*, 133 F. Supp.

---

[2] The agreement in the Record is between Jose Luis Garcia as the "Contractor" and Graebel/Houston Movers, LLC # 927 as the "Company." Graebel/Houston Movers, LLC #927 is presumably a division of Graebel that is located in Houston. *See* Dkt. 29-2. The agreement calls for all claims or disputes arising from the agreement to be brought in the state serving the city in which the "Company" is headquartered. *Id.*

2d 514, 526 (S.D. Tex. 2001), the plaintiffs assert that "courts have long held . . . that the venue statute's fallback provision 'requires that another district exist in which Plaintiff[s] can establish both personal jurisdiction and venue ***over each party and each claim in the <u>entire</u> "action," not just over a single claim versus [MidCap].***'" *Id.* at 32 (emphasis in the plaintiffs' brief). With regard to the forum-selection clauses in the non-Texas drivers' contracts, the plaintiffs contend the argument is foreclosed by *Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas*, 571 U.S. 49, 134 S. Ct. 568, 577–80 (2013). *Id.*

MidCap replies that "[s]imply because thirty Plaintiffs want to assert their claims in one lawsuit does not create venue in this District for each Plaintiff." Dkt. 58 at 6. MidCap asserts that the plaintiffs' reliance on *McCaskey* is misplaced because the plaintiffs do not dispute that the non-resident plaintiffs can pursue claims in each plaintiff's home district, and the fallback provision similarly does not apply because jurisdiction would be proper against the relevant defendants in each of these other districts. *Id.* at 7 n.3.

### 1. Forum Selection Clause

The court will first address the argument that forum-selection clauses in the non-Texas drivers' contracts require them to bring their disputes in other forums. In *Atlantic Marine*, the U.S. Supreme Court, when discussing the argument that "a party may enforce a forum-selection clause by seeking dismissal under § 1406(a) and Rule 12(b)(3)," held that "Section 1406(a) and Rule 12(b)(3) allow dismissal only when venue is 'wrong' or 'improper,'" which "depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws." 571 U.S. at 55. It noted that the first two paragraphs of the venue statute "define the preferred judicial districts for venue in a typical case, but the third paragraph provides a fallback option," which "ensures that so long as a federal court has personal jurisdiction over the defendant, venue will always lie somewhere." *Id.* at 56–57. Under *Atlantic Marine*, a forum-selection clause is irrelevant

when considering whether to dismiss for improper venue under Rule 12(b)(3). *Id.* at 57 (concluding that "venue is proper so long as the requirements of § 1391 are met, irrespective of any forum-selection clause"). Seemingly conceding this point, MidCap states in a footnote in its reply that it merely referred to the forum-selection clause "to emphasize that each Graebel Defendant and its particular group of drivers contemplated that their business relationship arose in a particular region in the United States." Dkt. 58 at 6 n.2. It did, however, reserve the right to move for a transfer of venue under 28 U.S.C. § 1404 at a later date. *Id.* The court, therefore, will consider the forum-selection-clause argument if the Graebel Defendants file a motion to transfer venue.

### 2. The Fallback Provision

Here, not all of the defendants reside in Texas, so § 1391(b)(1) does not apply. With regard to § 1391(b)(2), there are substantial allegations of alleged misrepresentations in this district. *See, e.g.*, Dkt. 47 at 31 (discussing an alleged misrepresentation made in Houston). But, § 1391(b)(2) permits venue in "a judicial district in which a substantial part of the events or omissions giving rise to the *claim* occurred," and there are not allegations of alleged misrepresentations made to *each* plaintiff by the defendants in this district. Thus, the plaintiffs have not shown that venue is proper with regard to the claims of non-Texas plaintiffs under § 1391(b)(2). The plaintiffs' main argument is thus that venue is proper under the fallback provision, § 1391(b)(3), because there is no other district in which the entire action could be filed.

The plaintiffs rely primarily on *McCaskey v. Continental Airlines, Inc.* In *McCaskey*, the court noted, while discussing the fallback provision, that it "requires that another district exist in which Plaintiff can establish both personal jurisdiction and venue over each party and each claim in the *entire* action, not just over a single claim versus [a particular defendant]." 133 F. Supp. 2d 514, 526 (S.D. Tex. 2001) (Kent, J) (citations and quotations omitted). The court reached this conclusion because the fallback provision uses the term "action," as opposed to "claim," when stating that it

applies if "there is no district in which an action may otherwise be brought."[3] § 1391; *McCaskey*, 133 F. Supp. 2d at 526. The court concluded that in order for the defendant to show that venue was not proper under the fallback provision, it had to show that it could have been sued in a different venue and that "the whole action, involving multiple properly joined parties and claims could have been brought in its entirety in another district court." *McCaskey*, 133 F. Supp. 2d at 526. The court acknowledged that the "burden rests on the plaintiff to establish a prima facie case of venue," but it declined "to require a plaintiff who seeks to utilize [the fallback provision] to negate every single one of the hundreds of judicial districts as plausible venues." *Id.* Instead, the court found it more appropriate for the defendant to "posit a forum and articulate reasons why such is available, in terms of both venue and jurisdiction, in order to necessitate any response from a plaintiff in this regard." *Id.*

MidCap contends that the fallback provision cannot apply because claims by the non-Texas plaintiffs who were not parties to the alleged misrepresentations in Houston could be brought in another district. Dkt. 58. However, as the *McClaskey* court noted, the fallback provision does not separate the plaintiffs. It states that it applies if there is no other district in which an *action* may otherwise be brought, *see* § 1391(b)(3), which is different than the use of the term "claim" in § 1391(b)(2). Here, the entire *action* may not be brought in some other district because there are Texas plaintiffs who would not have been parties to any misrepresentations that occurred in these

---

[3] In *McCaskey*, the court was relying on the pre-2011 version of § 1391 and therefore referred to § 1391(a)(3). In 2011, the statute was amended, but the relevant language is still essentially the same. *Compare* 28 U.S.C.A. § 1391(a)(3) (2006) ("A civil action wherein jurisdiction is founded on diversity of citizenship may, except as otherwise provided by law, be brought only in . . . a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, *if there is no district in which the action may otherwise be brought*."), *to* 28 U.S.C.A. § 1391(b)(3) (2017 Supp.) (amended 2011) ("A civil action may be brought in . . . *if there is no district in which an action may otherwise be brought* as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.").

other districts. The fallback provision applies, and the plaintiffs have asserted a prima facie case that venue is proper in the Souther District of Texas under this provision—so long as the court can exercise personal jurisdiction over the defendants. *See* § 1391(b). The motion to dismiss for improper venue is DENIED. The court, therefore, now turns to personal jurisdiction.

## B.    Personal Jurisdiction

MidCap argues first that general jurisdiction is lacking because neither Midcap entity is at home in Texas. Dkt. 42 at 5; *see Bristol-Myers*, 137 S. Ct. at 1780. MidCap also contends that the court cannot exercise specific jurisdiction over MidCap because the amended complaint does not identify any tortious conduct by MidCap in Texas and the plaintiffs have not established a plausible basis for imputing the jurisdictional contacts of the other defendants to MidCap. *Id.* at 6.

The plaintiffs assert that the court "has jurisdiction over MidCap for four independent reasons: (1) MidCap purposefully availed itself of the Texas courts by filing its state court receivership against the Graebel Entities for the purpose of liquidating them, without paying [the plaintiffs], who are intervening parties in the receivership, (2) as it relates to the Graebel Entities, MidCap's exercise of control over them dictates that the Graebel Entities' contacts with Texas are MidCap's contacts, (3) MidCap purposefully availed itself of the benefit of doing business in Texas by administering the Graebel Entities through numerous communications directed into Texas and by setting up shop in Graebel's Dallas office for months, and (4) MidCap participated in, and is the sole beneficiary of, the Graebel Entities' scheme to defraud the Graebel Drivers into working without pay."[4] Dkt. 92 at 13.

---

[4] The plaintiffs present their third argument about actual jurisdiction arising from MidCap's contacts as opposed to through its control of other entities in their opening paragraph, but they do not provide additional argument in the substantive argument portion of their brief. *See* Dkt. 92. Instead, in the argument section, they argue that the court should exercise jurisdiction over MidCap because it is an "employer" under the economic realities test. *See id.*

MidCap asserts in response that (1) the non-Texan plaintiffs must be dismissed pursuant to *Bristol-Myers*; (2) the plaintiffs did not make a prima facie case of personal jurisdiction because (a) MidCap has not consented to jurisdiction in Texas, (b) the plaintiffs cannot establish jurisdiction over MidCap as an alleged employer, (c) the plaintiffs lack evidence to support their agency and alter ego theories, and (d) no evidence supports the plaintiffs' conspiracy theory of jurisdiction; and (3) the plaintiffs fail to address personal jurisdiction over MidCap Trust. Dkt. 98.

