# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| JOSE GARCIA, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-1601 |
| | § | |
| VASILIA A/K/A "VAUNA" PETERSON, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion for decertification filed by defendant MidCap Funding X Trust ("MidCap") and various other defendants who have since been dismissed. Dkt. 242. After considering the motion, response, reply, and applicable law, the court is of the opinion that the motion should be GRANTED.

## I. BACKGROUND

This lawsuit is about the plaintiffs, who were moving truck drivers for entities associated with non-party Graebel Companies, Inc.,[1] allegedly not being paid for their work. Dkt. 142. MidCap was Graebel's secured lender during a portion of the time period at issue, and the plaintiffs contend that MidCap had complete control of Graebel and is responsible for Graebel's failure to pay the plaintiffs. *Id.*

The court conditionally certified a Fair Labor Standards Act ("FLSA") class on July 25, 2018. Dkt. 114. The parties have now completed discovery. Dkt. 242. There are currently thirty-one

---

[1] Graebel and its affiliates were originally defendants in this lawsuit. However, all of the parties to this lawsuit that were affiliated with the Graebel entities have settled. *See* Dkt. Entries on May 20, 2019. The court will refer to all Graebel-related entities that have settled collectively in this order as "Graebel" for ease of reference.

named plaintiffs, and 120 or 128 individuals who were drivers for Graebel have opted in to the conditionally certified class. *Id.* (motion); Dkt. 269 (response). MidCap nows moves for decertification of the class, arguing that the putative class members are not similarly situated. Dkt. 242. The motion is ripe for disposition.

## II. LEGAL STANDARD

Courts in the Southern District of Texas follow the two-stage *Lusardi* approach to FLSA collective action certification. *See Badgett v. Taco Cabana, L.P.*, No. H-05-3624, 2006 WL 2934265, at *1–2 (S.D. Tex. Oct. 12, 2006) (Miller, J.). This approach involves a "notice" stage, during which the court considers whether to preliminarily certify a class and allow notice to potential class members, and a "decertification" stage, which occurs after discovery is largely complete and includes a consideration of whether the evidence obtained during discovery supports continuing to consider the claims of the plaintiffs and opt-in plaintiffs collectively. *Id.* This case is currently at the decertification stage, and MidCap has moved for decertification.

During the decertification stage, the court must "make a factual determination as to whether there are similarly situated employees." *Maynor v. Dow Chem. Co.*, 671 F. Supp. 2d 902, 930 (S.D. Tex. 2009) (Rosenthal, J.). The plaintiffs have the burden to prove the putative class members are similarly situated, and the court's analysis is "more searching than it was at the conditional certification stage." *Id.* at 931. Courts must keep in mind that similarly situated is not the same as identically situated. *Id.* In making the similarly situated determination, courts consider the following three factors: "'(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural concerns.'" *Id.* (quoting *Proctor v. Allsups Convenience Stores, Inc.* 250

2

F.R.D. 278, 280 (N.D. Tex. 2008)). "The three factors are not mutually exclusive and there is generally overlap among them." *Id.* (citations and quotations omitted).

### III. ANALYSIS

MidCap argues that the putative class members are not similarly situated, and the plaintiffs argue that while they are not identical, they are similar enough to proceed collectively, especially in light of the remedial purposes of the FLSA. Dkts. 242, 269. The court will consider what evidence discovery has revealed relating to each of the three factors in the similarly situated analysis and then weigh the factors to determine if the putative class is similar enough to proceed collectively or if the court should instead decertify the class.

### A. Disparate Factual and Employment Settings of Individual Plaintiffs

#### 1. Pay Policy

The plaintiffs argue that the pay policy at issue here is uniform for all plaintiffs because the drivers received no pay for moving jobs they performed from the end of October 2016 until Graebel closed in mid-March 2017. Dkt. 269 at 9. The plaintiffs contend the drivers only received disbursements for their estimated expenses under a formula called the Labor Per Formula. *Id.* The Labor Per Formula was intended to cover the labor expense for people hired to help with the move and did not include any compensation for the driver. *Id.* at 9–11 (citing testimony from Graebel executives); *see, e.g.*, Dkt. 269, Ex. G (Etchison Dep.) ("[W]hat they were receiving, that wasn't necessarily their pay; that was an advance for work to be done, you know, so they could hire labor.").

MidCap points out that some of the drivers testified that they received more than the Labor Per Formula during the relevant time period, and it cites various deposition testimony indicating that some drivers received payments that were not advances during this time period, and others received

no advances or pay. Dkt. 242 at 10–11. The plaintiffs argue that the executives themselves admit that the plaintiffs were all subjected to the same nationwide pay practice and that the defendants have rebutted this point with "deposition testimony from a handful of Plaintiffs that Defendants have cherry-picked out of context." Dkt. 269 at 12. By way of example, the plaintiffs note that one of the plaintiffs who testified that she was paid $6,000 during the relevant time period later clarified that the money was for other jobs and not the jobs for which she is now seeking payment. *Id.* (citing Dkt. 269, Ex. E at 79 (Earley Dep.)).

