United States District Court
Southern District of Texas
**ENTERED**
August 29, 2019
David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JOSE GARCIA, *et al.*, | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § | CIVIL ACTION H-17-1601 |
| | § | |
| VASILIA A/K/A "VAUNA" PETERSON, *et al.*, | § | |
| | § | |
| *Defendants*. | § | |

**MEMORANDUM OPINION AND ORDER**

Pending before the court are (1) a motion for summary judgment that was filed by defendant MidCap Funding X Trust ("MidCap") (Dkt. 173); and (2) a motion to strike evidence relied upon by the plaintiffs filed by MidCap (Dkt. 216). After considering the motion, response, reply, and applicable law, the court is of the opinion the motion to strike (Dkt. 216) should be GRANTED IN PART AND DENIED IN PART, and the motion for summary judgment (Dkt. 173) should be GRANTED.

**I. BACKGROUND**

The plaintiffs, who are individuals who drove moving trucks for entities associated with Graebel Van Lines LLC ("Graebel"), brought this lawsuit relating to allegedly not getting paid for their services against Graebel, affiliated entities, and Graebel's secured lender, MidCap. Dkt. 164. The Graebel entities dissolved in March 2017. *Id.* The plaintiffs have settled their claims against Graebel, and MidCap is the only remaining defendant. Dkts. 297, 298. The court has also dismissed the FLSA overtime claim, and it dismissed the opt-in plaintiffs after decertifying a conditionally certified FLSA collective action. Dkts. 292, 293. The only remaining claims are (1) an FLSA claim that the drivers were not paid for their work from October 2016 through March 2017; (2) an FLSA

claim that the defendants did not keep adequate records of the drivers' work hours and pay; (3) breach of contract; (4) quantum meruit; (5) fraud; and (6) conspiracy and aider and abettor liability for fraud.  Dkt. 114.  The plaintiffs seek to impose liability on MidCap for many of these claims under an alter ego or agency theory of liability.  *Id.*

MidCap moves for summary judgment on all the claims, arguing that the law in the Fifth Circuit is "clear and well established that being a lender to a borrower, even when the lender holds substantial rights over the borrower, does not create a basis under any theory of liability for acts of the borrower."  Dkt. 174 at 1.  It argues that (1) the plaintiffs cannot make a strong showing of total control and domination that is required to hold a lender liable for the acts or omissions of its borrower; (2) MidCap is not liable for breach of contract or fraud under an alter ego theory or agency theory; (3) the drivers cannot prove conspiracy between MidCap and Graebel because there was no agreement to defraud, intent to defraud, or unlawful, overt act towards a conspiracy; (4) the drivers' aiding and abetting claim fails because the cause of action has not been recognized by Texas state courts; (5) the drivers cannot recover under quantum meruit because the drivers had contracts and because MidCap did not directly benefit from the drivers' services; and (6) the FLSA claims fail because MidCap is not the drivers' employer or joint employer.  *Id.*

The plaintiffs respond first and foremost that MidCap was the drivers' employer under the FLSA because it controlled the decision to pay or not to pay and also injected discretionary capital into the Graebel entities.  Dkt. 210 at 24.  The plaintiffs argue next that MidCap conspired with Graebel not to pay the drivers and to induce them to continue driving for free.  *Id.*  They contend that MidCap "knew where the money it was sweeping [from a lockbox account each night] was coming from, it made the conscious decision not to pay the drivers knowing it, and it was the sole beneficiary

2

of [Graebel's] fraud." *Id.* With regard to the aiding and abetting claim, the plaintiffs argue, without addressing MidCap's argument regarding Texas's failure to recognize the claim, that there is a question of material fact with regard to their aider and abettor claim. *Id.* And, they contend that there is at least a question of material fact as to whether they can pierce the corporate veil to hold MidCap accountable for Graebel's actions under Delaware law, which it contends applies to the alter ego claim in this case. *Id.*

In reply, MidCap does not dispute that Delaware law applies to the plaintiffs' alter ego theory of liability. Dkt. 215. Instead, it contends that Delaware law is essentially the same as Texas law in this area and that the plaintiffs cannot show that MidCap and Graebel operated as a single economic entity. *Id.* It also argues that the drivers failed to provide any evidence that MidCap agreed to defraud drivers and asserts that Graebel made all the decisions regarding what to pay with MidCap's loan advances. *Id.* Finally, MidCap urges the court to grant judgment in its favor on the following issues, which it contends the plaintiffs did not address in their response: (1) MidCap did not direct Graebel to make any misrepresentations or decide to pay or not pay certain people under an agency theory; (2) the plaintiffs' contractor agreements preclude recovery under quantum meruit; (3) the plaintiffs cannot establish the elements of quantum meruit; (4) aiding and abetting is not a cognizable Texas claim; and (5) the plaintiffs' vicarious liability theories are mutually exclusive. *Id.*

MidCap has also filed a motion to strike evidence that the plaintiffs attached to their response to the motion for summary judgment. Dkt. 216. It argues that (1) the court should strike all evidence that the plaintiffs attached that the plaintiffs do not cite in their response; (2) the court should strike certain statements contained in Greg Cutlip, Jr.'s declaration as not based on personal knowledge,