The court will first consider the impact of *Bristol-Myers* and then consider the various different theories under which the plaintiffs contend the court may exercise jurisdiction over MidCap.

### 1. *Bristol-Myers*

MidCap argues that the claims of the non-Texas plaintiffs must be dismissed because under the U.S. Supreme Court's holding in *Bristol-Myers* each plaintiff must be able to establish jurisdiction as to each defendant. Dkt. 98. The plaintiffs argue that *Bristol-Myers* does not apply in federal cases. Dkt. 92.

In *Bristol-Myers*, the U.S. Supreme Court noted that it has required that the *International Shoe* jurisdictional requirements be met with regard to each defendant over whom a court in a particular state exercises jurisdiction. *Bristol-Myers Squibb*, 137 S. Ct. at 1783. The case involved 600 plaintiffs who sued Bristol-Myers Squibb Company ("BMS") in California for injuries allegedly caused by a drug the company manufactured. *Id.* at 1777. Most of these plaintiffs were not California residents. *Id.* The California Supreme Court held that California courts could exercise specific jurisdiction over the nonresidents' claims, and BMS appealed to the U.S. Supreme Court. *Id.* BMS sold the drug at issue in California, but it did not create, manufacture, label, or package the drug there. *Id.* The U.S. Supreme Court reminded that in "order for a court to exercise specific

jurisdiction over a claim, there must be an 'affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State.'" *Id.* at 1781 (quoting *Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846 (2011)). "[A] defendant's general connections with the forum are not enough." *Id.* It then noted that the nonresident plaintiffs were not prescribed the drug at issue in California and did not obtain or ingest it in California, and the Court concluded that the "mere fact that *other* plaintiffs were prescribed, obtained and ingested [the drug] in California—and allegedly sustained the same injuries as did the nonresidents—does not allow the State to assert specific jurisdiction over the nonresidents' claims." *Id.* The Court instructed that a defendant's relationship with a third party is an insufficient basis to assert jurisdiction—even if the third parties reside in the forum and bring similar claims as the nonresidents. *Id.* There has to be "a connection between the forum and the specific claims at issue." *Id.*

The plaintiffs argue that *Bristol-Myers* is not controlling because it relates to state court's exercise of jurisdiction under the Fourteenth Amendment, not a federal court's exercise under the Fifth Amendment. Dkt. 47 at 10. In *Bristol-Myers*, the U.S. Supreme Court specifically noted that its decision "concerns the due process limits of the exercise of specific jurisdiction by a State," and that it was leaving "open the question whether the Fifth Amendment imposes the same restrictions on the exercise of personal jurisdiction by a federal court." 137 S. Ct. at 1783–84. In her dissent, Justice Sotomayor asserted that the majority's opinion "will make it profoundly difficult for plaintiffs who are injured in different States by a defendant's nationwide course of conduct to sue that defendant in a single, consolidated action," though she acknowledged that the plaintiffs "might" be able to "bring a single suit in federal court." *Id.* at 1789 (Sotomayor, J., dissenting).

MidCap argues that the plaintiffs "do not contend how or why the due process analysis in this lawsuit would be any different than the Court's analysis in *Bristol-Myers*. Dkt. 58. Under Fifth Circuit law, courts "may reach those entities that are subject to the jurisdiction of the state in which the district court sits" in FLSA cases. *Lovett v. Sanderson*, 184 F.3d 819 (5th Cir. 1999) ("The path for a district court to follow in deciding whether to exercise personal jurisdiction over an out-of-state defendant in a federal-question case is well-trodden and clear.").

The Fifth Circuit has not addressed the impact of *Bristol-Myers* on federal class action or collective action litigation.[5] Some district courts have found that *Bristol-Myers* prevents them from exercising jurisdiction over claims by out-of-state plaintiffs in class actions and collective actions. *See, e.g.*, *Practice Mgmt. Support Servs., Inc. v. Cirque du Soleil, Inc.*, 301 F. Supp. 3d 840, 846 (N.D. Ill. 2018) (finding that *Bristol-Myers* prevented it from exercising jurisdiction over non-Illinois-resident class members in a Rule 23 case); *DeBernadis v. NBTY, Inc.*, No. 17 C 6125, 2018 WL 461228, at *2 (N.D. Ill. Jan. 18, 2018) (collecting cases and finding the applicability of *Bristol-Myers* to the collective action in that case to be "a close question" but ultimately dismissing the claims of the out-of-state plaintiff classes). Other district courts have determined that *Bristol-Myers* should not apply to class actions or FLSA collective actions, citing the extra protection provided in certifying a class under either Rule 23 or the FLSA. *See, e.g.*, *Weisheit v. Rosenberg & Assoc., LLC*, No. JKB-17-0823, 2018 WL 1942196, at *5 (D. Md. Apr. 25, 2018) (collecting cases); *Casso's Wellness Store & Gym, L.L.C. v. Spectrum Lab. Prods., Inc.*, No. 17-2161, 2018 WL 1377608, at *5 (E.D. La. Mar. 18, 2018) (Engelhardt, J.) (noting that several courts have "declined to extend the

---

[5] Under Fifth Circuit law, in FLSA cases filed in federal court in Texas, a defendant's "amenability to personal jurisdiction [is] determined under Texas' long-arm statute." *Aviles v. Kunkle*, 978 F.2d 201, 204 (5th Cir. 1992). The Texas long-arm statute reaches "as far as the federal constitutional requirements of due process will allow." *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007).

holding in *Bristol-Myers* to class actions" and that there are "material differences between mass tort actions [like the claims in *Bristol-Myers*] and class actions" and specifically highlighting the "additional due process safeguards for class certification under Federal Rule of Civil Procedure 23"). *See generally In re Chinese-Manufactured Drywall Prods. Liability Litig.*, MDL No. 09-2047, 2017 WL 5971622 (E.D. La. Nov. 30, 2017) (Fallon, J.)(noting that class actions have different due process safeguards than mass tort claims and asserting that "[s]ince [*Bristol-Myers*] is not a change in controlling due process law, [it] does not apply to federal class actions"). The court agrees with the reasoning in the latter cases and declines to extend the *Bristol-Myers*' requirement to analyze personal jurisdiction with regards to each individual plaintiff to the FLSA collective action jurisdictional analysis.

## 2.    MidCap As Employer

The plaintiffs also argue that Texas has jurisdiction over MidCap because MidCap is directly liable for failing to pay the Graebel Drivers as their employer. Dkt. 92 at 15. They assert that specific jurisdiction depends on whether they have adequately alleged employer status under the economic realities test. *Id.* MidCap asserts first that the court should not consider this argument because it was raised for the first time in the supplemental response. Dkt. 98 at 5. With regard to the merits, MidCap asserts that jurisdiction of FLSA claims must be determined under the Texas long-arm statute, which requires a due process assessment. *Id.* (citing *Aviles*, 978 F.2d at 203–04).

The plaintiffs cite *Willshire v. HK Management*, No. Civ. A. 3:04-CV-0090B, 2004 WL 2974082, at *3 (N.D. Tex. Dec. 16, 2004) (Boyle, J.), and *Bishop v. Consolidated Natural Gas, Inc.*, No. CIV. A. 99-1363, 2000 WL 6263, at *2–3 (E.D. La. Jan. 5, 2000), to support their argument that personal jurisdiction can stem from a finding of employer status under the economic realities test. In *Willshire*, in deciding personal jurisdiction, the court fist noted that is was only permitted to

17

exercise jurisdiction over defendants who are subject to jurisdiction in Texas state courts. 2004 WL 2974082, at *2. The arguments presented in favor of jurisdiction were that the plaintiff was employed by the defendant and that the defendant scheduled concerts in Texas. *Id.* at *3. The court conducted an analysis to determine if the defendant was the plaintiff's employer. *Id.* The court determined that the plaintiff had provided *prima facie* evidence of joint employment, which, it found, "would lead to specific jurisdiction." *Id.* Similarly, in *Bishop*, the court held that "specific jurisdiction would be triggered if [the defendant] were a joint employer and played an integral role in denying [the plaintiff] the promotional opportunity at issue in this employment discrimination lawsuit." 2000 WL 6263, at *3.