MidCap argues in reply that the "so-called 'policy' Plaintiffs allege—a 'failure to pay'—is inapposite" to the common policies or plans that have been held to violate the FLSA. Dkt. 284 at 2. It asserts that Graebel's policy prior to November 2016 was to pay pursuant to a rate schedule and that after November 2016 Graebel was unable to determine pay for drivers beyond the Labor Per Formula because of an information technology ("IT") system failure that caused Graebel not to be able to make settlement statements, and the failure to pay was a consequence of this IT failure, not a systematic policy. *Id.* MidCap additionally argues that even if the court considered this failure to be a "policy," more than a "handful" of plaintiffs testified that they received more than the Labor Per Formula. *Id.* at 3. According to MidCap, thirteen drivers were deposed who took advances under the formula, and seven of them said they received more than the Labor Per Formula. *Id.* (citing Dkt. 242 at 10–11).

The testimony cited by the plaintiffs indicates that from Graebel's perspective, the drivers were only receiving the Labor Per Formula after the IT failure and not the pay they would have received if Graebel could still make settlement statements. Dkt. 269 at 9–11. However, the testimony and exhibits offered by MidCap present a more muddled story. The drivers' testimony

4

indicates that some of the drivers believed they were compensated beyond the formula, some drivers believe they only received Labor Per Formula, and some indicated they were not paid at all. Melissa Earley testified that she did not receive advances and was paid around $6,000 from January to April 2017.[2] Dkt. 242, Ex. 5 at App. 300–301. David Anderson testified that in 2017 he only received advances for expenses (Dkt. 242, Ex. 1 at App. 38), and then he testified that it was possible that his income for the first quarter of 2017 was $30,000 (Dkt. 242, Ex. 1 at App. 61–63). William Gibbs testified that he believed he did not receive "the full amount of compensation for all – all services" during the relevant time period. Dkt. 242, Ex. 12 at App. 699. Eric Guynup testified that he was not getting paid in full during the relevant time period and that Graebel was paying him "whatever they wanted to pay me." Dkt. 243, Ex. 13 at App. 749. Eugene Kaale submitted a claim for revenue owed that indicates he received some cash advances. Dkt. 243, Ex. 14A at App. 819. Gabriel Strasser testified that he received payment from Graebel for approximately $24,000 during the relevant time period. Dkt. 243, Ex. 17 at App. 1036. He agreed that he received some money during the time period but that it was "way less than what they owed." *Id.* at App. 1037. He said that the amount paid was for "miscellaneous." *Id.* at App. 1038. When asked if the amounts paid during the relevant time period were in addition to advances to pay his crews, he responded that "once you had a positive balance with the company, there is no such a thing as advance. Advance is when you have no money and you are actually borrowing money. And once you have a positive balance, that's my money. So whatever I request of them, it was my money, whether it was for labor, personal, whatever. Once you have a positive balance, there is no loan. Advance is a loan." *Id.* Albert Foks

---

[2] However, later in her deposition, she agreed that the Labor Per Formula was "how we paid the people who worked with us." Dkt. 269, Ex. E at 79.

testified that he received advances and then Graebel paid him another amount of money, but not the total amount he was owed. Dkt. 243, Ex. 9 at App. 560. Jose Garcia testified that he did not receive any advances, though he acknowledged that some employees did. Dkt. 243, Ex. 11 at App. 664–65. John Ford did not take advances. Dkt. 243, Ex. 10 at App. 638.

MidCap points out that Brian Etchinson, who is one of the deponents the plaintiffs cite for the proposition that drivers were only paid the Labor Per Formula and not paid their own wages during the relevant time period (*see* Dkt. 269 at 10 (citing Etchison Dep. at 65–66)), testified that "home funding" meant the total amount a driver was owed under the formula in the independent contractor agreement. Dkt. 243, Ex. 7 at App. 353–54. He wrote an email to managers on March 7, 2017, indicating that home funding would be "in the afternoon and funding [would] be based on availability." Dkt. 243, Ex. 7A at App. 368. "Funding for home" was the revenue that drivers had due—their final payment. Dkt. 243, Ex. 7 at App. 358–59. He testified that this was an attempt to "empower the general managers" because they knew their drivers and who needed to be paid; he asked them to identify priority funding by highlighting contractor funding requests in purple and "left it to their discretion to determine who gets highlighted in purple." Dkt. 243, Ex. 7 at App. 353–54. He also testified, when asked about the "ransom tactic," that he recalled a time where a driver got paid when he finished a move because he wanted to be paid before he turned in the trailer, and he said that he recalled "paying a lot of drivers when they completed their assignments." *Id.* at App. 355–56.

The evidence presented by both parties demonstrates that while perhaps the intention when the IT failure occurred was to only pay Labor Per Formula for some time period, in reality drivers were getting paid in different ways. These differences weigh against continued certification.

### 2. Economic Realities

One of the biggest issues in this case with regard to the FLSA claims is whether the drivers were independent contractors or employees. If the drivers are not employees, the FLSA does not apply, and there will be no collective action. Thus, the extent to which the drivers are similarly situated with regard to the factors considered in making the independent contractor/employee determination is paramount to determining the practicality of proceeding as a collective action.

Rather than relying on the contractual designation of a worker as an independent contractor, courts consider various factors that elucidate the economic realities of the relationship between the alleged employee and employer. *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 845–46 (5th Cir. 2010). Courts "focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself [or herself]." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). The five non-exclusive factors are: "(a) the permanency of the relationship; (b) the degree of control exercised by the alleged employer; (c) the skill and initiative required to perform the job; (d) the extent of the relative investments of the worker and the alleged employer; and (e) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer." *Thibault*, 612 F.3d at 846; *see also Hopkins*, 545 F.3d at 343. Sometimes courts in the Fifth Circuit refer to the test as "whether the putative employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."[3] *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010); *see also*

---

[3] In *Williams*, the Fifth Circuit stated that the four factors quoted above were the "four standard factors under the economic reality test" but that the "court ha[d] reference other factors in

*Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). "No single factor is determinative"; "[r]ather, each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind." *Hopkins*, 545 F.3d at 343.