3

speculative, hearsay, and lacking proper foundation; (3) the court should strike certain deposition testimony because it is speculative, the deponent lacks personal knowledge, or it is hearsay; and (4) the court should strike certain exhibits that are printouts of email correspondence because they are hearsay, lack completeness, are irrelevant, or because the emails do not support the propositions for which the plaintiffs cite them.  *Id.*  The plaintiffs contend that the uncited exhibits they attached are not voluminous and corroborate other evidence cited in the summary judgment record, and they urge the court to consider them as part of the summary judgment record.  Dkt. 248.  With regard to the objections that witnesses lacked personal knowledge, the plaintiffs argue that the witnesses testified based on what they knew and any attacks on the basis of that knowledge go to the veracity of the testimony, not its admissibility.  *Id.*  They argue that to the extent MidCap argues statements of MidCap or Graebel representatives are hearsay, they are admissions of a party opponent and thus not hearsay.  *Id.*  They then respond to each individual objection.  *Id.*

The court will first consider the evidentiary objections and then turn to the motion for summary judgment.

## II. EVIDENTIARY OBJECTIONS

### A.    Material Attached But Not Referenced

MidCap objects to Exhibits D-27, H-45, M-45, Q, Q-1, U, W, EE, and GG, because the plaintiff attached these exhibits to their summary judgment response but did not cite them.  Dkt. 216. The plaintiffs argue that they provided pin cites for "virtually all factual statements in the summary judgment response" and that the additional attached material is "not voluminous and in fact corroborate[s] other evidence cited in the summary judgment record."  Dkt. 248.  They thus urge the court to consider all of the attached exhibits as part of the summary judgment record.  *Id.*

While the court agrees that the uncited exhibits are not overly voluminous,[1] it is the plaintiffs'
responsibility to go through the exhibits and cite the exhibits or portions of exhibits that support each
of their specific arguments.  It is not the court's burden to "comb through the evidence and pinpoint
exhibits that demonstrate that a genuine dispute of material fact exists." *Ureteknologia De Mexico
S.A. de C.V. v. Uretek (USA), Inc.*, No H-16-2762, 2018 WL 4680603, at *9 (S.D. Tex. Sept. 28,
2018).  Accordingly, the court agrees with MidCap that the exhibits that the plaintiffs have not cited
in their briefing should not be considered as part of the summary judgment record.  MidCap's motion
to strike as it relates to Exhibits D-27, H-45, Q, Q-1, U, EE, and GG is GRANTED.  MidCap's
motion to strike Exhibit M-45 is DENIED because Exhibit M-45 is not attached to the plaintiffs'
response.  MidCap's motion to strike Exhibit W is DENIED AS MOOT as the plaintiffs withdrew
this exhibit.  *See* Dkt. 248 at 3.

## B.   Declarations

MidCap objects to two sentences in paragraph 2 of Greg Cutlip, Jr.'s declaration.  Dkt. 216.
First, MidCap objects to the first sentence in paragraph 2, which states that Cutlip "believe[d] that
the Graebel Drivers were deceived" because (1) it is not based on personal knowledge and is mere
speculation; and (2) it lacks proper foundation.  *Id.*  The plaintiffs argue globally that the declarant
stated what he knew and attacks on the basis of that knowledge go to veracity, not admissibility.
Dkt. 248 at 2.  The plaintiffs cite *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir.
2016), in which the Fifth Circuit noted that it is an error for a court to consider the veracity of a

---

[1]   Exhibit D-27 is a nine-page email string.  Exhibit H-45 is a three-page email string.
Exhibit Q is Jose Garcia's son's declaration regarding a meeting.  Exhibit Q-1 is a twenty-eight-page
excerpt of a deposition.  Exhibit U is a sixty-two-page court filing.  Exhibit W is an eight-page
amendment to a Credit and Security Agreement.  Exhibit EE is a three-page letter.  Exhibit GG is
a seven-page email string.  Exhibit M-45 is not attached to the response.

document rather than its admissibility in making a decision to strike evidence.  In that case, a magistrate judge struck deposition testimony that was refuted by other evidence in the record.  *See* 832 F.3d at 234.  Here, the issue is not the veracity of Cutlip's testimony, it is whether it is proper to introduce his *belief*.  Under Federal Rule of Evidence 701, opinion testimony is limited to opinions "rationally based on the witness's perception" that are "helpful to clearly understanding the witness's testimony or to determining a fact in issue" and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  In the context of the remainder of Cutlip's declaration, it appears that the testimony to which MidCap objects is based on Cutlip's perception and could be helpful to a jury.  The motion to strike the first sentence of paragraph 2 of the Cutlip declaration is therefore DENIED.

Next, MidCap objects to the second sentence in paragraph 2 of Cultip's declaration which states that Graebel instructed him to tell the drivers to keep driving, asserting that it is inadmissible hearsay.  Dkt. 216.  The plaintiffs argue that all of the hearsay arguments are admissible as admissions of a party opponent.  Dkt. 248.  MidCap points out that Cutlip's admission may be an admission of Graebel, since he was a Graebel employee, but it is not an admission of *MidCap*.  Dkt. 251.  The court agrees with MidCap.  The statement is hearsay and not an admission of MidCap, so it not admissible against MidCap.  Thus, the motion to strike the first portion of the second sentence of paragraph 2 of Cutlip's declaration is GRANTED.

Next, MidCap objects to the second half of the second sentence in paragraph 2, which indicates that Graebel made the instruction in the first half of the paragraph after it knew it was not collecting anything and was going to shut down.  Dkt. 216.  MidCap objects to this portion of the sentence as lacking proper foundation and not being based on personal knowledge.  *Id.*  Cutlip was

Chief Executive Officer of Graebel,[2] and the court finds this was a sufficient position to know what the company knew. Thus, to the extent this portion of the sentence is relevant without the hearsay statement contained in the first half of the sentence, the motion to strike is DENIED. .