While these two district courts held that joint employer status was sufficient to meet the due process requirements of exercising jurisdiction in these cases, "other courts have held that the joint employer analysis is irrelevant to personal jurisdiction." *In re Enter. Rent-a-Car Wage & Hour Emp't Practices Litig.*, 735 F. Supp. 2d 277, 326 (W.D. Penn. 2010) (discussing cases). The court finds that whether MidCap was considered the plaintiffs' "employer" is not necessarily irrelevant, but it is also not determinative, as the employer test was not crafted to determine if exercising jurisdiction over a defendant "employer" meets a due process inquiry. Rather, the court should consider MidCap's contacts that may be part of the economics reality test to the extent they are the types of minimum contacts considered the due process inquiry. The plaintiffs, however, provided the court with no additional arguments indicating that the contacts it asserts make MidCap the plaintiffs' "employer" are sufficient, standing alone or in conjunction with other contacts, to satisfy

due process concerns. The plaintiffs therefore have not met their burden with regard to this argument.[6]

### 3.     Alter Ego

The plaintiffs next assert that Graebel is MidCap's alter ego. Dkt. 92. "[I]t is compatible with due process for a court to exercise personal jurisdiction over an individual or corporation that would not ordinarily be subject to personal jurisdiction in that court when the individual or corporation is the alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 653 (5th Cir. 2002). To determine if an alter ego relationship is established, the court must consider whether:

> (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important by the commentators and Texas courts are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit.

*Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1162–63 (5th Cir. 1983) (quoting *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193 (5th Cir. 1983)). "Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions. . . . No single factor is determinative, [which] should be apparent from the extensive list of circumstances that courts have developed to guide alter ego determinations." *Bridas S.A.P.I.C. v. Gov't of*

---

[6] The court does not consider the waiver argument since the plaintiffs did not meet their burden on the merits.

*Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003). A "corporate veil may be pierced to hold an alter ego *liable* for the commitments of its instrumentality only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil." *Id.* (emphasis added). However, "the alter ego test for attribution of contact, i.e. , personal jurisdiction, is less stringent than that for liability." *Stuart v. Spademan*, 772 F.2d 1185, 1198 n.12 (5th Cir. 1985); *see also Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2nd Cir. 1981) ("In deciding the limited question of whether [the court] had jurisdiction the court should have looked only to the question of whether [the defendant challenging jurisdiction] was a shell for [the defendant over whom the court clearly had jurisdiction]; it should not have required a showing that the shell was used to commit fraud."). "'[O]nly a prima facie showing is required on a jurisdiction motion.'" *Hargrave*, 710 F.2d at 1161 (quoting 4 C. Wright & A. Miller, Federal Practice and Procedure § 1068, at 250 (1969)).

Before turning to the evidence in this case that relates to the alter ego factors, the court will discuss *Valdes v. Leisure Resource Group, Inc.*, 810 F.2d 1345 (5th Cir. 1987), which is on point and very instructive. In *Valdes*, an Iowa financial institution, United Service Corporation ("USC"), sold two condominiums to an Austin company, Leisure Resource Group of Austin, Texas ("LRG"), which planned to operate a vacation time-share business. 810 F.2d at 1347. USC retained deeds of trust and agreed to purchase the credit contracts when LRG sold shares of the condos. *Id.* LRG later purchased condos without notifying USC or seeking credit from USC. *Id.* Eventually, LRG began having cash-flow problems, and it hired consultants from California to organize its business affairs. *Id.* The consultants told USC that LRG was on the verge of bankruptcy in an attempt to convince it to provide "a cash infusion." *Id.* USC agreed to loan LRG $700,000, but the loan was on the

condition that LRG's president would no longer sign checks and that one of the consultants would have to approve LRG's expenditures. *Id.* USC was unaware that thirty percent of the "cash infusion" was earmarked as a consulting fee. *Id.* USC was also unaware that in July 1981 the president of LRG had executed a contract to purchase a hotel in Mexico for $8,000,000.00 from Immobiliaria Kan Kun, S.A. and its principal Eugenio Riquelme Valdes (the "*Valdes* Plaintiffs"). *Id.* The consultants also did not know about the hotel in Mexico. *Id.*

The consultants became suspicious when LRG's president was unable to meet his financial obligations despite the budget and cash infusion. *Id.* They learned that the president had received loans from USC for contracts for time shares that had been rescinded during the rescission right period. *Id.* The consultants advised USC and recommended that the president of LRG be removed. *Id.* USG then accelerated all of the loans and took steps for foreclose on the stock that secured the loans. *Id.* The consultants formed a company to operate LRG and executed an interim operating agreement with USC whereby the consultants assumed control of LRG and would receive the stock after conditions precedent were met. *Id.* USC also agreed to loan more money to cover overhead expenses for the six-month term of the interim operating agreement. *Id.* at 1348.

The consultants learned about the Mexican hotel after they assumed control of LRG when the *Valdes* Plaintiffs called to say LRG was behind on its payments. *Id.* The consultants negotiated a new deal with the *Valdes* Plaintiffs in November 1981.

Eventually, an LRG employee advised USC that the consultants were misusing corporate funds and that one of the consultants was a felon. *Id.* USC initiated a receivership. *Id.* They received a preliminary injunction and then settled with the consultants and obtained control over LRG and its stock. *Id.* The vice president of USG became the president of LRG. *Id.*

After the consultants were removed, the deal between the *Valdes* Plaintiffs and LRG fell apart. *Id.* LRG eventually terminated the contract. *Id.* The *Valdes* Plaintiffs filed a lawsuit to recover for breach of the contract, fraud, breach of warranty, breach of fiduciary duties, violation of the Texas Deceptive Trade Practices Act, civil conspiracy, and tortious interference with contractual relations. *Id.* They essentially argued that the Mexican company was "fraudulently induced to give up valuable rights in the form of promissory notes owed by LRG under the July contract when it signed the November contract, which LRG did not perform." *Id.*

The case proceeded to trial, and after various claims were dismissed, the jury considered only the theory that the Mexican company was fraudulently induced to destroy the July promissory notes, with civil conspiracy and alter ego extending liability to USC. *Id.* at 1348–49. The jury found in favor of the *Valdes* Plaintiffs and awarded $6,600,000.00 in actual damages and $100,000.00 in punitive damages against all three defendants (LRG, USC, and USC's parent company). *Id.* The jury found that both USC and its parent were alter egos of LRG. *Id.* at 1352.

With regard to lender liability, the Fifth Circuit first discussed the viability of the jury's civil conspiracy finding. *Id.* at 1350. The Fifth Circuit noted that the evidence indicated that there were two types of financing in the case, financing for certain interim overhead costs and financing for purchasers of time-share units. *Id.* at 1351. It determined that the jury must have based its conspiracy finding on LRG's false representations that USC's parent company would purchase consumer contracts from the sale of time-shares in Mexico. *Id.* However, there was no evidence that USC or its parent company knew about these misrepresentations and that it would require "a leap of faith, not a rational inference, to rest a finding of knowledgable participation" on the evidence presented. *Id.* at 1352.

The Fifth Circuit then turned to the jury's alter ego finding. *Id.* First, it determined that neither USC nor its parent actually "owned" LRG at the relevant time periods, as USC did not have control of the LRG stock. *Id.* at 1354. The court made an *Erie* guess that "Texas courts would not invariably require full and unfettered ownership of the corporation whose veil is sought to be pierced on alter ego grounds, but in the absence of such a condition, particularly persuasive evidence of control would be required." *Id.* "In the absence of full ownership, or where there is no ownership of the allegedly controlled entity, other significant indications that the autonomy of a corporation has been supplanted by the actions of the allegedly dominant company must exist before alter ego liability will be imposed." *Id.*

The Fifth Circuit found that there was no evidence that LRG failed to observe corporate formalities and that the "objective indicia of control and alter ego [were therefore] absent." *Id.* The *Valdes* Plaintiffs, however, argued that "the practical effect of the Interim Operating Agreement, which committed the lenders to advance day-to-day operating costs to LRG, 'propped it up' as a mere shell and conduit for the lenders' schemes." *Id.* The Fifth Circuit found that this was a mischaracterization as "LRG was doing business and generating receivables throughout the events covered by this case," albeit losing money. *Id.* at 1355. This jeopardized the lenders' collateral, and the goal of the interim operating agreement was to preserve these assets. *Id.* The agreement required the lenders to commit up to $60,000 a month to pay "in their unilateral discretion" the general and administrative costs of operating LRG. *Id.* They used a lockbox account for receivables, which the Fifth Circuit noted was "a common security device." *Id.* Importantly, the Fifth Circuit determined that "[e]ven if the lenders approved each and every one of LRG's business expenditures, this does not *ipso facto* prove their control over LRG." *Id.* It explained that "the ability of a lender to monitor a debtor's expenditures pursuant to a loan agreement represents a veto power which is negative in

nature and when exercised in such a limited sense does not amount to domination or control." *Id.*

The court found there was no evidence that the lenders' administration usurped the daily management decisions regarding LRG. *Id.* Instead, the decisions seemed to be "confined to legitimate, limited controls for the purposes of protecting a multimillion-dollar loan package and attempting to keep LRG in business." *Id.*

The *Valdes* Plaintiffs also argued that the lenders assisted in LRG's fraud and that this misuse of LRG's corporate form justified treating LRG as the lenders' alter ego. *Id.* The Fifth Circuit was not convinced, as this would "equate liability for conspiracy with alter ego liability," and "if two entities are so intertwined as to be alter egos, they would not have sufficient separate existence to be liable for conspiracy." *Id.* at 1356.