### a.     Graebel's Control Over the Drivers

MidCap argues that the plaintiffs are not similarly situated because Graebel exercised a different degree of control over each plaintiff, and the plaintiffs argue that Graebel controlled all meaningful aspects of their employment. Dkts 242, 269. With regard to the economic realities test, "'[c]ontrol is only significant when it shows an individual exerts such a control over a meaningful part of the business that she stands as a separate economic entity.'" *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1049 (5th Cir. 1987) (quoting *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1312–13 (5th Cir.)). "'[M]inor regular tasks cannot be bootstrapped into an appearance of real independence.'" *Id.* (quoting *Pilgrim Equip.*, 527 F.2d at 1312–13). The court will thus consider the evidence to determine if the dissimilarities cited have enough impact on the determination of meaningful control to render the consideration of the claims collectively inappropriate.

MidCap points specifically to testimony indicating varying degrees of control over drivers' schedules, the moving process, the laborers or workers who assisted with the moves, and how often the drivers took jobs. Dkt. 242. The plaintiffs argue that Graebel controlled all meaningful aspects of their employment, and the differences pointed out by MidCap are immaterial or de minimis when considered in light of evidence of similarity. Dkt. 269. Specifically, the plaintiffs argue that "virtually all Plaintiffs" testified that (1) they never or rarely turned down jobs because they would

different contexts," and cited *Hopkins*. *See Williams*, 595 F.3d at 620 & n.17 (citing *Hopkins*, 545 F.3d at 343).

be passed over for other jobs in the future; (2) they had to wear Graebel uniforms; (3) they had to affix the Graebel name to their trucks; (4) they had to use Graebel-employed helpers; (5) they were required to comply with Graebel policies and procedures to execute the moves; and (6) they received training on how to drive and execute moves in accordance with Graebel policy. *Id.*

### 1)    Uniforms and Logos

The plaintiffs point out that all of the drivers had to wear Graebel uniforms and affix Graebel logos to their trucks, which they contend weighs in their favor on the control factor. Dkt. 269. Courts considering the control factor are somewhat divided on the significance of a uniform requirement. *Compare, e.g.*, *Guerra v. Teixeira*, No. TDC-16-0618, 2019 WL 330871, at *6 (D. Maryland Jan. 25, 2019) (finding that a uniform and ID card requirement, when there was no legal requirement that the employees wear uniforms or carry ID cards "and the purported purpose of the requirement . . . could be accomplished through other means," weighed, "at least to a limited degree, in favor of a finding of control"); *Flores v. Velocity Express, LLC*, 250 F. Supp. 3d 468, 482 (N.D. Cal. 2017) (noting that the defendant "did control the appearance of its drivers and their vehicles"); *Acosta v. Senvoy, LLC*, No. 3:16-cv-2293-PK, 2018 WL 3722210, at *7 (D. Or. July 31, 2018) (finding the fact that the defendants controlled the "drivers' appearance, requiring them to purchase and wear Senvoy-approved uniforms and identification badges" to weigh heavily in favor of employer control); *with, e.g.*, *Roslov v. DirectV Inc.*, 218 F. Supp. 3d 965, 974 (E.D. Ark. 2016) (finding that the control apparent from installation standards and uniform requirements "does not negate the reality that [the alleged employee] was still operating as a 'separate economic entity'"); *Meyer v. U.S. Tennis Ass'n*, No.1:11-cv-06268, 2014 WL 4495185, at *7 (S.D.N.Y. Sept. 11, 2014) ("To be sure, USTA did have some degree of control over Plaintiffs (uniforms, best practices,

evaluations, and code of conduct), but 'the degree of control is not so great as to weigh in favor of finding the Plaintiffs to be employees as opposed to independent contractors.'" (citation omitted)); *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 607 (E.D.N.Y. 2012) (finding that the defendant's control over its branding via car decals and uniforms was "not so great as to weigh in favor of finding the Plaintiffs to be employees as opposed to independent contractors"); *Herman v. Mid-Atlantic Installation Servs., Inc.*, 164 F. Supp. 2d 667, 673 (July 27, 2000) (finding that "[r]equiring installers to wear uniforms and ID badges identifying themselves with [the defendants] does not make them employees" because (1) it was required by the county; and (2) even if it were not, "the requirement does not affect the economic reality of the relationship" and "does not affect the installers' economic dependance or independence from [the defendants] in any way, but merely allows consumers to be assured on their *bona fides*"). Here, MidCap has presented no evidence that the uniform and logo policy was not required by all members of the putative class, so the court, after considering the caselaw relating to uniforms and logos, finds that the similarity weighs at least somewhat in favor of maintaining a collective action. However, the extent to which this impacts the actual economic reality is minimal.

### 2) Standardized Moving Procedures

The plaintiffs also contend that all of the putative class members had to comply with Graebel policies and procedures to execute the moves. Dkt. 269 (citing drivers' deposition testimony). MidCap argues that the "few record citations that refer to a specific policy or training refer to truck-maintenance, safety, or Department of Transportation ("DOT") requirements," which MidCap contends is not relevant to control. Dkt. 284. MidCap argues that Graebel's level of supervision over the actual move process varied from driver to driver. Dkt. 242.