**C.    Depositions and Emails**

MidCap objects to the admission of cited testimony in the depositions of Ormando Gomez, Julie Eggebrecht, Craig Boucher, and Greg Cutlip, Sr. as well as various email printouts that were presented as exhibits I-65, I-66, J-131, K-141, O-149, Z, and 29-3. Dkt. 216. The court need not rule on these objections because even if the objected to testimony and emails were included in the record, summary judgment is appropriate. *See* Part IV, *infra*. Accordingly, the motion to strike with regard to the depositions of Ormando Gomez, Julie Eggebrecht, Craig Boucher, and Greg Cutlip, Sr. and the emails at exhibits I-65, I-66, J-131, K-141, O-149, Z, and 29-3 is DENIED AS MOOT.

### III.  SUMMARY JUDGMENT LEGAL STANDARD

A court shall grant summary judgment when a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] fact is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party." *Fordoche, Inc. v. Texaco, Inc.*, 463 F.3d 388, 392 (5th Cir. 2006). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e). The court must view the evidence in the light most favorable

---

[2]  From January 1, 2015 until mid-November 2016, Cutlip was senior vice president of operations. In mid-November he was named CEO. Dkt. 174, Ex. F at App. 527.

to the non-movant and draw all justifiable inferences in favor of the non-movant. *Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 524 (5th Cir. 2008).

## IV. ANALYSIS

### A.   FLSA Employer or Joint Employer

The plaintiffs contend that MidCap is liable for alleged FLSA violations because it was their joint employer. Dkt. 164. MidCap argues that it was Graebel's lender and that a lender is not a joint employer under the FLSA. Dkt. 174. It notes that whether a party is a "joint employer" under the FLSA is determined pursuant to the economic realities test, and all of the economic realities factors weigh against it being a joint employer. *Id.* The plaintiffs argue that MidCap was their joint employer under the FLSA because MidCap's decision to pay or not pay the drivers coupled with its decision to inject discretionary capital into Graebel makes MidCap their joint employer. Dkt. 210. In reply, MidCap contends that it was a lender and did not decide who to pay and that the economic realities factors weigh against a finding that MidCap was the plaintiffs' joint employer.

#### 1.   Legal Standard

Rather than relying on the contractual designation of a worker as an independent contractor, courts presented with an FLSA claim consider various factors that elucidate the economic realities of the relationship between the alleged employee and employer. *Thibault v. Bellsouth Telecomms., Inc.*, 612 F.3d 843, 845–46 (5th Cir. 2010). Courts "focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself [or herself]." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008). The five non-exclusive factors are: "(a) the permanency of the relationship; (b) the degree of control exercised by the alleged employer; (c) the skill and initiative required to perform the job; (d) the extent of the

relative investments of the worker and the alleged employer; and (e) the degree to which the worker's opportunity for profit and loss is determined by the alleged employer." *Thibault*, 612 F.3d at 846; *see also Hopkins*, 545 F.3d at 343. Sometimes courts in the Fifth Circuit refer to the test as "whether the putative employer: (1) possessed the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."[3] *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010); *see also Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012). "No single factor is determinative"; "[r]ather, each factor is a tool used to gauge the *economic dependence* of the alleged employee, and each must be applied with this ultimate concept in mind." *Hopkins*, 545 F.3d at 343.

### 2. *Nissenbaum*: Can a Lender Be a Joint Employer?

MidCap relies on a Nevada federal district court case to argue that the limited connection between an employee and his or her employer's lender is insufficient to establish a joint employer relationship and that "employer" "'is not a word that commonly refers to creditors.'" Dkt. 174 (relying on *Nissenbaum v. NNH Cal Neva Servs. Co., LLC*, 983 F. Supp. 2d 1245, 1247–49 (D. Nev. 2013), and quoting *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 150 (2d Cir. 2007)). The plaintiffs argue that *Nissenbaum* supports their position that a secured lender *can* be an FLSA joint employer because the *Nissenbaum* court relied on the economic realities factors; the *Nissenbaum* secured lender was not an "employer" because it had no involvement in payroll, which the plaintiffs

---

[3] In *Williams*, the Fifth Circuit stated that the four factors quoted above were the "four standard factors under the economic reality test" but that the "court ha[d] referenced other factors in different contexts," and cited *Hopkins*. *See Williams*, 595 F.3d at 620 & n.17 (citing *Hopkins*, 545 F.3d at 343).

here contend "stands in stark contrast to MidCap's control over Graebel Entities' ability to make payroll in this case." Dkt. 210.

In *Nissenbaum*, a Nevada federal district court considered a lawsuit filed by the plaintiff, who had been the general manager of a resort in Lake Tahoe that was a party to a loan and security agreement. 983 F. Supp. 2d at 1247. The plaintiff was demoted to hotel manager following a visit by the lender during which the plaintiff told the lender the resort was a "financial mess," and the property went into receivership. *Id.* at 1248. The reason given for the demotion was that the property was going into receivership and the managing director was replacing the general manager. *Id.* The receivership order authorized the receiver to manage the resort and to borrow or receive funds from the lender. *Id.* The lender made approximately seven advances at the receiver's request. *Id.* However, eventually the lender foreclosed and its subsidiary became the new owner through a trustee sale. *Id.* The lender hired a new management company, and the new management company terminated the employment of both the plaintiff and the new manager. *Id.* at 1248–49.