MidCap contends that the fact pattern in this case involves a nearly identical fact pattern and that *Valdes* therefore forecloses any alter ego argument. Dkt. 42. The plaintiffs, citing *Valdes*, note that the Fifth Circuit has "expressly declined to foreclose whether the residency or forum contacts of a debtor like Graebel may be attributed to a secured lender like MidCap." Dkt. 47. The plaintiffs contend that the Fifth Circuit had the benefit of a full evidentiary record to base its finding that no alter ego relationship existed and that *Valdes* does not involve a situation where a secured creditor used its control to generate revenue from the debtor's employees and then failed to pay them. *Id.*

The plaintiffs submit the following evidence to support their argument that MidCap exercised sufficient control over Graebel:

- An email attaching a memo that provides MidCap with an update on the Graebel business. Dkt. 92-9. It discusses layoffs and reduction in independent contractors and drivers. *Id.* The plaintiffs contend that it provides the last accurate ledger of money owed to the independent contractors was on November 30, 2016. *See* Dkt. 92 at 2.

- An email chain from January 1 through 3, 2017, between Graebel and MidCap officials that includes an attached borrowing base report. One of the emails from MidCap to Graebel

notes that MidCap wanted to discuss the "payroll and contractor disbursements planned for this week" and notes that "payroll and contractor disbursements would tail off under a potential wind down scenario." Dkt. 92-7. The plaintiffs assert that this is evidence that "MidCap deliberately allocated less and less resources to paying drivers." Dkt. 92 at 2.

- Testimony from Ormando Gomez, the Graebel corporate representative, relating to MidCap providing "money outside the borrowing certificate" for payroll. Dkt. 92-2 at 49–52. The representative stated that MidCap was "not comfortable giving [Graebel] any more money outside the borrowing certificate," but indicated that MidCap was willing to do so if Robert Peterson put up some money. *Id.* at 48–50. Gomez then discussed a second time that Graebel needed to ask for money outside of the certificate the week before Christmas. *Id.* at 50–51. He stated that MidCap "extended [Graebel] the funds over the borrowing base to make payroll." *Id.* at 51. The plaintiffs contend that this testimony indicates that MidCap made sure individuals classified as employees were paid. Dkt. 92 at 2.

- An email dated December 23, 2016, that makes a late funding request because "we [presumably Graebel] do not have the available funds in the operating account to provide settlement to Independent Contractors and their businesses. . . . No funding will immediately impact customers, clients and [Graebel's] ability to service." Dkt. 92-6. While it is unclear, the plaintiffs contend that this email means that a request for funding for drivers, who were considered independent contractors, was denied. Dkt. 92 at 2. Deposition testimony from Graebel's representative indicates the email was sent by Graebel's CFO. Dkt. 92-2 at 60.

- A recorded conversation between a Graebel manager and the Houston drivers in which the Graebel manager stated that the "banks are in charge" and the banks "now own the company." Dkt. 92 at 4–5 (quoting Ex. L-1). The Graebel manager then represented to the drivers that the banks had a fund set up and would pay the contractors once the banks figured out how much the contractors were owed. *Id.* The plaintiffs contend that this evidence "conclusively shows that MidCap knew the drivers were not being paid and continued to allocate resources for the business to continue operating without paying the drivers." *Id.* at 5.

- Testimony from Graebel's corporate representative that MidCap would advance the accounts receivable amount or a percentage of that amount to Graebel to allow Graebel to operate and pay its expenses. Dkt. 92-2 at 32. Additionally, most if not all money paid to Graebel would go into a lockbox that MidCap controlled. *Id.* at 32–33. Graebel submitted a borrowing certificate to MidCap every day for funds to be released, and MidCap provided funding Graebel needed for cash flow on a day to day basis. *Id.* at 31.

- Testimony from MidCap's assistant vice president, Kevin P. Sullivan, who was an analyst in the portfolio group at the time in question, indicating that when Graebel was in default, funding by MidCap was "on a discretionary basis." Dkt. 92-5 at 162. Sullivan met with Graebel's management in Dallas and in January 2017, MidCap sent a team including Will Gould to Dallas. *Id.* at 83–84.

- Testimony from Gomez that a team from MidCap was in Graebel's offices in Dallas from January until Graebel closed in April 2017. Dkt. 92-2 at 54–55. Gomez says they were there to "try[] to get an understanding of the business, the receivables, and try[] to understand the risk." *Id.* at 55.

- A letter from MidCap's counsel stating that MidCap was on site "in order to monitor the Borrower's collateral." Dkt. 92-14.

- Testimony from Graebel's representative that under a borrowing certificate in 2016 there were no funds to make payroll. Dkt. 92-2 at 47. MidCap required an individual named Robert Peterson to put up a guaranty for an amendment to the credit and security agreement. *Id.* at 42, 49. This happened again a week before Christmas, and MidCap provided the funding to make payroll without requiring an amendment, but when Graebel requested funds to pay the contractors a couple of days later, Mr. Gould at MidCap stated, "I can't let you borrow this." *Id.* at 71.

- Testimony from Sullivan that Graebel needed outside financing to continue operating and MidCap's funding was necessary for Graebel to meet its daily capital requirements. Dkt. 92-5 at 73–75, 168–69.

- Testimony from William Gould, the president of specialty finance for MidCap Trust, that MidCap retained MCA Financial, a turnaround company, in 2017, to "act on MidCap's interest with respect . . . to the situation with Graebel." Dkt. 92-8 at 115–16.

MidCap contends that this evidence negates the alter ego factors that courts consider because it shows that (1) MidCap did not own Graebel stock; (2) MidCap maintains a separate office from Graebel; (3) MidCap did not share officers, directors, or employees with Graebel; (4) MidCap and Graebel did not have a shared accounting system; (5) MidCap did not exercise control over Graebel's daily activities, policies, procedures, capital expenditures, or allocation of capital; (6) MidCap had no authority to hire, fire, or set the compensation of Graebel employees; and (7) MidCap had completely separate operations, management, and tax filings from Graebel. Dkt. 98 at 8 (citing Dkt. 92-8 (Gould Dep.) at 165–67, 169–70). Indeed, Gould testified that (1) MidCap did not own stock of Graebel; (2) MidCap and Graebel did not share offices and MidCap merely sat in Graebel's conference room while they were in Dallas; (3) MidCap and Graebel did not share any directors or officers and did not share an accounting system; (4) MidCap did not exercise control over Graebel's

daily activities; (5) MidCap did not create policies and procedures for Graebel; (6) MidCap and Graebel did not share a common business operation; (7) MidCap and Graebel are distinct types of businesses, have different management, and separate daily operations; (8) they do not share tax filings; (9) MidCap could not hire and fire Graebel employees or contractors or set their pay; and (10) MidCap did not control Graebel's allocation of capital. Dkt. 92-8 at 165–70. Gould stated that MidCap did not devise a plan to defraud Graebel drivers and did not tell MidCap to stop paying its drivers. *Id.* at 167–68. Gould asserted that MidCap was simply a lender to Graebel. *Id.* at 170.

The court finds that the evidence presented is insufficient to make a prima facie showing to support the plaintiffs' alter ego theory. MidCap's control over Graebel, like the control exercised in *Valdes*, was confined to protecting its investment. It does not appear that MidCap directed Graebel regarding how to use the capital it advanced, other than controlling how much it advanced and when, but even if it had controlled this to some extent, the Fifth Circuit noted in *Valdes* that a lender approving every single business expenditure does not necessarily mean the lender has the degree of control required to demonstrate alter ego. *See Valdes*, 810 F.2d at 1355. MidCap's team in Dallas was there to monitor its collateral, and it appears that they stayed in the conference room and did just that. The plaintiffs have provided the court with no evidence that MidCap exercised any greater degree of control that the financial institution in *Valdes*, and they have not provided evidence supporting the other alter ego factors. Accordingly, the court finds that the plaintiffs have not met their burden and that the court may not exercise jurisdiction over MidCap under an alter ego theory.