David Anderson testified that it was his responsibility to perform a move in "accordance with Graebel's specifications." Dkt. 269, Ex. A at 197. He contends that Graebel showed him films about the general process, but nobody supervised him; he decided how to arrange the move. Dkt. 242, Ex. 1 at 31. However, later in the deposition, Anderson asserted that Graebel "controlled the move 100 percent." *Id.* at 198. Gregory Cutlip testified that Graebel imposed safety requirements on drivers and violations would result in discipline or suspension. Dkt. 269, Ex. C at 93–94. Albert Dennis testified that Graebel had a handbook on "the way that they wanted it done," and he had to keep a driver log in compliance with DOT requirements and comply with federal and state hours of service rules. Dkt. 269, Ex. D at 68. He noted that his duties were performed "based on [his] experience and [his] judgment on how to carry it out." Dkt. 242, Ex. 4 at App. 199. Melissa Earley testified that she had to follow all of Graebel policies and procedures and that Graebel controlled probably 80% of the specific details of how she completed a move. Dkt. 269, Ex. E at 11, 32, 41–42, 54–55. Albert Foks testified that Graebel gave the drivers a manual that had rules or "specifications that [the drivers] needed to do as . . . far as Graebel employees." Dkt. 269, Ex. I at 130. Lisa Othello testified that Graebel sent the drivers to training about safety and how the job is performed. Dkt. 269, Ex. N at 221. She said they had to comply with certain maintenance standards, which included having a clean truck that was in good working order and folding the pads. *Id.* at 222. Mark Wilburn testified that his manager at Graebel had rules or policies that the drivers in North Carolina had to follow. Dkt. 269, Ex. Q at 30. Brian Etchison, a Graebel executive, testified that drivers were responsible for complying with policy and procedures referred to in their contracts and that Graebel's safety department would have been responsible for ensuring they did so. Dkt. 269, Ex. G at 48–49.

There was also testimony about Graebel's degree of control regarding what routes its drivers took. Robert Catterson testified that he could take whatever route he wanted. Dkt. 242, Ex. 2 at App. 90. Jose Garcia also testified that he chose his own route. Dkt. 242, Ex. 11 at 659. Albert Fern testified that Graebel chose the routes. Dkt. 242, Ex. 8 at App. 400. Mark Wilburn said that Graebel controlled everything, including giving him a Google map with the best possible route. Dkt. 242, Ex. 18 at App. 1062. He felt that he had to take the route provided in case something happened to his truck. *Id.* Eric Guynup mainly drove locally in Dallas, and he said that Graebel did not want them to take toll roads because Graebel did not want to pay tolls, so Graebel basically told him the route to take because he often would have preferred to use the toll roads. Dkt. 242, Ex. 13 at App. 754.

After reviewing the cited testimony, the court finds that, as MidCap noted, many of the drivers are referring to safety requirements that are not highly probative of control and thus not particularly relevant to the court's present inquiry regarding whether the drivers were similarly situated with regard to the substantive matters the court must consider in its analysis of the claims in this case. However, some of the drivers indicated that Graebel had rules about how they performed the move, and the degree of similarity on this aspect of control is highly relevant. Not only does the cited testimony indicate that the drivers had different perceptions with regard to who was in control of the way they performed their jobs, the cited testimony calls into question whether all of the drivers received the same type of training, particularly since some drivers testified about being sent to training and others simply received some type of safety manual. The court finds the evidence about allegedly standardized procedures weighs against continued certification.

### 3)   Turning Down Jobs

The court now turns to the plaintiffs' argument that the plaintiffs were all similarly subject to Graebel's control because they could not turn down jobs. The plaintiffs contend that the drivers "never turned down jobs, or did so exceedingly rarely, largely based on the understanding that they could not turn down moving jobs that were assigned to them, either by virtue of Graebel policy or the reality that, if they turned down a job once, they would be punitively passed over for jobs in the future." Dkt. 269 at 16. MidCap contends that the drivers' experiences with turning down jobs was "mixed," pointing out that some drivers took off winters or only worked half of the year and others thought they would face negative consequences if they turned down a job. Dkt. 284.

David Anderson testified that he never declined jobs because there was an unwritten rule that if you declined a job you may face "a long period of no work." Dkt. 269, Ex. A at 104–05. Albert Dennis testified that he could say no to a job but that people did not want to say no because "who wants to say no, when you—when you got somebody that's going to be [annoyed] with you." Dkt. 269, Ex. D at 28. Melissa Earley agreed that her contract permitted her to reject shipments, but she said the drivers could not actually reject them "[b]ecause if we did we were blacklisted." Dkt. 269, Ex. E at 34. She refused a job one time and did not get called for a week and a half. *Id.* at 100. However, she stated that the drivers could take time off if they had a doctor's appointment or vacation if they had permission to take time off. *Id.* at 35. Albert Fern agreed that he was free to accept or reject any assignment but he did not do so because "if we didn't take it, we didn't work." Dkt. 269, Ex. H at 42. John Ford testified that he was not aware that his agreement permitted him reject jobs. Dkt. 269, Ex. J at 24. He said he did reject jobs once or twice a year, but that when you do that "you go to the bottom of the list, then the other guys will rotate up." Dkt. 269, Ex. J at 24.