The plaintiff filed a lawsuit alleging violations of Title VII of the Civil Rights Act of 1964, the Equal Pay Act, and Nevada's discrimination and equal pay laws. *Id.* at 1249. The court considered whether the lender, which was one of the defendants, was a joint employer under the FLSA as part of its consideration of a motion for summary judgment on the Equal Pay Act claim. *Id.* at 1250. The court found that the agreements at issue at most gave the lender the right to approve of the decision to demote the plaintiff and that the record did not indicate that it actually played any role in the decision. *Id.* at 1253. It noted that the plaintiff had argued that because the lender was providing funding to the receiver, it had some control over her salary, but pointed out that the "fact that [the lender] had the right to obtain a court-appointed receiver following [the original owner's]

10

default in no way bestowed [the lenders] with the authority to take over the operation and management of the [resort]." *Id.* at 1256. Ultimately, the court held that the plaintiff had not provided a disputed issue of material fact on the issue of whether the lender was her joint employer under the economic realities test. *Id.* at 1252.

*Nissenbaum* is helpful in that it demonstrates that the situations in which lenders become involved in the businesses for which they provide funds vary. It does not stand for the proposition that a lender *cannot* be liable as a joint employer under the FLSA. Rather, it demonstrates that the court must disregard labels and consider the economic realities of the relationship in the case before it.

### 3.       The Economic Realities

MidCap does address the economic realities test, asserting that it cannot be considered a joint employer under the FLSa because it did not have the power to hire and fire the drivers, did not supervise or control the drivers' work schedules or conditions of employment, did not determine the drivers' rate and method of payment, and did not maintain their employment records. Dkt. 174. MidCap contends that its role was providing Graebel daily loan advances for all of Graebel's operating expenses. Dkt. 215 (citing Dkt. 210 (Response) at 24–25).

The plaintiffs assert that MidCap's control over funding was complete and that its agreement with Graebel required capital infusion every day for Graebel to be able to continue its operations. Dkt. 210 at 24. They argue that MidCap acted in its sole discretion with regard to funding when Graebel was in default, and they were in default in the fall of 2016. *Id.* at 25 (citing Ex. D at 162). The plaintiffs agree that MidCap perhaps did not have formal authority to hire and fire, but argue that this formality has no place when considering the true economic reality because MidCap "certainly

11

did exercise its authority over whether to pay the Graebel Drivers, and actually decided not to pay the Graebel Drivers and keep them working for free." *Id.* The plaintiffs point out that MidCap used its discretion to pay employees, including drivers, in November during a payroll crisis, *see* Dkt. 210, Ex. B at 133, and acted in its discretion to extend credit without amending the credit and security agreement to fund payment for some employees one week before Christmas, *see id.* at 51–52. They note, though, that MidCap "[c]rucially . . . decided, in its discretion, not to pay the Graebel Drivers in the days before Christmas"—referring to a decision on December 23, 2016, not to fund an advance. *Id.* (citing Ex. B at 70–71).

MidCap asserts that there is no evidence to support any contention that MidCap was involved in Graebel's payroll process or somehow decided not to pay the drivers. Dkt. 174. Rather, when Graebel wanted loan advances to fund business expenses in November and December of 2016, Graebel determined what expenses to pay from the advances. *Id.* MidCap contends that its decision not to fund an advance on December 23, 2016, which was its right under the loan agreement, is not evidence as a matter of law that MidCap decided not to pay independent contractors, as merely withholding funds is not equivalent to being a statutory employer. *Id.*

In support of its position that it did not direct where funds were spent, MidCap cites deposition testimony of Gregory F. Cutlip, Sr., Graebel's chief executive officer. Dkt. 174 (citing Ex. F, App. 561). Cutlip testified that he signed the borrowing certificates for loans from MidCap. Dkt. 174, Ex. F. at App. 561. He testified that when MidCap granted an exception and loaned monies that it did not have to loan for Graebel to pay operating expenses, and the CFO or CFO representative at Graebel made the decision regarding what expenses to pay. *Id.* at App. 560–61. He testified that these expenses included payroll and independent contractor payments and that he

12

approved the global amount of funding for drivers each day.  *Id.* at App. 562.  MidCap asserts that MidCap did not take a position on how Graebel allocated funds and never directed Graebel to pay certain vendors or viewed it as its role to tie funding to particular payments.  Dkt. 174.

MidCap also cites testimony from William D. Gould (MidCap's President of Specialty Finance and corporate representative) and Kevin Sullivan (MidCap's Assistant Vice President for the Asset-Based Lending Group and portfolio manager for the Graebel loan) to support its position. *Id.*  Gould testified that "MidCap was not taking a position on how Graebel allocated funds." Dkt. 174, Ex. G at App. 582.  Gould also testified that "MidCap never directed Graebel to make payments to certain vendors" and that "MidCap did not view it as its role to pass judgment or to tie fundings to particular payments identified by Graebel."  Dkt. 174, Ex. G at App. 584.  Sullivan, who was an analyst with the portfolio group at MidCap at the relevant time, testified that neither he nor anyone else at MidCap had a role in determining which vendors were critical and needed to be paid immediately versus those who were not critical and did not need to be paid immediately.  Dkt. 174, Ex. E at App. 512; Dkt. 210, Ex. D at 12.  MidCap additionally points out that its October 12, 2016 notice of default states that any "Revolving Loans or other extensions of credit that may be hereafter made by Agent and/or Lenders to Borrowers during the continuance of Existing Defaults, are in each case in the sole and absolute discretion of Agent and Lenders . . . ."  Dkt. 174 & Ex. 2 at App. 218.