### 4.    Agency

The plaintiffs also assert that Texas has jurisdiction over MidCap because MidCap had complete financial control over Graebel and Graebel was merely MidCap's agent. Dkt. 92 (citing Dkts. 6, 42, 92-2 at 28–30). MidCap contends that the plaintiffs' agency theory fails because the

plaintiffs do not offer any support for their allegations that MidCap directed Graebel to make misrepresentations to Graebel's drivers. Dkt. 98 at 7. MidCap asserts that it did *not* direct Graebel to defraud drivers or stop paying them. *Id.* (citing Dkt. 92, Ex. E (Gould Dep.) 167–69).

Under Texas law, an agent's contacts can be imputed to its principal for personal jurisdiction purposes. *Coleman v. Kockner & Co. AG*, 180 S.W.3d 577, 588 (Tex. App.—Houston [14th Dist.] 2005, no pet.). The burden of proof of an agency relationship is on the party asserting it. *Id.* "An 'agent' is one who is authorized by a person or entity to transact business or manage some affair for the person or entity." *Townsend v. Univ. Hosp.-Univ. of Colo.*, 83 S.W.3d 913, 921 (Tex. App.—Texarkana 2002, pet. denied). "To prove agency, evidence must establish that the principal has both the right: (1) to assign the agent's tasks; and (2) to control the means and details of the process by which the agent will accomplish that task." *Happy Indus. Corp. v. Am. Specialties, Inc.*, 983 S.W.2d 844, 852 (Tex. App.—Corpus Christi 1998, pet. dism'd w.o.j.).

The plaintiffs have not met their burden of demonstrating a prima facie case of jurisdiction by presenting evidence of an agency relationship. They show that MidCap was in control of the release of funds, *see* Dkt. 92, Ex. B at 28–30 (O. Gomez Dep.), but they have not presented any evidence raising a prima facie case that MidCap told Graebel to stop paying its drivers. William D. Gould, MidCap Trust's president of specialty finance, testified that MidCap did not direct Graebel to stop paying the drivers, did not direct anyone to pay only partial payments to drivers, and did not come up with a formula regarding how much to pay drivers. Dkt. 92, Ex. E at 168–69. The plaintiffs point to evidence that MidCap did not agree to provide extra funds to pay the drivers that was over the amount of the borrowing certificate in December 2016 even though it has provided extra funds to make payroll days earlier (*see* Dkt. 92-2 at 42, 47, 49, 71), but this evidence is insufficient to demonstrate that MidCap was telling Graebel who to pay and not pay with the amount that was

available in the regular allotment of funds. Because the plaintiffs do not cite sufficient evidence to refute Gould's testimony or any affirmative evidence that MidCap controlled the means and details of Graebel's business that gave rise to the plaintiffs' causes of action, *see* Dkt. 92 at 18 (citing only the Gomez declaration in support of their agency argument), they have not sufficiently established an agency relationship. The court therefore cannot exercise personal jurisdiction over MidCap under an agency theory.

### 5. Conspiracy

The plaintiffs argue that MidCap's active participation with Texas co-conspirators to commit a tort in Texas that injures Texas residents subjects MidCap to personal jurisdiction. Dkt. 47 at 15. They assert that Graebel Houston told its drivers that MidCap promised to pay them and that this is "compelling evidence of conspiracy." Dkt. 92. They additionally point to MidCap's participation in transactions that occurred in Texas. *Id.* They argue that they rely on both the contacts consummated by MidCap on its own and a separate set of contacts that MidCap committed in concert with its Texas coconspirators in furtherance of the conspiracy to defraud the plaintiffs out of their wages are sufficient to subject MidCap to personal jurisdiction in Texas. Dkt. 47 at 15.

MidCap argues that there is no evidence to support a conspiracy theory of jurisdiction. Dkt. 98. MidCap concedes that Graebel and MidCap participated in teleconferences, some of which were initiated by MidCap, and that MidCap's due diligence team was in Graebel's offices in Dallas in early 2017. *Id.* However, it contends that there is no evidence that a conspiracy arose out of those contacts with Texas. *Id.* MidCap asserts that the plaintiffs must show that MidCap purposefully targeted specific plaintiffs in Texas, and it cannot do so. *Id.* It points out that it has presented evidence that Graebel, not MidCap, decided who to pay and who not to pay and that MidCap did not direct Graebel to defraud or underpay drivers. *Id.*

Under Fifth Circuit law, the court must consider "whether the plaintiffs made a prima facie showing of minimum contacts with [Texas] by each . . . defendant based on [the defendant's] civil conspiracy . . . to commit an intentional or willful act, which was carried out and resulted in damage to the plaintiffs in the state." *Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 632 (5th Cir. 1999). "Each defendant's contacts with the forum must be analyzed individually, and a defendant cannot be subject to personal jurisdiction solely because he [or she] participated in an alleged conspiracy with a co-conspirator who had contacts with Texas." *Logal Int'l Inc. v. 1556311 Alberta Ltd.*, 929 F. Supp. 2d 625, 630–31 (S.D. Tex. 2012) (Atlas, J.).

Here, then, the court must consider whether the plaintiffs have made a prima facie showing that MidCap purposefully directed its actions at Texas and the conspiracy claim relates to or arises out of those contacts. The conspiracy allegations are that MidCap controlled the finances in such a way that the plaintiffs would not be paid and directed Graebel managers to instruct the plaintiffs to continue driving. Dkt. 104. There was allegedly a meeting of the minds to defraud the drivers and MidCap's alleged overt act in furtherance of the conspiracy was failing to allocate funds to pay the plaintiffs. *Id.* The plaintiffs submit evidence that a MidCap team was working out of Graebel's Dallas, Texas, office in early 2017 to monitor its collateral and that Graebel managers, calling in from Texas, told the plaintiffs in October 2016 that the drivers would eventually be paid so long as they continued to generate revenue. Additionally, the plaintiffs provide evidence that a Graebel manager held a meeting in Houston, Texas, on March 13, 2017, and he told the drivers that the company had "a fund set up to pay the driver(s) whatever drivers Graebel still owes there's a fund set up to pay them." Dkt. 92, Exs. L, L-1. The manager also told the drivers that the "banks are in charge" and "the banks are going to do what the banks – because they now own the company. The banks own the company, not Armstrong, the banks." Dkt. L-1 at 19. The plaintiffs contend that this evidence

conclusively shows that MidCap knew the plaintiffs were not being paid and continued to allocate resources for the business to continue operating without paying the drivers and that the evidence, viewed as a whole, strongly indicates that MidCap knowingly participated in Graebel's fraud and instructed Graebel to keep the drivers working on the promise of future payment. Dkt. 92 at 5–6.

MidCap contends that the evidence here directly disproves the conspiracy allegations as it presents evidence that MidCap funded requests without reference to expenses and Graebel made the calls regarding who to pay and not to pay. Dkt. 98 (citing Dkt. 92-8 at 136 (Gould Dep.) (president of specialty finance at MidCap testifying that "MidCap was not taking a position on how Graebel allocated funds"), Dkt. 92-5 at 86–87, 144 (Sullivan Dep.) (MidCap vice president stating that "MidCap provides funding for general working capital purposes and purposes outlined in the credit and security agreement, rather than for specific uses") and Dkt. 92-2 at 100 (Gomez Dep.) (Graebel representative indicating Graebel generally made the decision regarding who to pay)).

The evidence taken as a whole does not constitute a prima facie showing that the conspiracy claim arises out of MidCap's contacts with Texas.

### 6.    Consent

The plaintiffs contend that MidCap Funding instituted and is actively prosecuting a receivership in state court in Dallas, Texas. Dkt. 92 at 14; *see* Dkt. 47-1 (MidCap Funding's Petition).[7] The plaintiffs are parties to that proceeding, which deals with the disposal of the Graebel entities' assets. *Id.* The plaintiffs contend that their claim here, which is for a constructive trust over the revenue their work created so as to obtain their wages, could not be more related to the

---

[7] The plaintiffs actually refer to MidCap generally in their consent argument, without differentiating between MidCap Funding and MidCap Trust. Dkt. 92. The petition and application for appointment of receiver, however, was filed only by MidCap Funding. Dkt. 47-1.

receivership action in Dallas. *Id.* They contend that this lawsuit and the Dallas lawsuit relate to the same transaction and that MidCap Funding therefore consents to this court's jurisdiction. *Id.*