13

He said that Graebel did not stop giving him jobs immediately because he rejected a job. *Id.* at 25. Jose Garcia testified that he "told the man yes all the time." Dkt. 269, Ex. K at 89. Eric Guynup testified that he was not able to reject a job if dispatch called about a job because "[y]ou wouldn't be working the following day if you reject too many jobs." Dkt. 269, Ex. M at 21–22. He would give Graebel advance notice if he was going on vacation. *Id.* at 22–23. Chet Painter testified that while hypothetically he could have rejected a job, he did not do so. Dkt. 269, Ex. O at 79. He worked local jobs, so he just showed up at the office each day to work, and if he was sick, they assigned jobs to someone else. *Id.* at 79–80. Mark Wilburn testified that he did not know if he could reject a job, but he never did. Dkt. 269, Ex. Q at 11. If he wanted to take a vacation, he would call in advance and let Graebel know. *Id.* at 12–13.

This evidence is relatively consistent that the drivers did not think they could turn down jobs because they may not get as many assignments, at least temporarily, if they did, and they could take time off without repercussion if they asked in advance. This is evidence of control that impacts the economic reality and weighs in favor of continued certification.

### 4) Use of Graebel-Employed Helpers

The plaintiffs next contend that they were similarly situated with regard to the control prong because they had to use Graebel-employed helpers who Graebel had drug tested and approved. Dkt. 269. MidCap asserts that several of the drivers testified that they selected their own helpers. Dkt. 284.

David Anderson testified that he generally found workers from Graebel dispatch, but he had discretion in how many workers to take and how much to pay them. Dkt. 242, Ex. 1 at App. 48. Richard Catterson testified that he supervised workers that were dispatched from Graebel on a job

and paid them, in cash, pursuant to guidelines given to him by Graebel. Dkt. 242, Ex. 2 at App. 81. Kevin Clayburn testified that whoever worked for him had to be approved by Graebel and be drug tested by Graebel, and he would decide which workers, out of a pool of Graebel-approved workers, would work for him on which jobs. Dkt. 242, Ex. 3 at App. 171. John Ford testified that he had two employees who worked for him, and he never had additional helpers from Graebel. Dkt. 242, Ex. 10 at App. 623. Albert Dennis's helpers were sent from Graebel; Graebel hired them and determined how much they were paid. Dkt. 269, Ex. D at 162. Melissa Earley testified that the workers on her jobs were Graebel employees who were background and drug tested through Graebel. Dkt. 242, Ex. E at 97. Albert Foks testified that he used Graebel labor to assist in performing services for the customers. Dkt. 242, Ex. I at 16. William Gibbs testified that his helpers were Graebel employees, and he would set the number of people he needed. Dkt. 242, Ex. L at 20–21.

After reviewing the testimony cited by both parties, the court finds there is more similarity in the way helpers were employed than difference, and this is relevant to the economic realities and weighs in favor of continued certification.

### b. Opportunity for Profit and Loss and Investment

MidCap argues that the opportunity for profit and loss varied significantly between drivers because the drivers could determine their own hours and also had various ways in which they could increase the amounts Graebel paid them like owning their own trailer, having good performance, negotiating with Graebel for increased rates for packing, accepting larger instead of smaller jobs, accepting jobs in the warehouse or branch office, mentoring younger drivers, and setting up their own LLCs or corporations, some of which had their own full-times employees who received W-2s. Dkt. 242 at 16–17; *see, e.g.*, Dkt. 242, Ex. 16 at App. 881–86 (Painter Dep.) (noting that he had more

than one company that performed moving services for Graebel); Dkt. 252, Ex. 15 at App. 827 (Othello Dep.) (testifying that she and another Graebel driver formed a company that provided services for Graebel); Dkt. 242, Ex. 9 at 555–56 (Foks Dep.) (discussing how he would sign supplemental agreements on some jobs to make more on the packing).  MidCap points out that some courts have focused on the level of investment in vehicles, and that in this case some drivers owned their own tractors and trailers, some leased a tractor through Graebel, some leased a used Graebel-owned vehicle, some used only Graebel-owned vehicles, and some used a combination of their vehicles and Graebel's.  Dkt. 242 at 18; *see, e.g.*, Dkt. 242, Ex. 8 at App. 388-89 (Fern Dep.) (discussing the five trucks in the moving fleet he used for Graebel during the relevant time period); Dkt. 242, Ex. 2 at App. 78–79 (Catterson Dep.) (testifying that he owned a trailer that he purchased through Graebel); Dkt. 242, Ex. 1 at App. 17 (Anderson Dep.) (noting that he bought a small truck because Graebel insisted he own a truck, but he only drove trucks furnished by Graebel); Dkt. 242, Ex. 6 at App. 335–38 (Eggebrecht Dep.) (testifying that at first Graebel wanted owner-operators who brought their own equipment, but it later worked with Cure Leasing Company, which provided trucks to Graebel's contractors).  Graebel helped finance some trucks or helped with down payments. Dkt. 242 at 18.  Also, some drivers said they were responsible for all operational costs associated with a move, while others said they were sometimes covered, and others said they were routinely covered.  *Id.* at 19; *see, e.g.*, Dkt. 242, Ex. 10 (Ford Dep.) (stating that he was responsible for operating costs such as fuel, truck maintenance, and insurance); Dkt. 242, Ex. 1 at App. 12 (Anderson Dep.) (testifying that he sometimes asked Graebel to pay for "incidentals" like food); Dkt. 242, Ex. 8 at App. 408–10 (Fern Dep.) (testifying that some Graebel jobs had fuel surcharges, some jobs included hotels and food, and some shipments were more profitable than others).  One

driver said that her operations manager would cover expenses for jobs that did not pay enough. Dkt. 242 at 19; *see* Dkt. 242, Ex. 15 at App. 847 ("[W]e can call Edwin and he can tell us how much we're going to make. If it's not enough, Edwin takes care of everything else, the labor, everything. . . . Some jobs don't pay as well as some, so they compensate you for expenses.").