In support of their position that MidCap decided not to pay the drivers, the plaintiffs also cite the deposition of Kevin Sullivan and they cite the deposition of Ormando Gomez, who testified as the representative for the Graebel entities.  *See* Dkt. 210 & Ex. B at 9, Ex. D at 12.  Gomez testified that the week before Christmas Graebel was not going to be able to make payroll, and he was on a call between Graebel and MidCap during which MidCap was informed Graebel could not make

payroll.  Dkt. 210, Ex. B at 51.  He testified that they "went and turned to another amendment" to the credit and security agreement and were unable to execute the agreement at that time but MidCap "did let us borrow on that day for payroll."  *Id.* at 51–52.  He stated that a couple of days after this, Graebel made a request for funds to pay contractors, including drivers, via telephone, and MidCap's representative responded that he could not let Graebel "borrow this."  *Id.* at 70–71.  Gomez testified that when Graebel officially requested funds outside of the borrowing base by issuing borrowing certificates, the certificates did not include what they were borrowing the money for.  *Id.* at 72. Sullivan testified that when Graebel was not in default, funding that did not exceed either borrowing base availability or the revolving loan commitment was not discretionary, but in "[p]eriods following a default[,] funding by MidCap [was] on a discretionary basis."  Dkt. 210, Ex. D at 162.

The plaintiffs also cite an email from Bob Idzi, the interim CFO at Graebel, to Sullivan entitled "Late Funding Request," which was sent on December 23, 2016.  Dkt. 210 & Ex. D-25.  In the email, Idzi specifically stated that the request was a "late funding request," that there was a shortfall in the borrowing base of $602,000, and that the funds were needed "to provide settlement to Independent Contractors and their businesses."  *Id.*  Idzi stated that if Graebel did not receive the funding it would "immediately impact customers, clients and [Graebel's] ability to service."  *Id.* MidCap did not approve this late funding request, *see* Dkt. 210, Ex. B at 70–71, but it did approve subsequent funding requests in January relating to paying vendors, *see* Dkt. 210, Ex. J-131. Additionally, in April 2017, Sullivan sent an email asking for wiring instructions to Graebel's payroll provider as it determined it "would prefer to wire go-forward payroll fundings directly to the payroll provider."  Dkt. 210, Ex. FF.

MidCap points out in reply that Gomez testified that there were no available funds under the borrowing certificate to make payroll, and that Kevin Sullivan testified that the decisions to fund were not related to the fact the money was associated with payment of independent contractors. Dkt. 215 (citing Dkt. 210, Ex. B at 47 (Gomez Dep.), Ex. D at 128 (Sullivan Dep.)).  It thus argues that the decisions were made "irrespective of the category of expenses Graebel indicated it needed to use the loan advances to pay." *Id.*  MidCap argues that Graebel determined what expenses to pay from funds advanced by MidCap, and MidCap did not exercise any control over how Graebel used those funds. *Id.*  In support, it cites testimony from Craig Boucher, who worked for Mackinac Partners, a turnaround, restructuring, and advisory firm Graebel hired in January 2017. *Id.*  Boucher testified that "when the fundings came through, they were never specifically identified as to what the fundings were for." Dkt. 210, Ex. O at 236.  "So, once we got the dollar and we asked for money we – we would schedule out what we felt that we needed and they would fund us.  We would allocate the money within – if it was equal to what we asked for, we funded everything.  If it was less than what we asked for, we made determinations in terms of what was – you know, what was our biggest, most important payment to make." *Id.*

The court finds, viewing any disputed facts in the light most favorable to the plaintiffs, that the plaintiffs have not presented an issue of material fact that MidCap controlled how Graebel spent the funds advanced during a default.  The plaintiffs attempt to raise a suspicion that MidCap purposefully prevented the drivers from being paid by failing to fund an advance of $602,000 on December 23, 2016, *see* Dkt. 210, Ex. D-25 (late funding request email), but MidCap funded advances in December 2016 and January 2017, *see* Dkt. 174, Ex. 5 at App. 248 (loan ledger), and there is no evidence that MidCap directed where those funds would go.  It was up to Graebel to

15

allocate the funds.[4]  The plaintiffs state that MidCap was involved in and determined Graebel's ability to make or miss payroll after the December 23, 2016 refusal to let Graebel borrow funds to pay the drivers, and that in April 2017 MidCap "even directed Mackinac Partners to allow MidCap to make the Graebel Entities' payroll directly." Dkt. 210 at 29.  However, their evidence is, first, an email indicating that MidCap wanted to discuss the tracking summary to "better understand the $3mm of critical vendor payments and the $6mm of projected collections." Dkt. 210, Ex. J-131. Certainly, MidCap was involved in decisions on whether to fund, but the evidence indicates that MidCap funded the $3 million discussed in this email, so the email is not probative regarding MidCap declining to pay drivers.  MidCap, as the lender, was involved in deciding whether to lend money, but if it did not direct who to pay.  The decision on whether to lend or not to lend, at least under the evidence presented in this case, does not make it an employer.  The second exhibit cited regarding directing Mackinac to fund payroll is an email in which MidCap requests wire instructions for Graebel's payroll provider in April 2017.  Dkt. 210, Ex. FF.  It is possible that a jury could infer from this email that MidCap had a role in directing where this specific loan was going.  But this does