MidCap, citing Southern District of Texas Local Rule 7.4, asserts first that the court should not even consider this argument because the plaintiffs did not raise it until their supplemental briefing, which they submitted after jurisdictional discovery. Dkt. 98 at 4. MidCap also argues that its claims do not arise out of the same nucleus of facts involved in the receivership. *Id.* at 5. It contends that the receivership involves only whether the receiver can collect assets pledged to MidCap as collateral, whereas the focus of this case is whether MidCap is responsible for wages owed to the plaintiffs under the FLSA. *Id.*

  a.      **Local Rule 7.4**

The court will first address MidCap's assertion that the court should not consider the consent argument. Southern District of Texas Local Rule 7.4 states that "[f]ailure to respond will be taken as a representation of no opposition." S.D. Tex. L.R. 7.4. In the plaintiffs' original response to MidCap's motion to dismiss, they contend that "MidCap now attempts to reap the fruits of its own fraud by filing suit in Texas state court against Graebel Van Lines and the other Graebel entities to collect on its $60 million note" and that "MidCap cannot—at least not with a straight face—contend that it would be unduly burdensome to be haled into Texas to defend itself when MidCap is already prosecuting a case that arises out of the same transactions." Dkt. 47 at 12, 28; *see also* Dkt. 31. They also note in that response, in a footnote, that they intervened in the receivership and requested "a constructive trust be imposed over any proceeds directly traceable to their unpaid work and that those proceeds be impounded in the Court registry pending the outcome of this action." Dkt. 47 at 6 n.2. Thus, while the plaintiffs did not directly say that MidCap *consented* to jurisdiction in their original response, the assertion of this argument now can hardly be considered a surprise that is prejudicial

to MidCap. Moreover, MidCap had the opportunity to respond to the argument via supplemental briefing. The court is not bound to robotically apply its own rules and has considerable discretion to manage its own docket. Here, it finds that there is no reason to disallow the argument simply because it was not expressly raised in the original briefing.

### b. Consent

The court now turns to the substance of the argument that by instituting the receivership action in Dallas, MidCap Funding consented to jurisdiction in this case. In support of their consent argument, the plaintiffs cite several cases in this district that rely upon the First Circuit's holding in *General Contracting & Trading Co.* Dkt. 92 at 13–14. MidCap relies on *Guzman v. Memorial Hermann Hospital System*, No. H-07-3973, 2008 WL 5273713, at *13 (S.D. Tex. Dec. 17, 2008).

In *General Contracting & Trading Co., LLC v. Interpole, Inc.*, 940 F.2d 20 (1st Cir. 1991), the First Circuit considered a case in which the plaintiff ordered some wooden utility poles from the defendant, a New Hampshire corporation. The delivery was delayed, and the plaintiff sued the defendant in New Hampshire. 940 F.2d at 21. The defendant filed a third-party claim in the same lawsuit against the party that was in charge of shipping the poles to the plaintiff (the "third party defendant"). *Id.* The third party defendant ("TPD") never responded, which resulted in a default judgment on the third-party claim. *Id.* TPD unsuccessfully tried to set aside the default and then filed a separate claim against the original plaintiff in the same court. *Id.* After some more very convoluted litigation history, TPD argued that the original default judgment was a nullity because the district court lacked personal jurisdiction over TPD. *Id.* at 21–22. The First Circuit determined that TPD "submitted itself to the court's personal jurisdiction by instituting" the second lawsuit. *Id.* at 22. The court noted that to hold otherwise "would produce an unjust asymmetry, allowing a party (here, [TPD]) to enjoy the full benefits of access to a state's courts *qua* plaintiff, while nonetheless retaining

immunity from the court's authority *qua* defendant in respect to claims asserted by the very party it was suing (here, [the original defendant and third party plaintiff])." *Id.* at 23.

The first case the plaintiffs cite that relies on *General Contracting & Trading* is *Toshiba International Corp. v. Fritz*, 993 F. Supp. 571, 573 (S.D. Tex. 1998) (Kent, J.). In *Toshiba*, the defendant contended he had no contacts with Texas, and the plaintiff, citing *General Contracting & Trading Co.*, argued that the defendant had waived a personal jurisdiction argument by filing a third-party complaint. 993 F. Supp. at 573. Judge Kent pointed out that in *General Contracting & Trading* waiver resulted when the party objecting to jurisdiction had filed a separate original action that arose out of "'the same nucleus of operative facts.'" *Id.* (quoting *Gen. Contracting & Trading Co.*, 940 F.2d at 23). He distinguished the facts, however, because Fifth Circuit precedent indicated that filing a third-party complaint does *not* waive an objection to jurisdiction. *Id.*

Next, the plaintiffs cite *Kennedy Ship & Repair L.P. v. Loc Tran*, 256 F. Supp. 2d 678, 684 (S.D. Tex. 2003) (Kent, J.). The *Kennedy Ship & Repair* defendants had previously filed a lawsuit against the plaintiffs in state court and then non-suited the case. *Kennedy Ship & Repair*, 256 F. Supp. 2d at 681–82. The plaintiffs' claims stemmed at least in part from that lawsuit. *Id.* at 682. The defendants moved for dismissal for lack of personal jurisdiction, but the court denied the motion. *Id.* at 685. Citing, *General Contracting & Trading Co.*, the court noted that it could not "think of a better textbook example of a non-resident invoking Texas's benefits and protections than a non-resident filing a lawsuit in a Texas court in his individual capacity, as the Defendant did here, and such suit now serves as the basis of Plaintiffs' claims." *Id.* at 684.

Finally, in *International Transactions, Ltd. v. Embotelladora Agral Regionmontana SA de CV*, 277 F. Supp. 2d 654, 667 (N.D. Tex. 2002) (Fish, C.J.), Judge Fish considered a case that involved a debt collection dispute between a Cayman Islands corporation and Mexican corporations. 277 F.

Supp. 2d at 658. The Cayman Islands corporation had entrusted funds to a Texas corporation to invest in a promissory note issued to one of the Mexican corporations for the construction of a bottling plant. *Id.* at 658. The Mexican corporation defaulted on the note and the Texas corporation initiated an arbitration proceeding pursuant to the terms of the note. *Id.* The Mexican defendant brought two lawsuits in state court in Texas against the Texas corporation—the first suit sought a stay of the arbitration initiated by the Texas corporation and to compel arbitration in front of a different arbitration association. *Id.* at 659. This case was dismissed. *Id.* In the second suit, four of the Mexican corporations sought to compel joinder of additional parties to the arbitration and asserted an affirmative claim against the Texas corporation for usury. *Id.* This case was settled. *Id.* The Texas corporation eventually was awarded more than $11 million in arbitration, and the Mexican corporations filed for bankruptcy in Mexico. *Id.* Then, the Cayman Islands corporation sued the Texas corporation to regain custody of the arbitration award; the Cayman Islands corporation was successful, and then brought suit in Texas against the Mexican corporations to enforce the award and receive payment. *Id.* The Mexican defendants moved to dismiss for lack of personal jurisdiction. *Id.*

Judge Fish noted that "[u]nder Texas law, '[v]oluntary filing a lawsuit in a jurisdiction is purposeful availment of the jurisdiction's facilities and can subject a party to personal jurisdiction in another lawsuit when the lawsuits arise from the same general transaction.'" *Id.* at 667 (quoting *Primera Vista S.P.R. de R.L. v. Banc Serfin, S.A. Institucion de Banca Multiple Grupo Financiero Serfin*, 974 S.W.2d 918, 926 (Tex. App.—El Paso 1998, no pet.) (citing *Gen. Contracting & Trading Co.*, 940 F.2d at 22)). Judge Fish noted that he was "mindful that a party does not necessarily waive its jurisdictional objections by filing suit," but determined that the lawsuits appeared "to arise out of

the same nucleus of operative facts." *Id.* at 668. The court concluded that there was no unfairness in subjecting the Mexican defendant to jurisdiction. *Id.*

The court now turns to the case relied upon by MidCap: *Guzman v. Memorial Hermann Hospital System*, No. H-07-3973, 2008 WL 5273713 (S.D. Tex. Dec. 17, 2008) (Rosenthal, J.). In *Guzman*, the plaintiff sued Memorial Hermann Hospital System in Texas State court for medical malpractice. 2008 WL 5273713, at *1. Memorial Hermann removed the case to federal court. *Id.* The plaintiff amended her complaint to add state-law claims against other individuals and entities, including a claim against Emergency Consultants, Inc., a Michigan corporation that had an administrative services agreement with the company that contracted to provide emergency physicians to Memorial Hermann. *Id.* Emergency Consultants had been involved in another lawsuit in Texas that arose out of a contract between Emergency Consultants and one of its physician partners at a different Memorial Hermann hospital. *Id.* at *5. The physician partner had sued Emergency Consultants, asserting that it interfered with her independent medical judgment. *Id.* Emergency Consultants filed a petition for a writ of mandamus seeking to quash a deposition in that case. *Id.* The plaintiff in *Guzman* asserted jurisdiction over Emergency Consultants under an alter ego and single business enterprise theory. *Id.* Judge Rosenthal determined that the "relationship between the allegedly negligent medical care in this case and [Emergency Consultants'] Texas contacts is 'too attenuated to satisfy specific jurisdiction's due process concerns.'" *Id.* at *10.