The plaintiffs argue that their profit and loss was determined by Graebel because their job assignments were uniformly from Graebel dispatch. Dkt. 269 at 19. They contend that if Graebel did not have jobs, then they did not work. *Id.*

While the court agrees that Graebel was in control of the drivers' profit, which would be the case with any company that pays for services, MidCap has presented evidence that there were differences in the drivers' ability to profit. This factor weighs against continued certification.

### c.     Permanency of the Relationship

MidCap argues that the relative permanence of the relationships between drivers and Graebel, which is a consideration in the independent contractor analysis, varied greatly amongst the drivers. Dkt. 242 at 19. It contends that some had on-again-off-again relationships, and others worked for a time as an employee compensated with an hourly wage and then transitioned to contractor. *Id.* The plaintiffs argue that virtually all of the plaintiffs testified to at least a years' long employment with Graebel, and they all testified that they worked exclusively for Graebel until 2017, when the company closed. Dkt. 269 at 15.

MidCap refers specifically to testimony from David Anderson, Eric Gaynup, Albert Dennis, Melissa Earley, Gabriel Strasser, and Chet Painter. Dkt. 242 at 19. Painter testified that he worked for Graebel for almost thirty years. Dkt. 242 at App. 886. He first worked as an hourly employee, but he had the role of supervisor or project manager from 1998 until 2017. *Id.* at App. 892. Strasser

testified that he would work at Graebel warehouses when he was waiting for moving jobs. Dkt. 242, at App. 1032. Earley testified that she started working or providing services at Graebel in 2003 as a warehouse employee and received a paycheck every two weeks. Dkt. 242, Ex. 5 at App. 261. She signed a Terminal Service Contract Agreement with Graebel in 2010 on behalf of her company, M&J Services. *Id.* at App. 263–64. She worked for Graebel under that agreement but also was asked from time to time (about five times a year) to run the office for up to three days at a time, and she was paid on the clock while performing that work. *Id.* at App. 266. Albert Dennis testified that he was paid hourly to do warehouse work or pull trailers to relocate to another yard. Dkt. 242, Ex. 4 at App. 238. Eric Guynup testified that at some point he started traveling and doing hotels on his own for a couple of years during his eighteen or nineteen year relationship with Graebel; he believes it was around 2008 or 2009. Dkt. 242, Ex. 13 at App. 755–57. David Anderson similarly testified that he left around the end of 2011 to drive for a different van line, but he came back to Graebel around the middle of January 2012. Dkt. 242, Ex. 1 at App. 41. He left again from December 2013 until May 2014. *Id.* at App. 42–43. But he left on good terms and was rehired. *Id.* at App. 43.

While it is clear from these bits and pieces of testimony that not all of the drivers stayed with Graebel continuously for twenty or so years before Graebel went out of business, the employees who worked for other van lines for brief periods of time during their relationship with Graebel or had returned long before Graebel allegedly stopped paying its drivers, and all of the employees had been working for Graebel for relatively long periods of time. The fact that some of them also performed hourly work from time to time differentiates the employees, but it is not probative with regard to "permanence" of the relationship. The court does not believe the dissimilarities on the permanency factor are sufficient to preclude collective consideration of the FLSA claims.

#### d. Level of Skill of Drivers

MidCap points out that some drivers testified that they were essentially small business managers owning a fleet of vehicles and were responsible for paying all local, state, and federal taxes and withholding unemployment and employment taxes. Dkt. 242 at 20. Others did not operate as an entity and used one truck for all their moves, which did not require specific managerial or financial skill. *Id.*

The plaintiffs argue that the defendants are "complicat[ing] what is simple." Dkt. 269 at 18. The plaintiffs assert that they were truck drivers who required a commercial drivers' license and Graebel's training and "[t]hat's it, and that's all." *Id.* MidCap argues in reply that several drivers actually had a Class C license, not a commercial license. Dkt. 284 (citing Dkt. 269, Exs. E, H, O).

While driving a truck could be considered "simple," regardless of the type of license one carries, running a small business with multiple trucks and jobs each day is not quite as simple. Certainly the skills and initiative of the drivers varied, which weighs against collective consideration of their claims.

Considering the similarities and differences among the drivers outlined above with regard to relevant aspects of their employment settings, the court finds that there are significant differences that weigh, in total, against collective consideration.

### B. MCA Exemption Defense

MidCap contends that the second factor in the similarly situated analysis—whether the defenses are individual to each plaintiff—weighs against collective consideration because the defense that the plaintiffs are exempt from the FLSA's overtime requirement under the Motor Carrier Act ("MCA") exemption cannot be determined based on common evidence. Dkt. 242 at 21. The

plaintiffs contend that the MCA exemption is not considered on a plaintiff by plaintiff basis and thus should not weigh against continued certification. Dkt. 269. The court has already granted summary judgment with regard to the FLSA overtime claims based on the MCA Exemption, which was appropriate to consider collectively because the plaintiffs stipulated to the weight of their vehicles and did not argue that any particular plaintiff was not involved in interstate commerce.