---

[4] Gomez testified that MidCap funded over $3 million between January 3 and 13, 2017, that went to drivers through a company called Comdata. Dkt. 174, Ex. H (Gomez Dep.) at App. 627. He stated that the funds were "[o]utside of the borrowing base" and it was his understanding that "anytime they lent us money outside of the borrowing base, it was discretionary." Dkt. 210, Ex. B at 132–33.  The plaintiffs argue that this testimony supports their argument that MidCap "continued to extend discretionary capital to the Graebel Entities—over $3 million in the first half of January—but not money to pay the Graebel Drivers." Dkt. 210 at 25–26.  However, they provide no evidence that MidCap instructed Graebel not to pay the drivers with the discretionary funds.  The only evidence they provide of MidCap knowing drivers were not being paid is from the December 23, 2016 request, which the face of the email making the request acknowledges was a "late funding request." Dkt. 210, Ex. D-25.  Failing to fund a request that they knew was for the drivers one time is insufficient control for the court to conclude that MidCap was in control over the drivers' pay and that the economic realities of the relationship indicate it should be subjected to liability for the drivers' pay as a joint employer under the FLSA.

16

not demonstrate control over the drivers' pay sufficient to subject MidCap to FLSA liability as the plaintiffs' joint employer.

The court now turns to the other economic realities factors. MidCap contends it did not have the power to hire and fire the drivers, did not supervise or control the drivers' work schedules or conditions of employment, did not determine their rate or method of pay, and did not maintain their employment records. Dkt. 174 at 27–29. The plaintiffs contend that MidCap had the power to hire and fire the drivers by virtue of the fact that it had the means and was the sole decisionmaker regarding whether or not to pay the drivers. Dkt. 210 at 26. They cite *Bonnette v. California Health and Welfare Agency*, 704 F.2d 1465, 1470 (9th Cir. 1983), *overruled on other grounds by Garcia v. San Antonio Metro. Transit Authority*, 469 U.S. 528, 538, 105 S. Ct. 1005 (1985), in which the California Health and Welfare Agency (the "Agency") was found to be a joint employer of chore workers who were employed to help public assistance recipients. The Agency provided the funds to pay the chore workers, controlled their rate of pay and method of pay, and maintained employment records. 704 F.2d at 1470. Sometimes the pay went through the recipients, and the recipients had the power to hire and fire the chore workers. *Id.* at 1467–68. The Ninth Circuit found that the recipients and the Agency were joint employers. *Id.* at 1470. The plaintiffs contend this is directly analogous to MidCap's power to determine whether employees were paid by choosing whether or not to issue funds when Graebel was in default. Dkt. 210 at 27. The court disagrees, as here MidCap did not control the rate of pay or maintain employment records; it was only controlling the flow of funds.

The plaintiffs do not address any of the other economic realities factors.

The court finds that the plaintiffs have not shown that there is an issue of material fact that MidCap was a "joint employer" of the plaintiffs. Accordingly, the motion for summary judgment on the plaintiffs' FLSA claims against MidCap is GRANTED.

**B.     Veil Piercing**

MidCap contends that the plaintiffs' claims for breach of contract and fraud under their alter ego and veil-piercing theories fail as a matter of law because the plaintiffs have no evidence to support these theories under Texas law. Dkt. 174 at 13. The plaintiffs contend that Delaware law applies and that there are genuine issues of material fact as to whether Graebel's veil may be pierced to hold MidCap liable on the state law contract and tort claims. Dkt. 210 at 40. MidCap replies that Delaware and Texas apply the same tests, and both states require "'exclusive domination and control to the point that the [entity] no longer has independent significance of its own.'" Dkt. 215 at 1 (quoting *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999)).

**1.     Legal Standard: Alter Ego**

Under Texas law, as applied by the Fifth Circuit, to determine if an alter ego relationship is established, the court must consider whether:

> (1) distinct and adequately capitalized financial units are incorporated and maintained; (2) daily operations of the two corporations are separate; (3) formal barriers between management of the two entities are erected, with each functioning in its own best interests; and (4) those with whom the corporations come in contact are apprised of their separate identity. Other factors deemed important by the commentators and Texas courts are: (1) common stock ownership; (2) the method and degree of financing of the subsidiary by the parent; (3) common directors or officers; (4) separate books and accounts; (5) common business departments; (6) extent to which contracts between parent and subsidiary favor one over the other; and (7) connection of parent's employee, officer or director to subsidiary's tort or contract giving rise to suit.

18

*Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1162–63 (5th Cir. 1983) (quoting *Miles v. Am. Tel. & Tel. Co.*, 703 F.2d 193 (5th Cir. 1983)).  "Alter ego determinations are highly fact-based, and require considering the totality of the circumstances in which the instrumentality functions. . . . No single factor is determinative, [which] should be apparent from the extensive list of circumstances that courts have developed to guide alter ego determinations."  *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003).  A "corporate veil may be pierced to hold an alter ego liable for the commitments of its instrumentality only if (1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the corporate veil."  *Id.*

Delaware courts consider numerous factors in the alter ego analysis, and no single factor is determinative.  *Alberto v. Diversified Grp., Inc.*, 55 F.3d 201, 205 (5th Cir. 1995) (applying Delaware law).