First, *Guzman* is not on point at all because the foreign corporation in that case did not bring a lawsuit in Texas, it merely filed a *writ* in a lawsuit a physician had filed against it. That is different than purposefully taking advantage of the forum's laws in a case that arises out of the same nucleus of operative facts like the cases cited by the plaintiffs. The question here, then, is whether the receivership action arose out of the same nucleus of operative facts as this lawsuit. While MidCap

36

asserts that the "*only* issue involved in the receivership action is whether the receiver can collect assets pledged to MidCap as collateral," the impact of the plaintiffs' claim to those same assets will be an important factor in the case. *See* Dkt. 98 at 4. Being a factor in a case and having the same operative facts are, however, not the same. The Receivership lawsuit is not as related to this lawsuit as the lawsuits were in the cases cited by the plaintiffs in which the courts determined that the exercise of personal jurisdiction was appropriate. But it is not an attenuated relationship, either. Instead, it is like this entire case is a small part of the receivership action because the plaintiffs are claiming part of the funds from that case based on the arguments that they are entitled to the funds that they make in this case.

While this case seems like more of a close call than the cases relied upon by the plaintiffs, the court agrees with the plaintiffs' purposeful availment argument. The plaintiffs assert that the receivership case is "essentially a state court bankruptcy [because] it purports to dispose of all of the Graebel Entities' assets." Dkt. 92 at 14. They contend that it "deals with the very property for which the Graebel Drivers claim a constructive trust in this action" and that their claim for a constructive trust here "could not be more related to the Dallas Receivership." *Id.* Because it arises from the same operative facts, though a subportion of those facts, MidCap Funding has purposefully availed itself of the benefits and protections of Texas laws as they relate to these facts, and it is not unfair to subject it to jurisdiction in Texas. Accordingly, the court finds, notwithstanding the plaintiffs' failure to meet their burden with regard to their other jurisdictional theories, that it may exercise jurisdiction over MidCap Funding due to consent. MidCap Funding's motion to dismiss for lack of personal jurisdiction is therefore **DENIED**.

### 7.     **MidCap Trust**

The plaintiffs define the two MidCap entities as "MidCap" in their briefing and do not

distinguish the entities in their jurisdictional arguments. *See* Dkt. 92. MidCap asserts that this is legally improper and that the plaintiffs' assertion of claims against MidCap Trust disregards facts adduced during jurisdictional discovery. Dkt. 98. MidCap contends that MidCap Trust entered into the loan with Graebel in 2014 and simultaneously assigned the loan to MidCap Funding X. *Id.* (citing Dkt. 92-8 (Gould Dep.)). MidCap asserts that since that assignment, MidCap Trust has "had nothing to do with the Graebel loan." *Id.* (citing Dkt. 92-8 (Gould Dep.)).

The court agrees that it is improper for the plaintiffs to lump the MidCap entities together without demonstrating why the court may exercise jurisdiction over each entity. Because the plaintiffs have presented no evidence relating directly to MidCap Trust and the defendants present evidence that MidCap Trust was not involved with the events that gave rise to this lawsuit, the plaintiffs have not presented a prima facie case of jurisdiction. The motion to dismiss, as it relates to MidCap Trust, is **GRANTED**.

## C.     Motion to Dismiss for Failure to State a Claim

MidCap also moves for the court to dismiss all of the plaintiffs' claims for failure to state a claim upon which relief can be granted. Dkt. 41, 42. The plaintiffs argue that they have provided sufficient notice of all of their claims and have pled the fraud claims with particularity as required by Federal Rule of Civil Procedure 9(b).

### 1.     FLSA Coverage

MidCap requests dismissal of the plaintiffs' FLSA claim because the plaintiffs have not sufficiently alleged individual or enterprise coverage, which is a prerequisite for an FLSA claim. Dkt. 42 at 15–16. The plaintiffs argue that their amended pleading adequately establishes either individual or enterprise coverage under the FLSA. Dkt. 47 at 42. MidCap replies that the plaintiffs do not sufficiently allege individual coverage because they do not state which plaintiffs engaged in

work across state lines and they do not sufficiently allege enterprise coverage because MidCap and Graebel are in completely different industries and thus cannot be an "enterprise."  Dkt. 58 at 7–8.

The FLSA protects employees who are "engaged 'in the production of goods for commerce' ('individual coverage') *or* 'employed in an enterprise engaged in commerce or in the production of goods for commerce' ('enterprise coverage')." *Martin v. Bedell*, 955 F.2d 1029, 1032 (5th Cir. 1992) (quoting 29 U.S.C. § 207(a)(1)).  "The difference is that in the individual coverage analysis, the question is whether the plaintiff himself engaged in interstate commerce, whereas in the enterprise coverage analysis, the question is whether any two or more of the business's other employees engaged in interstate commerce." *Mendoza v. Detail Sols., LLC*, 911 F. Supp. 2d 433, 439 n.4 (N.D. Tex. 2012).  To determine individual coverage under the FLSA, courts in the Fifth Circuit ask "whether the work is so directly and vitally related to the functioning and instrumentality or facility of interstate commerce as to be, in practical effect, a part of it, rather than isolated local activity." *Sobrinio v. Med. Ctr. Visitor's Lodge, Inc.*, 474 F.3d 828, 829 (5th Cir. 2007)).  "In the motion to dismiss context, plaintiffs who allege the elements of individual coverage under the FLSA without explaining their involvement in interstate commerce do not sufficiently plead interstate commerce." *Shorts v. Primeco Auto Towing, L.L.C.*, No. H-13-2794, 2014 WL 3670004, at *3 (S.D. Tex. July 22, 2014) (Miller, J.).

With regard to enterprise coverage, the FLSA defines an "enterprise engaged in commerce or in the production of goods for commerce" as an "enterprise" that

> (I) has employees engaged in commerce or in the production of goods for commerce or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 . . . .

29 U.S.C. § 203(s)(1)(A).  "'Enterprise' means the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or other organizational units . . . ."  29 U.S.C § 203®.  To show separate entities comprise an enterprise, the entities must: "(1) perform related activities; (2) operate in a unified manner or through a common control; and (3) possess a common business purpose."  *Howard v. John Moore, L.P.*, No. H-13-1672, 2014 WL 5090626, at *5–6 (S.D. Tex. Oct. 9, 2014) (Miller, J.).

In the second amended complaint, the plaintiffs allege that MidCap and other defendants "have been enterprises within the meaning of 3(r) and 3(s) of the FLSA."  Dkt. 104.  They additionally assert that the plaintiffs were all "individual employees who engaged in commerce or in the production of goods for commerce."  *Id.*

MidCap argues that the plaintiffs merely recite the elements of individual coverage and fail to provide an individual description of the work each plaintiff performed or how that work engaged the individual plaintiff in interstate commerce.  Dkt. 42.  With regard to enterprise coverage, MidCap contends that the threshold requirement for enterprise coverage is the existence of an enterprise among separate entities, and the plaintiffs do not allege that MidCap and the other business have a common purpose.  *Id.* (citing *Flores v. Act Event Servs., Inc.*, 55 F. Supp. 3d 928, 935 (N.D. Tex. 2014), and *Howard*, 2014 WL 5090626, at *2).  Moreover, MidCap contends that the plaintiffs do not allege that MidCap engages in commerce or in the production of goods for commerce or had employees engaged in commerce or the production of goods for commerce.  *Id.*

The plaintiffs assert that it is absurd to suggest that moving drivers for an international moving company that provides relocation services for 33 branch terminal locations throughout the United States may not be involved in interstate commerce.  Dkt. 47 at 35.  They contend that the plaintiffs'

"jobs inherently involved transporting customers' belongings in interstate commerce," and that the first amended complaint reflects that in the first paragraph. *Id.* at 37. They additionally contend that enterprise coverage exists because they adequately allege that MidCap is their FLSA employer and that it is Graebel's alter ego and that all entities had the common business purpose of maximizing revenue for the benefit of MidCap. *Id.*

The first couple of paragraphs of the second amended complaint discuss the nature of Graebel's business, including an allegation that it "was in the business of providing local, intrastate, and interstate moving, storage, and relocation services for professionals." Dkt. 104 at 2. This allegation, however, is insufficient to establish individual coverage because it does not indicate that each of the plaintiffs provided interstate moving services, and it is possible that some plaintiffs worked only locally. For individual coverage, the plaintiffs must be more specific about the work of each individual since the industry engages in local, intrastate, and interstate commerce.