## C.    Fairness and Procedural Considerations[4]

MidCap next argues that fairness and procedural considerations weigh in favor of decertification. Dkt. 242 at 23. MidCap contends that the primary purposes of allowing collective action in FLSA cases is to lower costs by pooling resources and provide a means of efficiently resolving common issues of law and fact that arose from the same alleged activity. *Id.* It argues that the court cannot resolve common issues of law and fact in this case because (1) liability is not susceptible to common proof; (2) liability of unpaid minimum wage and overtime compensation requires a plaintiff by plaintiff and week by week analysis; (3) there is no commonality in the number of hours worked or the rate of compensation; and (4) predominant state-law claims undermine the efficiencies of collective action. Dkt. 242 at 23–28. The plaintiffs argues that there are no fairness and procedural considerations that weigh in favor of decertification because the plaintiffs were all paid pursuant to a common rate schedule and mere variations in damages do not disqualify an FLSA class from proceeding collectively. Dkt. 269 at 21.

---

[4] Since the court already granted summary judgment in MidCap's favor on the overtime claims, the only issues with FLSA claims moving forward are differences that will cause problems with collective consideration of the regular wage claims.

### 1.    Liability and Damages

With regard to liability, MidCap notes that the plaintiffs are seeking overtime from before MidCap entered into a Credit and Security Agreement with Graebel in December of 2014, and MidCap could not have been a joint employer before that date.  Dkt. 242 at 24.  It thus argues that the determination of joint employer cannot be applied to the class as a whole.  *Id.*  MidCap also argues that some of the plaintiffs testified that Graebel paid them at least minimum wage after the IT failure, and some say Graebel did not pay them at all.  *Id.*  MidCap also cites testimony about overtime varying widely from plaintiff to plaintiff, with some plaintiffs stating they are not seeking overtime pay in this lawsuit, others saying they did not work overtime, and still others providing interrogatory responses that they worked over forty hours.  *Id.*  MidCap additionally points to inconsistencies in the number of weeks the various different plaintiffs allegedly worked overtime. *Id.*  In sum, it argues that the amount of hours worked per week and the amount of compensation varied widely from plaintiff to plaintiff and job to job.  *Id.*

The plaintiffs assert that no fairness and procedural considerations weigh in favor of decertification as all of the plaintiffs were paid pursuant to a common rate schedule that was a percentage of the revenue generated by the job.  Dkt. 269.  Moreover, they contend that "variations in damages ought not disqualify a class of FLSA plaintiffs."  *Id.*  They argue that the level of identity that MidCap is demanding is not the level of identity that the FLSA requires.  *Id.*  They assert that there are mechanisms available to aid the court in managing the litigation in the collective context and that, given the remedial purposes of the statute, the court should find no need to decertify the class.  *Id.*

The plaintiffs rely on *Maynor v. Dow Chem. Co.*, No. CIV. A. G-07-0504, 2008 WL 2220394, at *8–9 (S.D. Tex. May 28, 2008) (Rosenthal, J.) for their argument that the court should not decertify the class simply because there will be differences in the amount of damages. The opinion cited by the plaintiffs is the opinion Judge Rosenthal issued on preliminary certification. The court will consider instead the opinion Judge Rosenthal issued denying the motion to decertify the class. *See Maynor v. Dow Chem. Co.*, No. CIV. A. G-07-0504, 671 F. Supp. 2d 902, 935–36 (S.D. Tex. 2009).

The plaintiffs in *Maynor* alleged that the defendant failed to pay them for time spent training and taking skills-assessment tests. *Id.* at 905. The defendant argued at the decertification stage that even though all of the plaintiffs had to take the assessments, all of the plaintiffs trained for the assessments in different ways, through classroom study, computer labs, tutoring, self-study, or online study, and for different amounts of time. *Id.* at 931. Judge Rosenthal framed the question as being "whether these variations preclude finding a common policy, plan, or practice affecting the covered employees." *Id.* She noted that the training requirements applied to every plaintiff and the defendant knew that the plaintiffs generally spent hours preparing for them off the clock. *Id.* at 932. Judge Rosenthal found that the fact that the plaintiffs all trained in different ways and for different amounts of time did "not eliminate the 'meaningful identifiable facts or legal nexus that bind the claims.'" *Id.* (quoting *Falcon v. Starbucks Corp.* 580 F. Supp. 2d 528, 535–36 (S.D. Tex. 2008)). She noted that this was "especially true when . . . subclassing provides a mechanism for addressing some individual issues raised by claims for compensable self-study or online study hours." *Id.* The defendant had argued that the plaintiffs had to prove that the defendant knew or should have known about the overtime hours, and Judge Rosenthal found that this was a common question

22

notwithstanding the different study methods or study time periods. *Id.* at 933. She pointed out that the difference in the amount of hours spent in self study amongst the plaintiffs impacted damages, not liability, and noted that the Fifth Circuit had endorsed bifurcation of the liability and damages phases in collective actions. *Id.* at 933-34 (citing *Moreau v. Klevenhagen*, 956 F.2d 516, 521–23 (5th Cir. 1992)).