> "'These factors include whether the corporation was adequately capitalized for the corporate undertaking; whether the corporation was solvent; whether dividends were paid, corporate records kept, officers and directors functioned properly, and other corporate formalities were observed; whether the dominant shareholder siphoned corporate funds; and whether, in general, the corporation simply functioned as a facade for the dominant shareholder.'"

*Id.* (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 WL 110537, at *5 (Del. Ch. Sept. 19, 1989) (quoting *United States v. Golden Acres, Inc.*, 702 F. Supp. 1097, 1104 (D. Del. 1988))).  "To prevail under the alter-ego theory of piercing the veil [under Delaware law], a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'" *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 176 (2d Cir. 2008) (quoting *Harco*, 1989 WL 110537, at *4).

19

2.	**Analysis: Alter Ego**

The plaintiffs contend that these standards are "plainly met in this case" because MidCap manipulated Graebel's corporate form to keep the drivers driving without pay so that they would continue generating revenue to enrich MidCap. Dkt. 210 at 41. They also point out that Graebel was undercapitalized and the evidence shows that it was at times wholly dependent on funding from MidCap to carry on its daily operations. *Id.* Moreover, the plaintiffs argue, the lockbox arrangement allowed MidCap to control all operating capital that Graebel would receive, and MidCap used this power to determine whether Graebel would extend credit or venture into new business areas. *Id.* at 42 (citing Dkt. 210, Ex. B-2 (the credit and security agreement) and Ex. B at 28–30).

MidCap argues that its rights as a secured lender do not subject it to alter ego liability, as even under Delaware law, the plaintiffs must show both that the entities acted as a single economic entity and that there was an element of injustice or unfairness. Dkt. 215 at 2. It points out that Delaware courts pierce the corporate veil only in exceptional circumstances. *Id.* (citing *In re Opus E., LLC*, 528 B.R. 30, 57 (Bankr. D. Del. 2015)).

This is not an exceptional case that merits piercing the corporate veil. A traditional arrangement of lending an entity money when it is having financial difficulty should not subject the lender to alter ego liability. While the evidence indicates that Graebel would not have been able to continue to operate during the relevant time period without the infusion of money daily from MidCap, there is no evidence to support the idea that MidCap exercised complete control over Graebel with regard to the drivers' pay and was in complete control of how the funds were spent and how Graebel's business was operating. And there is no evidence to support the idea that MidCap's decisions during the relevant time period were unjust. The December 23, 2016 example in which

20

MidCap did not loan funds that Graebel specifically requested so that it could pay drivers, which was a late funding request, is not sufficient to raise and issue of material fact that MidCap should be subjected to alter ego liability.[5]  MidCap's motion for summary judgment on the breach of contract and fraud claims pursuant to an alter ego theory is GRANTED.

### 3.      Agency

With regard to agency, MidCap argues that the plaintiffs' theory that Graebel was MidCap's agent fails because (1) MidCap did not direct Graebel to make any misrepresentations to the plaintiffs; (2) MidCap did not tell Graebel who to pay or not to pay; (3) MidCap did not control Graebel's finances; (4) even if MidCap had control over Graebel's finances, which it denies, the alleged control does not relate to the allegation that MidCap directed Graebel to defraud the plaintiffs.  Dkt. 174 at 18–19.  The plaintiffs do not address the agency theory in their response to MidCap's motion for summary judgment except for to conclude that "MidCap had complete financial control over the Graebel Entities and the Graebel Entities acted as [MidCap's] alter ego and agent."  Dkt. 210 at 42.

### 4.      Legal Standard: Agency

Under Texas law, the "essential element of an agency relationship is the right of control." *In re Carolin Paxson Advertising, Inc.*, 938 F.2d 595, 598 (5th Cir. 1991).  Under Delaware law, "[i]n order to determine whether or not a sufficient degree of control exists to establish an agency relationship, the Court must look to a wide variety of factors, such as stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries

_____

[5]   While admittedly the timing is reminiscent of Charles Dickens' *A Christmas Carol*, MidCap had no obligation to fund a late request simply because it was the holiday season.

and expenses, and origin of subsidiary's [or alleged agent's] business and assets." *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 841 (D. Del. 1978).

**5.    Analysis: Agency**

The court has already determined that there is not an issue of material fact with regard to control of payment to the drivers.  *See also* Dkt. 174, Ex. G (Gould Dep.) at App. 597, 599–600 (testifying that MidCap and Graebel had different management, separate daily operations, and did not share tax filings, and MidCap did not direct Graebel to stop paying drivers, did not have the right to hire and fire drivers, did not set the drivers' pay, could not enter into contracts of behalf of Graebel, and could not control Graebel's capital expenditures or allocation of capital).  Thus, the motion for summary judgment on the plaintiffs' claims against MidCap based on an agency theory is GRANTED.