With regard to enterprise coverage, it is plausible from the facts alleged that Graebel engaged in commerce and had employees engaged in commerce, as the plaintiffs allege there were locations throughout the United States and that it was engaged in interstate moving and relocation services. Dkt. 104. MidCap, on the other hand, is a financial institution. *Id.* However, the plaintiffs include numerous allegations that MidCap had control over Graebel's business when decisions were being made regarding payments to the drivers. *See id.* Since the court must take the allegations in the complaint as true when considering a motion to dismiss under Rule 12(b)(6),[8] there are sufficient allegations that MidCap worked in concert with Graebel to operate the business for the common

---

[8] The court may not consider the evidence submitted relating to the personal jurisdiction analysis when considering the motion to dismiss for failure to state a claim.

business purpose of protecting MidCap's return on its investment. The motion to dismiss the plaintiffs' FLSA claim based on the failure to plead coverage is therefore **DENIED**.

### 2.    FLSA Claim, In General

MidCap next asserts that the court should dismiss the FLSA claim because the plaintiffs generally recite the elements of an FLSA claim without any factual support. Dkt. 42. It also asserts that the claim should be dismissed because the plaintiffs are exempt from the FLSA's overtime provisions and that the collective action claims should be dismissed because the plaintiffs do not adequately identify the putative class. *Id.*

The plaintiffs argue that MidCap ignores the factual allegations that clearly state a claim under the FLSA. Dkt. 47 at 41. They note that the complaint alleges that (1) the plaintiffs were employed by the defendants; (2) they were not paid a wage as required by FLSA; and (3) the putative class is drivers who were not paid. *Id.* at 41–42.

The court finds, taking the allegations in the complaint as true, that the plaintiffs have adequately stated a claim under the FLSA and have identified the putative class. MidCap's motion to dismiss because the plaintiffs did not plead sufficient facts to support their FLSA claim, have no claim because they were exempt from the FLSA, and did not adequately identify the putative class is **DENIED**.

### 3.    Imputed Liability - Multiple Theories

MidCap takes issue with the assertion of multiple theories, noting that "[u]nder no set of facts can MidCap be liable under all three theories of liability." Dkt. 42 at 19. However, it is premature to dismiss one theory in favor of another at the motion to dismiss stage if the theories are all adequately pled. The motion to dismiss because of competing theories of liability is **DENIED**.

### 4. Conspiracy

MidCap next requests dismissal of the plaintiffs' conspiracy claim because the plaintiffs fail to plead several of the elements of their conspiracy claim with particularity and do not allege sufficient separateness between MidCap and the other defendants to support a conspiracy claim. Dkt. 42 at 18–19. It contends that the plaintiffs merely allege a lender-debtor relationship and fail to plead an unlawful overt act. *Id.* at 20. The plaintiffs contend that their complaint alleges sufficient conduct to establish liability over MidCap for conspiracy to commit fraud. Dkt. 47 at 51.

Under Texas law, the elements of a civil conspiracy include:

(1) two or more persons;
(2) an object to be accomplished;
(3) a meeting of the minds on the object or course of action;
(4) one or more unlawful, overt acts; and
(5) damages as a proximate result.

*Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). In the second amended complaint, the plaintiffs allege a "meeting of the minds" to defraud the drivers and a decision by MidCap to fail to allocate capital to pay the drivers. Dkt. 104 at 38. MidCap contends that the conclusory allegation that MidCap did not allocate enough capital is not an unlawful and overt act. Dkt. 58. However, if MidCap is an "employer" under the FLSA as alleged and purposefully did not allocate capital so that the drivers would not be paid, this would be an overt act that is unlawful under the FLSA. The court, taking the facts alleged in the second amended complaint as true, finds that the plaintiffs have stated a claim for conspiracy. The motion to dismiss the conspiracy claim is **DENIED**.

### 5. Aider and Abettor

MidCap contends that Texas does not recognize a claim for aider and abettor liability. Dkt. 42 at 20. The plaintiffs do not address this argument in their response. *See* Dkt. 47. MidCap takes note of this fact in its reply and argues that the plaintiffs conceded the point. Dkt. 58 at 8. However, the

court's primary consideration when considering whether to grant a Rule 12(b)(6) motion is the text of the complaint itself.

In *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 224 (Tex. 2017), the Texas Supreme Court noted that it has not expressly decided whether Texas recognizes an aiding and abetting cause of action, but it assumed, without deciding, that it does. Given this treatment, the court makes an *Erie* guess that the Texas Supreme Court would adopt the tort in the appropriate circumstance.[9] *See Seahawk Liquidating Tr. v. Certain Underwriters at Lloyds London*, 810 F.3d 986, 991 (5th Cir. 2016) ("When an issue of state law is unclear, a federal court must make an '*Erie* guess' as to what the state's highest court would decide."); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938). Accordingly, MidCap's motion to dismiss because the claim does not exist is **DENIED**.

### 6.    Veil Piercing/Alter Ego

The court now turns to the plaintiffs' veil piercing theories. First, the court notes that MidCap asserts in its reply in support of its motion to dismiss that the plaintiffs concede in their response that their fraud claims only include Graebel, Peterson, and Gomez. *See* Dkt. 58. However, the second amended complaint asserts a fraud claim against all the defendants and notes that MidCap is liable because Graebel acted as MidCap's agent and also under alter ego and veil-piercing theories. Dkt. 104 at 37. Thus, while the direct fraud claims may include only Graebel, Peterson, and Gomez, there is still an allegation that MidCap is liable for the fraud.

---

[9] MidCap cited one of this court's cases in support of its argument that Texas does not recognize an independent aiding and abetting fraud claim. *See* Dkt. 42 at 20 (citing *Graduate Med. Educ. Dev., LLC v. St. George's Univ., Ltd.*, No. H-15-2614, 2016 WL 5844707, at *13 (S.D. Tex. Oct. 6, 2016) (adopting the Magistrate Judge's recommendation regarding an aiding and abetting claim)). The court decided *Graduate Medical Education Development* before the Texas Supreme Court decided to analyze an aiding and abetting claim in *First United Pentecostal*.

MidCap requests that the court dismiss these imputed liability claims. It contends that the plaintiffs' veil piercing and alter ego fraud and breach of contract claims cannot survive because (1) the plaintiffs do not meet Rule 9(b)'s heightened pleading standard for the fraud claim; and (2) a contract claimant may only pierce the veil if the defendant has committed actual fraud against the plaintiff for the defendant's personal benefit. Dkt. 42 at 23–24. The plaintiffs argue that their complaint contains sufficient allegations to support their alter ego theory to pierce the corporate veil. Dkt. 47 at 53–54. In reply, MidCap relies on *Valdes*, which MidCap argues the plaintiffs cannot meaningfully distinguish. Dkt. 58 at 9.

While the court found, *supra*, that the evidence submitted did not support an alter ego theory of jurisdiction, relying heavily on *Valdes*, the court must take the allegations in the second amended complaint as true when considering a motion to dismiss for failure to state a claim. Taking these allegations as true, the plaintiffs have pled enough facts to meet the Rule 9(b) pleading standard for their alter ego fraud claim, and they have sufficiently alleged that MidCap committed fraud against the plaintiffs for its own personal benefit. *See* Dkt. 104 at 41–42. MidCap's motion to dismiss for failure to state a claim with regard to these theories is therefore **DENIED**.

### 7. Agency

Finally, with regard to the plaintiffs' attempt to impute liability under an agency theory, MidCap asserts that the plaintiffs do not meet Rule 9(b)'s standard because they do not provide any specificity about actual or apparent authority. Dkt. 42 at 24–25. MidCap also contends that there is no indication that MidCap had the right to control the means and details of Graebel's day-to-day operations. Dkt. 58 at 9–10.

In the second amended complaint, the plaintiffs allege that MidCap had the right to control how Graebel allocated capital and to control the means and details of the processes Graebel used to

maximize its revenue. Dkt. 104 at 42–43. They also assert that the credit and security agreement between MidCap and Graebel gave MidCap "virtual control over all of the Graebel Entities." Dkt. 104 at 23. The second amended complaint delineates the specific paragraphs of the contract that it contends provided this degree of control. *See id.* at 23–25 (quoting portions of the agreement). The second amended complaint provides rough dates and alleges that MidCap directed Graebel to cut costs and eventually directed Graebel to stop paying the drivers. *Id.* at 26. The court finds that there are sufficient allegations in the second amended complaint that, if taken as true, meet the Rule 9(b) requirements of pleading liability for fraud due to an agency relationship. The motion to dismiss this claim is **DENIED**.

## IV. CONCLUSION

MidCap's motion to dismiss (Dkt. 41, 42) is GRANTED IN PART AND DENIED IN PART. It is GRANTED with respect to the claims against MidCap Trust, which are DISMISSED FOR LACK OF PERSONAL JURISDICTION. It is otherwise DENIED.

Signed at Houston, Texas on July 20, 2018.

_____
Gray H. Miller
United States District Judge

46