If the evidence here showed a simple, single policy of not paying the drivers for the last several months of Graebel's existence, as the plaintiffs assert, and the plaintiffs were paid the same rate for all jobs, the court may have considered the bifurcated method of dealing with individualized inquiries discussed in *Maynor*. The court could determine collectively whether MidCap is liable as an "employer" for failing to pay and then determine the amount each driver is actually owed in individual proceedings. But, that is not what is happening in this case. Determining whether the plaintiffs are independent contractors or can be considered employees requires consideration of factors that the evidence shows is different for different drivers. Since the application of the economic realities factors could vary from driver to driver or possibly from region to region, it would be unfair to simply look at the averages of what happened in the interest of a determining the claims collectively.

### 2.      Number of Hours Worked or the Rate of Compensation

Additionally, there are differences in the number of hours worked and the rates of compensation in this case that makes the procedural considerations involved in considering all of the claims together concerning. MidCap argues that there is differing testimony regarding whether Graebel paid minimum wage or did not pay plaintiffs at all during the time period that the plaintiffs contend Graebel simply discontinued paying the drivers. *See* Dkt. 242 at 24–25. Additionally, it

points out that some plaintiffs worked overtime and others did not, and they all seem to have varied schedules. *Id.* at 25. And, finally, MidCap contends that the drivers' rates varied from job to job based on the net amount invoiced, meaning there is no consistent rate to apply in a collective proceeding. *Id.* at 28.

The plaintiffs argue that the drivers were all paid pursuant to a common rate schedule that was a percentage, most commonly between fifty and sixty percent, of the total revenue generated by the job, and they assert that the varying dollar amounts of damages does not make the collective action less manageable. Dkt. 269.

While the court agrees that there is a general commonality because Graebel paid the drivers a percentage of the total revenue generated, this does not make it easy to determine whether there are liability issues here collectively. The drivers were all working different hours and making different amounts on different jobs, making it necessary to determine on a driver by driver, job by job, week by week basis whether the driver was paid minimum wage. While there are possibly some procedural mechanisms the court could use to help make these determinations more manageable, all in all "the person specific inquiries into individual work time predominate over the common questions raised by [the] claims, making class certification improper." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016).

In *Tyson*, the plaintiffs in an FLSA collective action were employees at a pork processing plant in Iowa. 136 S. Ct. at 1042. They claimed that they were not paid for time spent donning and doffing protective gear. *Id.* They proposed using an average time spent donning and doffing, determined by an expert, to determine overtime hours for the class. *Id.* at 1048. The U.S. Supreme Court noted that in that the employees in *Tyson* "worked in the same facility, did similar work, and

24

w[ere] paid under the same policy," and that "under these circumstances the experiences of a subset of employees can be probative as to the experiences of them all." *Id.* It held that the "District Court could have denied certification on [the ground that representative testimony was not appropriate] only if it concluded that no reasonable juror could have believed that the employees spent roughly equal time donning and doffing." *Id.* at 1049. That was not the case in *Tyson*, as an expert had watched 744 videotapes of donning and doffing to establish an average time. *Id.* at 1042–44.

Here, the drivers were not in one facility or even the same geographical area, they worked different amounts of time on different jobs, and there is no expert designated to testify about averages. Moreover, the damages claimed by individual plaintiffs in this case vary widely, and an average award would not be fair. *See, e.g.*, Dkt. 222 at 7–8 (listing the wage claim amounts in various plaintiffs' interrogatory response, which range from $1,200 to $254,537). No reasonable jury could conclude that all of the drivers worked roughly the same amount of time.

### 3. Predominant State Law Claims

MidCap argues that the court should decertify the class due to fairness and procedural considerations because the common law claims predominate the FLSA claim because they require more proof on elements that are not relevant to the FLSA claim and involve substantially more issues that the FLSA claim. Dkt. 242. It thus argues that the inclusion of common law claims minimizes any efficiency achieved by proceeding as a collective action. *Id.* In support of this argument, MidCap cites *Ridley v. Regency Village, Inc.*, No. H-17-974, 2018 WL 1334813, at *5 (S.D. Tex. Mar. 15, 2018), a case in which this court declined to exercise supplemental jurisdiction over common law claims because they predominated the FLSA claim.

The plaintiffs do not address this argument in their response. *See* Dkt. 269 at 21–23 (arguing that the fairness and procedural considerations weigh in the plaintiffs' favor because the defendants' own witness "acknowledge[d] that Plaintiffs were all paid pursuant to a common rate schedule that was a percentage. . . of the total revenue generated by the one job" and that variations in damages "ought not to disqualify a class of FLSA plaintiffs that are otherwise similarly situated with respect to employment conditions and uniform pay policy"). The court notes that the plaintiffs have filed a motion to certify a Rule 23 class with regard to their breach of contract, quantum meruit, and fraud claims and their request for a constructive trust. Dkt. 221. The court finds that these issues could very well predominate over the FLSA claim, but it is unclear the extent to which this impacts continued certification, particularly if the court were to agree that the Rule 23 requirements were satisfied with regard to the common law claims. Regardless, the other fairness and procedural considerations weigh against collective consideration.

## IV. Conclusion

While the defenses do not weigh against collective consideration of the plaintiffs' claims, the dissimilarities among the drivers with regard to factual and employment setting and the fairness and procedural considerations weigh sufficiently against collective consideration that the court finds the best course is to decertify the class. Accordingly, MidCap's motion to decertify is GRANTED, and the opt-in plaintiffs' claims are DISMISSED WITHOUT PREJUDICE.

Signed at Houston, Texas on August 5, 2019.

_____
Gray H. Miller
Senior United States District Judge

26