**C.    Conspiracy**

MidCap next argues that the plaintiffs' conspiracy claim fails because there is no evidence that MidCap had an agreement with Graebel to defraud the drivers or evidence that there was any intent to defraud.  Dkt. 174.  Additionally, MidCap argues that the plaintiffs have no evidence of an unlawful, overt act in furtherance of the alleged conspiracy.  *Id.*

The plaintiffs state that it is no surprise that MidCap's witnesses deny that they had anything to do with the alleged fraud on the drivers.  Dkt. 210 at 31.  They assert, however, that MidCap knew where the money was coming from and made a conscious decision not to pay the drivers knowing that MidCap was the sole beneficiary of Graebel's fraud.  *Id.* at 32.  They contend that MidCap's knowledge that the drivers were not paid establishes them as co-conspirators.  *Id.*  They point out that whether an entity participated in fraud is a question of fact and in order to proceed they need

22

only show that a reasonable jury could conclude that Graebel and MidCap shared a conspiratorial objective. *Id.* (citing *United States ex rel. Reagan v. E. Tex. Med. Ctr. Reg'l Healthcare Sys.*, 274 F. Supp. 2d 824, 857 (S.D. Tex. 2003)).

The evidence is that Graebel sought funds to pay the drivers on December 23, 2016, in an admittedly late funding request, and MidCap did not approve it. The plaintiffs have provided no evidence that raises an issue of material fact that MidCap had anything to do with Graebel's decisions not to pay drivers at other times, and there clearly was not an agreement to fail to pay the drivers on December 23 because Graebel expressly said it wanted the funds to pay the drivers. There is not enough evidence for a reasonable jury to conclude there was a shared conspiratorial objective. Accordingly, the motion for summary judgment on the conspiracy claim is GRANTED.

**D.      Aiding and Abetting**

The plaintiffs claim that MidCap aided and abetted Graebel in its fraud by failing to allocate and make capital available to pay the drivers. Dkt. 164. MidCap argues that this court may not entertain the plaintiffs' aiding and abetting claim because the cause of action has not been recognized by Texas courts. Dkt. 174 (citing *In re DePuy Orthopaedics, Inc., Pinnacle Hip Implant Prods. Liab. Litig.*, 888 F.3d 753, 781–82 (5th Cir. 2018)). The plaintiffs argue that all they must prove to establish their aider and abettor claim is that MidCap "'with wrongful intent, substantially assisted and encouraged a tortfeasor in a wrongful act that harmed the plaintiff.'" Dkt. 210 (quoting *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 225 (Tex. 2017)). They assert that MidCap approved management plans for Graebel that allocated less and less revenue to the drivers, while assuming that revenue (which came from the drivers) would remain constant. *Id.* They argue that "[t]here is no question that MidCap encouraged the Graebel Entities to cut costs and

23

not pay the drivers, both in the fall of 2016 when the driver payroll crises first arose, and through March 2017 until the Graebel Entities closed their doors." *Id.* In reply, MidCap asserts that the plaintiffs failed to address their argument that aiding and abetting is not a cognizable Texas claim and that summary judgment should thus be entered in MidCap's favor. Dkt. 215.

In *In re DuPuy Orthopaedics*, the Fifth Circuit noted that the "Texas Supreme Court 'has not expressly decided whether Texas recognizes a cause of action for aiding and abetting,'" and a federal court "[w]hen sitting in diversity . . . exceeds the bounds of its legitimacy in fashioning novel causes of action not yet recognized by the state courts." 888 F.3d at 781 (quoting *First United Pentecostal Church of Beaumont*, 514 S.W.3d at 224). In *First United Pentecostal*, the case on which the plaintiffs rely, the Texas Supreme Court pointed out that it had not decided whether to recognize the cause of action and declined to address whether the claim did exist because the parties had not briefed the question. 514 S.W.3d at 224. Instead, the court assumed without deciding that the cause of action existed. *Id.* Here, MidCap did bring up the issue, and the court therefore must address it. And, it must find, as the Fifth Circuit did after considering *First United Pentecostal*, that it is inappropriate for this court to recognize the claim when the Texas Supreme Court has not yet done so. Accordingly, MidCap's motion for summary judgment on the aiding and abetting claim is GRANTED because no such claim has been expressly recognized by the State of Texas.

**E.      Quantum Meruit**

MidCap argues that the plaintiffs may not recover in quantum meruit because the services at issue are covered by express contracts. Dkt. 174. It asserts that this rule applies whether the party is seeking to recover from the other contracting party or from a third party not associated with the original contract but benefitting from the contract. *Id.* (citing *Karna v. BP Corp. N. Am.*, 11 F. Supp.

3d 809, 819 (S.D. Tex. 2014). Additionally, MidCap contends that even if the plaintiffs could assert a quantum meruit claim, they could not establish the elements because MidCap did not use, accept, or enjoy the plaintiffs' services as drivers and had no knowledge that they expected MidCap to pay them for their driving services. *Id.* It acknowledges that it indirectly benefitted from the services, but it contends that the benefit was insufficient as a matter of law for the plaintiffs to recover from MidCap. *Id.*

The plaintiffs did not address the quantum meruit arguments in their response, and MidCap argues in its reply that this failure is a waiver of the plaintiffs' quantum meruit claim. Dkts. 210, 215. The court agrees that the plaintiffs have waived any arguments that there is an issue of material fact with regard to the quantum meruit claim against MidCap. Accordingly, MidCap's motion for summary judgment on the quantum meruit claim is GRANTED.

## V. CONCLUSION

MidCap's motion to strike (Dkt. 216) is GRANTED IN PART AND DENIED IN PART as detailed above. MidCap's motion for summary judgment (Dkt. 173) is GRANTED. All claims against MidCap are DISMISSED WITH PREJUDICE. The court will issue a final judgment concurrently with this memorandum opinion and order.

Signed at Houston, Texas on August 29, 2019.

_____
Gray H. Miller
Senior United States District Judge

25